UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LV, RC, AD, NA, ADJ, YG, LO, AP, RLB, RD, and JYW, individually; and VSG, HR, CW, SS, MG, MS, ST, RZ, MC and JP, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   -against-<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION; NEW YORK CITY BOARD OF EDUCATION; JOEL KLEIN, in his individual and official capacity as Chancellor of the New York City School District,<br><br>        Defendants. | ECF CASE<br><br><br><br>No. 03 Civ. 9917 (RJH) |

**DECLARATION OF MIRANDA JOHNSON IN SUPPORT OF PLAINTIFFS' APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS**

      MIRANDA JOHNSON, an attorney duly admitted to practice before this Court, hereby declares, under penalty of perjury, as follows:

      1.     I am a member of the bar of this Court and a staff attorney at Advocates for Children of New York, Inc. ("AFC"). AFC and Milbank, Tweed, Hadley & McCloy LLP ("Milbank") represent Plaintiffs and the Class in the above-captioned action.

      2.     I respectfully submit this declaration in support of Plaintiffs' application for an award of their attorneys' fees and costs, pursuant to (i) paragraphs 41 and 42 of the Stipulation and Agreement of Settlement entered into and filed by the parties on December 11, 2007 (the "Stipulation"), which was approved by this Court in a final order entered on April 10, 2008, (ii) 20 U.S.C. § 1415(i)(3), and (iii) 42 U.S.C. §1988(b). A true and correct copy of the Stipulation is annexed to the Declaration of Douglas Henkin as Exhibit A. Capitalized terms not defined herein have the meanings set forth in the Stipulation.

3.     This declaration is based on my personal knowledge, my consultation with colleagues at AFC and Milbank, and a review of documents relating to this action. This litigation was filed in 2003, so many of the attorneys who initially worked on the case no longer work at AFC. My knowledge of the work performed by attorneys before I worked on the litigation is based upon my review of the time sheets of those attorneys, my knowledge of the case, my review of case documentation, and discussions with current and former AFC attorneys and support staff regarding the history of the litigation.

4.     The Stipulation requires Defendants to pay Plaintiffs' attorneys' fees and costs relating to prosecution of this action and to the enforcement of the settlement. With respect to the attorneys' fees and costs relating to the enforcement of the settlement, the Stipulation contemplates payment of attorneys' fees and costs yearly in arrears.

5.     The Stipulation provides that, before asking the Court to award attorneys' fees and costs, Plaintiffs would negotiate with Defendants in an effort to agree on such attorneys' fees and costs. Although Plaintiffs tried to negotiate in good faith with Defendants for an extended period of time and submitted several proposals to Defendants, no agreement was reached, making this application necessary to effectuate the Stipulation.

6.     Because Plaintiffs' efforts to negotiate a resolution of their request for attorneys' fees and costs extended past the time when the Stipulation called for the first application for attorneys' fees and costs relating to enforcement of the settlement, this application covers three distinct areas:

- This application covers the period from February 20, 2004, through and including June 30, 2008. This period includes time litigating the case, and time spent negotiating and implementing the settlement through the effective date. Although AFC performed work on the case in 2003, including investigating and drafting the complaint, AFC's records of attorney time during that period have been lost. This

2

application therefore does not seek fees for the substantial amount of work that AFC's attorneys performed prior to February 20, 2004.

- The application includes attorneys' fees and costs relating to enforcement of the settlement through and including June 30, 2008.[1]

- Finally, the application also includes attorneys' fees and costs for AFC's work in preparing this fee application, through June 18, 2009.[2]

## FACTORS RELEVANT TO THIS APPLICATION

7.      The complaint alleged that Impartial Hearing Orders and Stipulations of Settlement placed on the record (together, "Orders") were not enforced and implementation did not occur in a timely, effective, and comprehensive manner in part because Defendants lacked an effective policy and procedures to effectuate the timely and efficient enforcement of Orders. Plaintiffs further alleged that Defendants had not developed or maintained a system to ensure that all Orders were enforced in a timely and comprehensive manner or to track and monitor Orders for the purposes of ensuring timely enforcement.

8.      By Memorandum and Order dated September 15, 2005, the Court certified a class under Fed. R. Civ. P. 23(b)(2). On December 27, 2007, the Court amended the class definition to be the Injunctive Relief Subclass and the Compensatory Relief Subclass (together, the "Class"). On April 10, 2008, the Court entered an order granting final approval for the settlement contemplated by the Stipulation, and judgment was entered on April 11, 2008. The

---

[1] As set forth in paragraph 42 of the Stipulation, Plaintiffs reserve the right to apply for attorneys' fees and costs relating to enforcement of the settlement in separate applications. However, because Plaintiffs are asking the Court to set the hourly rates to be applied to all future fee applications in this case in this application, it is Plaintiffs' hope that, to the extent any future applications are necessary, they will need to focus only on the amount of time and expenses incurred and not what Milbank and AFC's hourly rates should be.

[2] Plaintiffs will seek the balance of AFC's fees falling into this category in future fee applications, if necessary.

Court's order became Final on May 27, 2008, and the Effective Date of the settlement was June 1, 2008.

9.     The Stipulation provides for compensatory relief to members of the Compensatory Relief Subclass in the forms of vouchers for compensatory educational services and reimbursement for out-of-pocket expenses spent on educational services. As of May 27, 2009, the Independent Auditor had approved a total of 213 vouchers, 136 of which were $8,000 vouchers, 67 of which were $15,000 vouchers, one of which was a $4,000 voucher, and nine of which were $1,000 vouchers, for a total of $2,106,000 in vouchers for educational services. An additional $52,146.60 in reimbursements to 17 parents has been approved. Collectively, the value of vouchers and reimbursements approved to date is $2,158,146.60.

10.     The Stipulation provides for injunctive relief to members of the Injunctive Relief Subclass. An Independent Auditor appointed by the Court (Daylight Forensic & Advisory LLC ("Daylight")) has begun monitoring and reporting on whether the DOE meets certain benchmarks for implementing Orders within certain limited time frames.

11.     On June 11, 2009, Daylight issued its report for the First Benchmark Period, which spanned June 1, 2008 and November 30, 2008. A true and correct copy of the First Benchmark Report is annexed hereto as Exhibit A. To comply with the First Benchmark, the DOE must have Timely Implemented either 70% of Orders and 75% of Action Items or 70% of Action Items and 75% of Orders. *See* Stipulation ¶ 4(a). Daylight found that the DOE failed to meet the First Benchmark by a significant margin. Daylight's review showed that the DOE Timely Implemented just 51.6% of Orders counted during the First Benchmark period. *See* Exh. A, at 8. Daylight also found that the DOE implemented only 33.1% of Payment Orders and 66.1% of Service Orders counted during the First Benchmark period. *Id.*

12.     Daylight's benchmark and quarterly reports also contain information designed to help the DOE to more effectively implement Orders in the future.  For example, Daylight analyzed which geographic areas have the most problem implementing Orders and which specific types of Action Items are least often Timely Implemented.  *See id.*, at 17-19.

### WORK PERFORMED BY AFC

13.     AFC is a nonprofit organization dedicated to ensuring access to the best education New York City can provide for all students.  For over 37 years, AFC has been working with low-income families in New York City to secure quality and equal public education services for their children.  AFC provides a range of direct services, including free individual case advocacy, technical assistance, and trainings, and also works on institutional reform of educational policies and practices through advocacy and litigation.  AFC has filed a number of federal class action lawsuits on behalf of New York City students to ensure that they receive appropriate education, including *D.S.  v. New York City Department of Education*, No. 05-4787 (JBW)(CLP) (E.D.N.Y.); *J.G.  v. Mills*, No. 04-5415 (ARR)(SMG) (E.D.N.Y.); *E.B. v. New York City Department of Education*, No. 02-5118 (CPS)(MDG) (E.D.N.Y.); *Ruiz v. Pedota*, No. 03-0502 (JBW)(ASC) (E.D.N.Y.) and *Jose P.  v. Mills*, No. 79-270 (ERK)(SMG) (E.D.N.Y.).  AFC also provides free legal representation in special education matters at all levels, including impartial hearings, to hundreds of low-income parents of students with disabilities each year.  As a result of its work, AFC is recognized throughout the field for its expertise and leadership on matters involving the rights of special education students in New York City.

14.     This action was filed in December 2003 by AFC.  Elisa Hyman, AFC's then Deputy Director, was the lead AFC attorney on this litigation from the pre-complaint investigation and filing of the complaint to her departure from AFC in 2005.  Shawn Morehead,

AFC's Director of Litigation until November 2008, replaced Ms. Hyman as the lead attorney in 2005. I began working on this litigation as a staff attorney in October 2007. Rebecca Shore, AFC's current Director of Litigation, became the lead AFC attorney in this case in November 2008.

15.     Because of the complex nature of this class action and AFC's limited resources, AFC determined that it required the resources that a large law firm could bring in order to effectively prosecute the case. It is unlikely that a small firm or sole practitioner could have provided AFC with the support it needed to litigate this case on behalf of Plaintiffs and the Class. Accordingly, Milbank joined AFC in March 2004 as co-counsel for Plaintiffs and the Class. The work was divided equally between AFC and Milbank. In particular, because of its expertise in the subject matter, AFC was primarily responsible for communication with Class Members, certain aspects of the process for reviewing discovery produced by Defendants, and certain aspects of communication with Defendants. In addition, AFC contributed its vast knowledge of the subject matter to discovery, court briefs and settlement negotiations. AFC did not duplicate any work performed by Milbank.

16.     The legal work performed by AFC in this complex class action included substantial pre-complaint investigation, the drafting of the complaint and a motion to intervene and amend the complaint, a motion for a temporary restraining order, numerous highly contested discovery disputes, contested motions for class certification, creating and responding to a sampling proposal, a motion to compel, an opposition to a motion to dismiss, substantial discovery, several unsuccessful attempts to negotiate a settlement, and ultimately the negotiation and implementation of a complex, heavily negotiated settlement. AFC at all times sought to

conduct its representation of Plaintiffs as efficiently and economically as possible within the boundaries of its obligation to pursue Plaintiffs' claims zealously.

17.    Plaintiffs filed two motions to certify a class (one in February 2004 and a renewed motion in October 2004). Plaintiffs also successfully defended against a motion to dismiss in 2004. The motion to dismiss was denied and the class was certified in September 2005.

18.    AFC spent a considerable amount of hours in this case on discovery. To the extent that Defendants produced documents, AFC attorneys and staff reviewed the documents to determine whether Orders were being implemented. Defendants fought hard to limit the documents produced and witnesses deposed as much as possible and failed, on numerous occasions, to satisfy their discovery obligations. The declaration of my co-counsel, Douglas Henkin, details the additional time and resources that AFC and Milbank had to devote to the discovery process in response to Defendants' failure to comply with their discovery obligations.

19.    Plaintiffs also took 14 depositions of current and former DOE administrators and staff, including the Director of the Bureau of Contract Aid and two employees of that office, the then-Chief Administrator of the Impartial Hearing Office, the Deputy Superintendent of Special Education Initiatives,[3] a Chairperson and Assistant Chairperson of Committees on Special Education, two Regional Implementation Liaisons, and four individuals concerning various deficiencies in the Region 9 document production. AFC took 11 depositions and second chaired an additional two depositions.

---

[3] Linda Wernikoff, Deputy Superintendent of Special Education Initiatives, was deposed twice as a Fed. R. Civ. P. 30(b)(6) witness.

20.   The intensive discussions that led to the Stipulation began in earnest after the Court set a trial date in June 2007.  Counsel for the parties then spent several months negotiating the specific terms of the settlement, meeting in-person many times at great length.

21.   Once the terms of the settlement were agreed upon, Plaintiffs prepared the initial drafts of the joint motion for preliminary settlement approval and the joint motion for final settlement approval as well as the initial drafts of the class notice and the proposed preliminary and final court orders.

22.   In addition, Plaintiffs had to file a motion for the appointment of the Independent Auditor after Defendants refused to agree to Plaintiffs' proposals for the Independent Auditor without suggesting an alternative until after Plaintiffs' motion was filed.

23.   After Defendants issued notice to the Class, Plaintiffs responded to over 800 phone calls from Class and potential Class Members concerning the settlement's injunctive and compensatory relief.  Plaintiffs' Counsel set up a "hotline" phone number at AFC that was listed in the settlement notice and claim form to assist Class Members with the claims process. Plaintiffs also assisted Class Members to apply for compensatory relief through the settlement and to respond to the Department of Education's challenges to Class Member claims.  When Plaintiffs' Counsel determined that a claimant likely had a valid claim but would be unable to respond to the DOE's challenge on his or her own, Plaintiffs' Counsel assisted in drafting the response to the DOE's challenge.  Plaintiffs worked with the Claims Administrator to respond to Class Member inquiries and ensure that compensatory relief was distributed to Class Members as soon as feasible.  In addition, Plaintiffs identified and communicated with service providers regarding the settlement and acceptance of the vouchers in order to increase the value of the compensatory relief for the Class.  Plaintiffs also worked with the Defendants, the Independent

Auditor and the Claims Administrator to resolve issues that arose during the course of the claims administration process.

24.     Throughout the litigation, the knowledge and experience of AFC's staff, as set forth in more detail below, enabled effective prosecution of this case. In particular, AFC's expertise in special education law and its knowledge of the structure and workings of the DOE enabled Plaintiffs' Counsel to devise an effective system to review the discovery materials provided by Defendants. In addition, AFC's insight into the impartial hearing process and lessons learned from settlements with the DOE of other systemic reform litigation was critical to the development of the injunctive relief and monitoring provided in the Stipulation.

## PLAINTIFFS' ATTORNEYS' FEES AND COSTS

### A.     Overview

25.     As previously noted, with regard to AFC's work on this case through June 30, 2008 and for the preparation of this fee application, Plaintiffs seek a total award of $517,901.25 for AFC's attorneys' fees, consisting of $502,732.50 in attorneys' fees and $15,168.75 for the fees of paralegal staff. Plaintiffs also seek an award of $2,572.64 in costs incurred by AFC. A summary of the AFC professional and paralegal fees for which reimbursement is sought is attached as Exhibit B, and a summary of the AFC expenses for which reimbursement is sought is provided in paragraph 61 below.

### B.     Attorney and Paralegal Staff Hours and Rates

#### 1.     Hours

26.     AFC attorneys and support staff individually record the time they spend working on litigation on daily entries in Microsoft Word and Excel spreadsheets. These entries include both the amount of time spent and a description of the work performed. Attached as

Exhibit C is a complete time detail for the AFC attorney time entries covered by this application and attached as Exhibit D is a complete time detail for the AFC paralegal time entries covered by this application. The time details provided show the attorney and paralegal work performed in this case by AFC between February 20, 2004 and June 30, 2008 and the work performed on the fee application by AFC staff through June 18, 2009.

27.   During the period of this application, AFC attorneys worked on this litigation for 1457.7 hours and members of AFC's support staff worked on this case in a paralegal capacity for 121 hours. Sarah Davison, a member of AFC's support staff who is responsible for collecting fees, collected the Microsoft Word and Excel spreadsheets detailing the work that AFC attorneys and support staff performed on this litigation. A total amount of all the attorney and paralegal hours, listed by attorney and support staff, is set forth in paragraph 29 below.

28.   AFC exercised its billing discretion and decided not to seek fees for the substantial time spent by its law interns on this case. In particular, law interns assisted class members with the claims process, answered class and potential class members' questions, and performed legal research. Plaintiffs are not seeking an award of fees for any of this work.

### 2.   Attorney Rates

29.   For the Court's convenience, the chart below shows the following for each attorney for whom compensation is sought in this application: his or her current or former position at AFC, the number of hours for which compensation is sought, year of law school graduation, and the hourly rate requested:

| Name and Current or Former Position | Total Hours For Which Compensation is Sought | Year of Law School Graduation | Requested Hourly Rate |
|---|---|---|---|
| Rebecca Shore, Current Director of Litigation | 12.2 | 1999 | $375 |
| Shawn Morehead, Former Director of Litigation | 592 | 2000 | $375 |
| Elisa Hyman, Former Executive Director | 169.8 | 1991 | $375 |
| Matthew Lenaghan, Current Deputy Director | 26.2 | 1999 | $350 |
| Randee Waldman, Former Senior Attorney | 221.9 | 1997 | $350 |
| Sarah Hechtman, Former Staff Attorney and Policy Analyst | 98.3 | 1993 | $350 |
| Miranda Johnson, Current Staff Attorney | 258.8 | 2006 | $275 |
| Maggie Moroff, Current Special Education Policy Coordinator | 0.8 | 1990 | $225 |
| Robyn Grodner, Former Staff Attorney and the Project Director of the Queens/Bronx Family Court Project | 16.3 | 1999 | $225 |
| Chris Tan, Current Staff Attorney and Director of the Juvenile Justice Project (2000) | 10 | 2000 | $225 |
| Jennifer Pringle, Current Director of NYS Technical and Education Assistance Center for Homeless Students | 8 | 2000 | $225 |
| Gisela Alvarez, Current Senior Project Director | 31.9 | 2001 | $225 |
| Jana Kosberg, Former Staff Attorney and Site Director | 9.5 | 2001 | $225 |
| Erika Palmer, Current Staff Attorney and Director of the Robin Hood Project | 7.5 | 2004 | $225 |
| Alice Rosenthal, Current Staff Attorney and Equal Justice Works Fellow | 1.4 | 2007 | $175 |
| Marcia Del Rios, Current Staff Attorney and Deutsche Bank Americas Fellow | 5.3 | 2007 | $175 |

30.     AFC's hourly rates for the attorneys above are consistent with – and indeed low for – those attorneys' qualifications and experience.  Where possible, the most junior attorney who could perform a task did so.  Below, I detail first the experience of the primary attorneys who worked on the litigation during the time period of this application and then provide a brief biographical summary of other AFC attorneys who worked on this case.

*Primary and Supervising AFC Attorneys on this Litigation*

31.     Rebecca Shore graduated *summa cum laude* from George Washington Law School in 1999, where she was a member of the Order of the Coif and Senior Projects Editor for the *George Washington Law Review*.  She was admitted in June 2000.  Ms. Shore was a law clerk for the Honorable Benson Everett Legg in the United States District Court for the District of Maryland from 1999 to 2000.  From 2000 to 2008, Ms. Shore was a litigation associate at Paul, Weiss, Rifkind, Wharton & Garrison LLP, where she represented multinational corporations and individuals in complex federal and state litigations.  She also represented individual and class plaintiffs pro bono in civil rights lawsuits against government and private entities, including *Doe v. New Yorker Hotel*, No. 03-7269 (BSJ) (S.D.N.Y).  Immediately prior to joining AFC, Ms. Shore was a staff attorney at the American Civil Liberties Union, where she represented individuals in discrimination claims brought under the Americans with Disabilities Act, Rehabilitation Act, 42 U.S.C. §1983, and state human rights statutes.  Ms. Shore has served as AFC's Director of Litigation since November 2008.  With respect to this case, Ms. Shore has overseen Plaintiffs' monitoring and enforcement of the injunctive and compensatory relief provided by the Stipulation.  Plaintiffs seek $375 per hour for Ms. Shore's time on this case.

32.     Shawn Morehead graduated with distinction from Stanford Law School in 2000, where she was a Senior Book Review Editor for the *Stanford Law Review*.  She was

12

admitted in December 2001.  Prior to joining AFC in 2004, Ms. Morehead served as a law clerk

for the Honorable Michael B. Mukasey, Chief Judge of the Southern District of New York, and

was an associate at Patterson, Belknap, Webb & Tyler LLP for three and a half years, where she

worked on commercial litigation matters.  While at Patterson, Ms. Morehead also litigated

*Bowen. v. Rubin*, No. 01-70 (NG)(SMG) (E.D.N.Y.), a civil rights case brought on behalf of

residents of an adult home for the mentally ill.  Ms. Morehead replaced Ms. Hyman as the lead

AFC attorney on this case and was AFC's Director of Litigation from December 2006 to

November 2008.  In addition to this litigation, Ms. Morehead served the lead AFC attorney on

two other federal class action law suits:  *D.S. v. New York City Department of Education* and

*E.B. v. New York City Department of Education*.  Ms. Morehead was a principle negotiator of the

court-approved settlement in *D.S.*, which included compensatory and injunctive relief for a class

of students excluded from educational services while attending high school in New York.  *See*

*generally, D.S. v. New York City Dept. of Educ.*, No. 05-4787, 2008 WL 5024911 (E.D.N.Y.

Nov. 25, 2008).  While at AFC, Ms. Morehead also represented parents and students at

suspension hearings and at impartial hearings and in IDEA proceedings before the State Review

Officer, and in federal court.  Ms. Morehead was involved in all stages of this case, including

taking eight depositions and second chaired five depositions, drafting discovery requests and

court submissions, conducting document discovery and composing a sampling proposal with the

assistance of an expert.  Ms. Morehead was also the lead AFC negotiator of the court-approved

settlement.  Plaintiffs seek $375 per hour for Ms. Morehead's time on this case.

33.     Elisa Hyman graduated from Duke University Law School in 1991, where

she also earned a Master's Degree in Economics.  Ms. Hyman was admitted in 1992.  She

worked at AFC for eight years, first as the Deputy Director and then the Executive Director.  In

addition to this litigation, while Ms. Hyman was employed by AFC, she was the lead AFC

attorney on several other federal class actions, including *D.S. v. New York City Department of

Education*, *E.B. v. New York City Department of Education*, *Ruiz v. Pedota*, and *Jose P. v. Mills*.

Before joining AFC in 1998, Ms. Hyman was Assistant General Counsel at Safe Horizon for two

years, where she focused on domestic violence and crime victim policy and served as the Queens

Child Advocacy Center planning director.  Between 1991 and 1995, Ms. Hyman worked as a

litigation associate at White & Case LLP.  Ms. Hyman researched and filed the complaint;

drafted and argued the motion to intervene and amend the complaint and the motion for class

certification; took three depositions and second chaired two depositions; and, until she left AFC,

oversaw settlement, discovery, and litigation strategy.  Plaintiffs seek $375 per hour for Ms.

Hyman's time on this case.

       34.     Matthew Lenaghan graduated from New York University School of Law

in 1999 and has been a longtime member of AFC's staff, joining the organization in 1999 as a

NAPIL (now Equal Justice Works) Fellow.  In February of 2006, he was promoted to Director of

Legal Services, in which capacity he was responsible for the supervision of all direct and legal

services provided to hundreds of clients each year.  Mr. Lenaghan has been the Deputy Director

at AFC since December of 2006.  As Deputy Director, he is responsible for the day-to-day

operations and program management of the organization.  Since 2004, Mr. Lenaghan has

represented parents of students with disabilities in the impartial hearing process approximately

110 times, and he has also represented parents in proceedings before the State Review Officer

and in federal court.  In addition to working on this case, Mr. Lenaghan represents AFC clients in

the federal class action lawsuits *J.G. v. Mills* and *Jose P. v. Mills*.  With respect to this case, Mr.

Lenaghan drafted supporting documents pertaining to Plaintiffs' motion for class certification

and Plaintiffs' response to Defendants' motion to dismiss, and he assisted with two depositions.

Mr. Lenaghan also provided oversight and input into strategic decisions throughout the course of

the litigation and, as Deputy Director, reviewed and approved the Stipulation.  Although Mr.

Lenaghan's current rate is $375, because Mr. Lenaghan was not a primary litigator on this case,

Plaintiffs are seeking a lower rate of $350 per hour for Mr. Lenaghan's time on this case.

35.     Randee Waldman graduated with honors from the University of Chicago

Law School in 1997.  Ms. Waldman worked at AFC from January 2001 to June 2006 as a Senior

Attorney.  While at AFC, in addition to working on this case and other federal lawsuits, Ms.

Waldman represented parents and students at impartial hearings and before the State Review

Officer to obtain appropriate special education services for students with disabilities, represented

students in student discipline cases, and directed the pro bono and law student intern programs.

Prior to joining AFC, Ms. Waldman was a litigation associate at Debevoise & Plimpton LLP.  In

this case, Ms. Waldman was involved in drafting submissions to the Court regarding Plaintiffs'

motion to intervene and amend the complaint and motion for class certification, was involved in

discovery and the design and implementation of the impartial hearing order database used by

Plaintiffs for discovery purposes; contributed to settlement negotiations; and helped the Lead

Plaintiffs obtain implementation of their impartial hearing orders.  Plaintiffs seek $350 per hour

for Ms. Waldman's work on this case.

36.     Sarah Hechtman graduated from Columbia Law School in 1993.  She also

holds a Master of Science in Public Policy and Administration from the London School of

Economics and Political Science.  She began working at AFC in 2004 as a Staff Attorney and

Policy Analyst.  Prior to working at AFC, Ms. Hechtman worked for two years at Children's

Rights, Inc., where she handled the litigation of federal class action civil rights lawsuits on behalf

of children in state custody in various jurisdictions. She also worked for three years in private

practice as a litigation associate at Anderson Kill & Olick, P.C. and for three years as an

Assistant District Attorney in Manhattan. With respect to this case, Ms. Hechtman was involved

with discovery and settlement negotiations. Plaintiffs seek $350 per hour for Ms. Hechtman's

work on this case.

37.     I graduated *magna cum laude* from New York University School of Law

in 2006, where I was a member of the Order of the Coif and a Root-Tilden-Kern Scholar. I also

hold a Master's Degree in Public Affairs from Princeton University's Woodrow Wilson School

of Public and International Affairs. I was admitted to the bar in February 2007. Prior to joining

AFC as a staff attorney in October 2007, I served as a law clerk to the Honorable Allyne R. Ross

in the United States District Court for the Eastern District of New York. In addition to this case,

I have worked on two other federal class action law suits while at AFC: *D.S. v. New York City

Department of Education* and *Jose P. v. Mills.* I helped negotiate the court-approved settlement

in *D.S.*, which is described in paragraph 31. *See generally, D.S.* at 2008 WL 5024911. I have

also represented parents of students with disabilities at impartial hearings and before the State

Review Officer. With respect to this case, I assisted in negotiating the settlement, communicated

with Lead Plaintiffs regarding the settlement, researched and communicated with service

providers for the compensatory relief aspects of the settlement, drafted the motion for

appointment of the Independent Auditor, and coordinated and responded to claimant inquiries

regarding the settlement and claims process. I also attended meetings and conference calls with

the Independent Auditor and Claims Administrator to provide information regarding the

settlement and advised and advocated on various issues relating to interpretation of the

Stipulation. Plaintiffs seek $275 per hour for my time on this case.

*Additional AFC Attorneys who Worked on this Litigation*

38.     A number of additional AFC attorneys worked on this litigation at various points when the demands of the case necessitated additional legal assistance. In particular, additional AFC attorneys beyond the primary and supervising attorneys identified above worked on the case in two main capacities: (1) they reviewed and analyzed impartial hearing orders produced by the Defendants during discovery, and (2) they provided legal information and advice to claimants regarding the injunctive and compensatory relief in the settlement. Although the current market rates for these attorneys' time are much higher, we are seeking lower rates for their work in this case because they performed less complex tasks relative to their experience and relative to the primary attorneys who worked on this case. Below I detail the experience and qualifications of these additional AFC attorneys who worked on this litigation.

39.     Maggie Moroff graduated from New York University School of Law in 1990. She was admitted to the bar in March 1991. Ms. Moroff started in her current position at AFC as the Special Education Policy Coordinator in 2008. Prior to joining AFC, she worked for four and a half years as a public defender/litigator in New York City (Neighborhood Defender Service of Harlem). Ms. Moroff also previously worked at AFC on special education policy issues. Ms. Moroff responded to class member inquiries regarding the settlement and compensatory relief. Plaintiffs seek $225 per hour for Ms. Moroff's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Moroff performed on this litigation and because she was not a primary or supervising attorney on this case.

40.     Robyn Grodner graduated from Benjamin N. Cardozo School of Law in 1999. She was admitted in October 2000. She began working at AFC in October 2000 and served as a staff attorney and the Director of the Queens/Bronx Family Court Project. Her work

at AFC included direct representation of students with disabilities at impartial hearings.  With respect to this case, she reviewed and analyzed impartial hearing orders produced by Defendants during discovery.  Plaintiffs seek $225 per hour for Ms. Grodner's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Grodner performed on this litigation and because she was not a primary or supervising attorney on this case.

41.     Christopher Tan graduated from Columbia Law School in 2000.  After graduating from Columbia University School of Law in 2000, Mr. Tan received a Skadden Fellowship to work for two years at the American Civil Liberties Union in California.  Mr. Tan has been at AFC since 2002 and currently directs AFC's Juvenile Justice Project.  He represents parents of court-involved youth in administrative hearings and impact litigation, conducts policy advocacy, and serves as co-counsel in the federal class action lawsuit *J.G. v. Mills*.  With respect to this case, Mr. Tan reviewed and analyzed impartial hearing orders produced by Defendants during discovery.  Plaintiffs seek $225 per hour for Mr. Tan's time on this case, a rate that is discounted due to the lesser complexity of the tasks Mr. Tan performed on this litigation and because he was not a primary or supervising attorney on this case.

42.     Jennifer Pringle graduated from Columbia Law School in 2000, where she was a Harlan Fiske Stone Scholar.  She was admitted to the bar in February 2002.  Ms. Pringle clerked for Magistrate Judge James C. Francis IV in the Southern District of New York, and she joined AFC in January 2004.  She currently serves as the Director of NYS Technical and Education Assistance Center for Homeless Students (NYS-TEACHS) at AFC.  She has approximately three and a half years of experience representing homeless parents of students with disabilities at impartial hearings.  With respect to this case, Ms. Pringle reviewed and analyzed impartial hearing orders produced by Defendants during discovery.  Plaintiffs seek

$225 per hour for Ms. Pringle's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Pringle performed on this litigation and because she was not a primary or supervising attorney on this case.

43.     Gisela Alvarez graduated from New York University School of Law in 2001, where she was Managing Editor of the *New York University Review of Law and Social Change*. She was admitted in May 2002. Ms. Alvarez joined AFC in September 2001 and currently serves as a senior project director. At AFC, she has represented parents at impartial hearings and supervised case advocacy and legal representation at impartial hearings. With respect to this case, Ms. Alvarez reviewed and analyzed impartial hearing orders produced by Defendants during discovery. Plaintiffs seek $225 per hour for Ms. Alvarez's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Alvarez performed on this litigation and because she was not a primary or supervising attorney on this case.

44.     Jana Kosberg graduated from the State University of New York-Buffalo Law School in 2001. She was admitted in February 2002. She worked at AFC as a staff attorney and site director from February 2002 to November 2005, where her responsibilities included provision of direct legal services, legal research and writing, and training parents and caseworkers to advocate for the rights of students. With respect to this case, she reviewed and analyzed impartial hearing orders produced by Defendants during discovery. Plaintiffs seek $225 per hour for Ms. Kosberg's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Kosberg performed on this litigation and because she was not a primary or supervising attorney on this case.

45.     Erika Palmer graduated *magna cum laude* from New York University School of Law in 2004, where she was a member of the Order of the Coif and an articles editor

19

for the *New York University Law Review*. Ms. Palmer joined AFC in 2004 and was admitted in March 2005. She currently serves as a staff attorney and Director of the Robin Hood Project, which provides training, technical assistance and educational case advocacy services to community-based organizations funded by the Robin Hood Foundation. At AFC, she has represented parents at impartial hearings and suspension hearings, attended numerous Individualized Education Plan (IEP) meetings, supervised attorney and non-attorney staff on special and general education casework, presented over 100 trainings on special education; and commented on draft state and federal legislation and regulations regarding special education and educational issues for children in foster care. With respect to this case, she reviewed and analyzed impartial hearing orders produced by Defendants during discovery. Plaintiffs seek $225 per hour for Ms. Palmer's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Palmer performed on this litigation and because she was not a primary or supervising attorney on this case.

46.     Alice Rosenthal graduated from Rutgers School of Law in 2007, where she was a Dean's Merit Scholar. She began working at AFC in September 2007 on an Equal Justice Works Fellowship and became a staff attorney upon admission to the bar in April 2008. At AFC, she currently represents students transitioning or aging out of foster care in New York City in special education and suspension proceedings. As an Equal Justice Works Fellow, Ms. Rosenthal's work on this case entailed responding to class member inquiries regarding the settlement and the compensatory relief. Prior to attending law school, Ms. Rosenthal worked at AFC for approximately two years as a parent advocate. Her work at that time included participation in client intakes, fact gathering, and preparation for impartial hearings, including subpoenas, disclosure, and witness preparation. In that capacity, she assisted the attorneys at

AFC to obtain enforcement of impartial hearing orders involving reimbursement for services for which parents had already paid and prospective payment for services that were ordered by impartial hearing officers.  Ms. Rosenthal worked on this case in a paralegal capacity by contributing to strategy discussions regarding this litigation, drafting a declaration in support of Plaintiffs' motion for class certification, and reviewing and analyzing impartial hearing orders. Plaintiffs seek $175 per hour for Ms. Rosenthal's work on this case as a law graduate, a rate that is discounted due to the lesser complexity of the tasks Ms. Rosenthal performed on this litigation and because she was not a primary or supervising attorney on this case.  Plaintiffs also seek $125 per hour for Ms. Rosenthal's work while a paralegal.

47.     Marcia Del Rios graduated from New York University School of Law in 2007 and was admitted to the bar in January 2008.  While in law school, she was a Root-Tilden Kern Scholar.  Ms. Del Rios is an AFC staff attorney who provides assistance and direct legal representation to immigrant families whose children are English Language Learners and/or special needs students.  With respect to this case, Ms. Del Rios responded to class member inquiries regarding the settlement and compensatory relief, primarily handling calls from Spanish-speaking parents.  Plaintiffs seek $175 per hour for Ms. Del Rios's time on this case, a rate that is discounted due to the lesser complexity of the tasks Ms. Del Rios performed on this litigation and because she was not a primary or supervising attorney on this case.

48.     As discussed in the accompanying memorandum of law, the requested rates are reasonable based on prior awards in similar cases during the last several years and the highly complex nature of this litigation.  Indeed, the requested rates are low as compared to the market rate in New York City for attorneys with similar years of experience.

### 3.   Paralegal Rates

49.   This application also seeks an award of $15,168.75 for the work performed by AFC's support staff in a paralegal capacity.  Because staff time is less expensive than attorney time, we endeavored to use support staff instead of attorneys whenever possible, thereby reducing overall litigation costs.  For example, the support staff, among other things, performed a significant part of the review of documents and Orders that the DOE produced and communicated with Class Members when possible.  The expenses AFC incurred in support staff time were essential to the efficient prosecution of this case.  AFC seeks $125 per hour for work performed by staff in a paralegal capacity.

50.   For the Court's convenience, the chart below shows the following for each staff member for whom compensation for paralegal or secretarial work is sought in this application:  his or her current or former position at AFC and the number of hours for which compensation is sought:

| Name and Current or Former Position | Total Hours For Which Compensation is Sought |
| --- | --- |
| Alice Rosenthal, Former Parent Advocate[4] | 34.1 |
| Anju Abraham, Former Outreach and Resource Associate | 48.1 |
| Sarah Davison, Current Coordinator of the Robin Hood Project | 11.7 |
| Melkis Alvarez, Current Case Manager, Robin Hood Project | 4.8 |

---

[4] As I explained above, Ms. Rosenthal worked on this case in a paralegal capacity prior to beginning law school.  *See infra* ¶ 46.  AFC is charging paralegal rates for Ms. Rosenthal's paralegal work.

| | |
|---|---|
| Rachel Kravitz, Former Program Associate | 3.15 |
| Erin O'Neill, Former Case Manager, Robin Hood Project | 2 |
| Janice Silber, Current Helpline Supervisor | 3 |
| Joanne Buccellato, Current Training Coordinator | 4 |
| Helen O'Reilly, Former Coordinator of the Juvenile Justice Project | 10.5 |

51.     Below I summarize the experience of the AFC staff who worked on this case in a paralegal capacity.[5]

52.     Anju Abraham graduated from Binghamton University of the State University of New York with a Bachelor of Arts in Political Science in 2007. She joined AFC in June 2007, where she worked as an Outreach and Resource Associate. In this case, Ms. Abraham helped track, assign and respond to calls from potential class members seeking information regarding the injunctive and compensatory relief available through the settlement.

53.     Sarah Davison graduated from Gonzaga University in 2002 with a Bachelor of Arts in Public Relations. She joined AFC in March of 2006 and serves as the Project Coordinator of the Robin Hood Project, in which capacity she provides training, technical assistance and educational case advocacy services to community-based organizations funded by the Robin Hood Foundation. Ms. Davison is also responsible for collecting all attorney and staff time for cases in which fees are awarded. Prior to working at AFC, she worked as an education liaison in an alternative to incarceration program in New York City. With respect to this case, Ms. Davison provided information to claimants regarding the

---

[5] Ms. Rosenthal's qualifications and paralegal work on this case are detailed in paragraph 46.

injunctive and compensatory relief available through the settlement and also supported the preparation of this fee application.

54.     Melkis Alvarez graduated from Harvard College in 2006 with a Bachelor of Arts in Biology.  Ms. Alvarez joined AFC in August 2006.  As a case manager in the Robin Hood Project, she helps at-risk students and parents to obtain appropriate educational and support services and trains and advises staff from Robin Hood-funded organizations in matters relating to the educational rights of students.  Ms. Alvarez provided information to claimants regarding the injunctive and compensatory relief available through the settlement, primarily handling calls from Spanish-speaking parents.

55.     Rachel Kravitz graduated from George Washington University in 2003 with a Bachelor of Arts in Political Science.  She began working as a program associate at AFC in February 2004, where her work included assisting in direct client representation at impartial hearings and litigation support, including legal research, document maintenance and court filings.  Her work in this case included maintenance of litigation files, data entry, and document service and filing.  AFC requests $125 per hour for Ms. Kravitz' work maintaining litigation files and document service and filing, which she performed in a paralegal capacity.  Ms. Kravitz also performed additional work that was secretarial in nature, for which AFC is seeking $50 per hour. *See infra* ¶ 66.

56.     Erin O'Neill graduated from George Mason University in 2000 with a Bachelor of Arts in English.  She started working in AFC's Family Court Project in January 2004 and then became a case manager in the Robin Hood Project in February 2005.  In both capacities, she worked with students and parents to help secure their rights under the IDEA and state education law.  With respect to this case, Ms. O'Neill reviewed and analyzed impartial

hearing orders and conducted data entry on discovery-related matters. AFC requests $125 per hour for Ms. O'Neill's work reviewing and analyzing impartial hearing orders, which she performed in a paralegal capacity. Ms. O'Neill also performed additional work that was secretarial in nature, for which AFC is seeking $50 per hour. *See infra* ¶ 66.

57.     Joanne Buccellato graduated in 1991 with a Master's Degree in Public Administration from Long Island University. She joined AFC in 1996 and currently serves as the Co-Director of AFC's Parent Training and Information Project, a federally funded parent center in New York City providing information and training to families of children with disabilities. With respect to this case, Ms. Buccellato reviewed and analyzed impartial hearing orders.

58.     Janice Silber has been working at AFC since 1986 and currently serves as Supervisor of AFC's Helpline. In that capacity, she coordinates and oversees the legal information that AFC provides to parents and service providers regarding general and special education-related issues. She is also a founding member and vice president of QSAC, Inc., which provides education and supportive services for students with autism. With respect to this case, Ms. Silber reviewed and analyzed impartial hearing orders.

59.     Helen O'Reilly graduated *magna cum laude* from Georgetown University with a Bachelor of Science in Foreign Service in 2003. She worked as the Juvenile Justice Project Coordinator at Advocates for Children from August 2003 to July 2006, where her work included representing parents at impartial hearings and providing legal support to AFC's federal class action litigation. With respect to this case, Ms. O'Reilly reviewed and analyzed impartial hearing orders produced by Defendants during discovery.

## C.    Office Charges and Disbursements

60.    Plaintiffs also seek reimbursement for the expenses necessarily expended in the prosecution of this action.

61.    The following chart summarizes the charges and disbursements for which Plaintiffs seek reimbursement:

| Charge or Disbursement | Amount Sought |
|---|---|
| Sampling Expert | $1000.00 |
| Interpretation Service | $153.01 |
| Westlaw Research | $282.13 |
| Secretarial | $1,137.50 |
| **Total** | **$2,572.64** |

62.    In seeking compensation for these items, AFC has not increased the price and is not seeking to make a profit on the items covered under charges and disbursements; rather, AFC is seeking our actual costs as charged by outside vendors.

63.    Expert Fees. In April 2006, AFC retained Professor Robert Tobias to review the sampling plan proposed by Defendants as described in paragraph 18 of Douglas Henkin's declaration and to advise on a counter-proposal. Professor Tobias is a Clinical Professor of Teaching and Learning and Director of the Center for Research on Teaching and Learning at the New York University Steinhardt School of Culture, Education and Human Development. He served the New York City public schools for 33 years as a teacher, researcher, and assessment specialist, retiring in 2001 as Executive Director of Assessment and Accountability. He has completed major research consulting projects for the Charter School Institute of the State University of New York, Polytechnic University and the City Council's Commission on the Campaign for Fiscal Equity. He charged $125 per hour for his services, which represents a substantial discount given his qualifications and experience. His time expenditure was also reasonable in light of the task for which he was retained. As discussed

26

above, Plaintiffs' retention of Professor Tobias was necessary because of Defendants' failures to produce documents during discovery. Professor Tobias' invoice is attached as Exhibit E.

64.    Interpretation Service. AFC uses a telephonic interpretation service, Language Learning Enterprises, Inc., when necessary to communicate with clients who are not proficient in English. AFC frequently relies on its attorneys and staff who are proficient in other languages to communicate with such clients. On other occasions, however, it is a more efficient use of attorney time to use an telephonic interpretation service. The use of this interpretation service enabled Plaintiffs' Counsel to effectively communicate with those Lead Plaintiffs and other Class Members who were not proficient in English regarding the settlement and claims process. A summary of LLE Link expenses incurred for this litigation and the vendor invoices are attached as Exhibit F.

65.    Westlaw Research. AFC used Westlaw to conduct legal research for its Court submissions and when necessary to support its strategic positions during settlement and discovery. AFC holds a monthly subscription from Westlaw, which allows the organization to conduct unlimited searches within a specified set of databases. The organization incurs an extra charge for searching legal documents outside of those databases. When staff members sign in to Westlaw, they enter the name of the litigation in a box designated for client identification. To determine the charges applicable to AFC's legal research on this litigation, AFC has procured from Westlaw a list of its searches broken down by client identification for the last 26 months.[6] AFC calculated the charge for its Westlaw usage by using the pro rata amount of the LV-related transactions, found by: (a) dividing the total market value of the monthly searches performed by

---

[6] Westlaw was unable to provide records of searches broken down by client identification for the time period preceding the last 26 months. Accordingly, AFC has not billed for its Westlaw use for that time period, which covered the filing of this case and many of the motions that were filed.

the market value of the LV-related searches to obtain the percentage of total transactions spent on LV, and (b) multiplying this percentage by AFC's actual monthly bill.[7]  A summary of Westlaw expenses incurred for this litigation and the vendor invoices are attached as Exhibit G.

66.    Secretarial Support.  These charges relate to secretarial work performed on this case by AFC support staff, which was necessary primarily to help enter data related to the discovery produced by Defendants.  AFC exercised its billing discretion to seek the lower rate of $50 per hour for this work, even though some of it was done by staff qualified to perform paralegal-level work.  AFC seeks $50 an hour for secretarial work done by its support staff.  A summary of secretarial costs incurred for this litigation and the secretarial daynotes are attached as Exhibit H.

## CONCLUSION

67.    For the reasons set forth above and in Plaintiffs' supporting memorandum of law, Plaintiffs respectfully request that this Court award them attorneys' fees and costs in the amount of $520,473.89 for AFC's work on this case and set the hourly rates for AFC's work on this case going forward at the rates requested herein, with such rates to increase 5% on January 1 of each year.

68.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2009
in New York, New York

Miranda B. Johnson

---

[7] AFC did not seek reimbursement for its Westlaw usage for months in which it did not conduct any legal research on this case.