UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LV, et al.,

       Plaintiffs,

   -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, et al.,

       Defendants.

03 Civ. 9917 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

 Before the Court is plaintiffs' motion for an award of attorneys' fees and expenses incurred in connection with a civil rights class action. The class action resulted in a settlement that this Court approved. Defendants argue that the fees and costs requested are excessive. For the reasons below, the Court awards attorneys' fees to plaintiffs in the amount of $1,238,403.09 and costs in the amount of $123,964.45.

## BACKGROUND

 The Individuals with Disabilities in Education Act ("IDEA") seeks to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). Among other things, it requires "school officials and parents of a disabled child to design an Individualized Education Program ('IEP') for each year of the child's education." *LV v. New*

*York City Dept. of Educ.*, No. 03-9917, 2005 WL 2298173, at *1 (S.D.N.Y. Sept. 20, 2005) (citing 20 U.S.C. §§ 1401(11), 1414(d)).  Under the IDEA, states must also "offer parents and disabled students procedural safeguards to challenge the decisions of local educational agencies" with respect to a child's IEP.  *Id.* at *1 (citing *Murphy v. Arlington Central School Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).  New York's procedural safeguards entitle parents to a review of their child's IEP before an impartial hearing officer ("IHO"), as well as an administrative appeal of the IHO's decision ("IHO order").  *See* N.Y. Educ. Law § 4404.

In 2003, plaintiffs brought this class action claiming that their rights had been violated by the failure of the New York City Department of Education ("DOE") to timely implement IHO orders.  They were represented by the non-profit organization Advocates for Children of New York ("AFC") and the law firm Milbank, Tweed, Hadley & McCloy LLP ("Milbank").  The Court granted plaintiffs' request for class certification.  Later it amended the class definition to include an "injunctive relief subclass" and a "compensatory relief subclass."  After protracted discovery and extensive negotiations, the parties agreed to a settlement on December 11, 2007 that provided compensatory and injunctive relief for the two subclasses.  Following a fairness hearing on April 10, 2008, the Court approved the Stipulation and Agreement of Settlement (the "Stipulation") between the class and the defendants.  The injunctive relief included a provision for the appointment of an independent auditor to monitor DOE's success in improving the implementation of IHO orders.  On March 26, 2008, the Court appointed Daylight Forensic and Advisory LLC ("Daylight") to serve as the independent auditor.

The parties agreed in the Stipulation that defendants deserve reasonable attorneys' fees and reimbursement of their expenses, and they agreed to try to negotiate a fee.  (*See* Henkin Decl. Ex. A ¶¶ 41, 42.)  In the event that negotiations proved fruitless, however, the Stipulation

allowed the plaintiffs to seek an award from this Court.  (*Id.*)  After unsuccessful negotiations on this issue, the plaintiffs filed this motion for $1,590,625.25 in attorneys' fees and $132,705.93 in expenses.  They seek $1,072,724.00[1] for work performed by Milbank and $517.901.25 for work performed by AFC, and $130,133.29 for expenses incurred by Milbank and $2,572.64 for expenses incurred by AFC.

## DISCUSSION

The parties have agreed that plaintiffs are entitled to reasonable attorneys' fees and costs. (*See* Stip. ¶¶ 41, 42.)  It is plaintiffs' burden to establish "with satisfactory evidence—in addition to the attorney's own affidavits"—why their requested fee is appropriate.  *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1059 (2d Cir. 1989).  The "starting point" for calculating a reasonable attorneys' fee is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Imbeault v. Rick's Cabaret Int'l Inc., RCI*, No. 08-5458, 2009 WL 2482134, at *1 (S.D.N.Y. Aug. 13, 2009) (Lynch, J.) (quoting *Hensley v. Eckerhard*, 461 U.S. 424, 433 (1983)).  The resulting figure is the "presumptively reasonable fee," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008), although it evidently "can be further adjusted as circumstances warrant," *McDow v. Rosado*, 657 F. Supp. 2d 463, 467 (S.D.N.Y. 2009).[2]  Here, the defendants challenge plaintiffs' rates and hours and raise a few other miscellaneous objections.

---

[1] There is a minor discrepancy between Milbank's numbers and the Court's.  Multiplying Milbank's requested rates (as found on pages 11 and 15 of the Henkin Declaration) by its hours (as found in Exhibit D of the Henkin Declaration) yields a fee of $1,072,807.00 for Milbank.  Milbank requests $1,072,724.00, which is $83.00 lower than that.  The Court will apply its reductions to Milbank's number—the lower amount.
[2] This Court has discussed elsewhere the Second Circuit's recent departure from use of the term "lodestar" in favor of the "presumptively reasonable fee."  *See McDow v. Rosado*, 657 F. Supp. 2d 463, 467–69 (S.D.N.Y. 2009).

## I.     Rates

A reasonable hourly rate is the rate a "paying client would be willing to pay."[3] *Arbor Hill*, 522 F.3d at 190.  In determining the rate, courts should consider, among other things, the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989).[4] *See Arbor Hill*, 522 F.3d at 187.  They should take into account the reality that "a paying client wishes to spend the least amount possible to litigate the case in an effective manner." *Kahlil v. Original Old Homestead Restaurant, Inc.*, 657 F. Supp. 2d 470, 475 (S.D.N.Y. 2009).  Courts may also rely on their "own knowledge of comparable rates charged by lawyers in the district." *Robinson v. City of New York*, No. 05-9545, 2009 WL 3109846, at *4 (S.D.N.Y. Sept. 29, 2009) (Lynch, J.) (internal quotation marks and citation omitted).  "[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment . . . ." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).[5]  Those rates, however, should still take into consideration "the varying level of experience of the lawyers over the course of the litigation." *Davis v. New York City Hous. Authority*, Nos. 90-628, 92-4873, 2002 WL 31748586,

---

[3] It bears noting that this metric is inherently inexact, and particularly so when applied to class actions, where each class member's stake is relatively small and would never be thought to justify the rates or hours class counsel actually receive for their services.

[4] The *Johnson* factors are:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

[5] Plaintiffs ask that the rates the Court awards "be increased by 5% on January 1 of each year while the Stipulation is in effect."  (Johnson Decl. ¶ 28.)  The Court declines that invitation.  Plaintiffs will of course be entitled to reasonable fees, at current rates, for work they perform in connection with this litigation in the future.  But while as a general matter "billing rates continue to increase over time," *Wise v. Kelly*, 620 F. Supp. 2d 435, 448 (S.D.N.Y. 2008), it would be a mistake to think rates will increase each year in the way plaintiffs assume.  Market forces work in sometimes unpredictable ways. *See, e.g.*, Nathan Koppel & Ashby Jones, *"Billable Hour" Under Attack*, Wall St. J., Aug. 24, 2009, at A1 (describing recent pressure from in-house counsel for large firms to shift to alternative fee arrangements).

at *2 (S.D.N.Y. Dec. 6, 2002); *Marisol A. v. Giuliani*, 111 F. Supp. 2d 381, 387 n.2 (S.D.N.Y. 2000) ("Each attorney should receive fees based on the average of his or her level of experience over the course of the litigation, as opposed to their current level of experience.").[6]

The reasonable hourly rate is determined "by reference to prevailing rates in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation." *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension*, 450 F.3d 91, 97 n.6 (2d Cir. 2006) (citations and alterations omitted).  The Second Circuit has said that "[t]o define markets simply by geography is too simplistic. Sometimes, legal markets may be defined by practice area." *Arbor Hill*, 522 F.3d at 192.  Even according to that principle, however, determining the relevant market for the legal services provided in this case is far from simple.  To be sure, this was a civil rights lawsuit, which counsels in favor of awarding rates of the sort lawyers generally garner in that substantive area of practice.  But civil rights lawyers, like lawyers in other areas of practice, do not all perform similar services and are not all of comparable skill, expertise, and reputation.  Milbank and AFC represented a class of plaintiffs in a class action alleging systemic violations of state and federal statutes and federal constitutional

---

[6] Without citation to any authority, plaintiffs suggest that this rule may not have survived *Arbor Hill* and that their lawyers should be entitled to current levels of experience, even if they only worked on this case as much less experienced lawyers.  The Court sees no reason the rule would have died with *Arbor Hill*; nor do plaintiffs supply one.  As the court put it in *Davis v. New York City Housing Authority*, "an attorney who starts a litigation as a first-year associate and continues with that litigation over the course of a decade, should not then be entitled to be billed out as a tenth-year associate (or lower-level partner) for the entire span of the litigation." *Davis v. New York City Hous. Authority*, Nos. 90-628, 92-4873, 2002 WL 31748586, at *2 n.4 (S.D.N.Y. Dec. 6, 2002).  Plaintiffs also argue that defendants' method should not be used because "[d]efendants do not explain who they think is deserving of lower rates, why, or how such rates would be determined." (Pltfs.' Reply 10 n.49.)  To the contrary, defendants state—presumably based on the records that plaintiffs provided to them—each attorney's level (or levels) of experience when working on this case. (*See* Defs.' Br. 21–23.)  Plaintiffs do not dispute the veracity of that information.  The Court will simply use the average of each attorney's experience levels while working on the case.  Where a lawyer worked on the case as a first-, second-, and third-year associate, for example, his or her level of experience will be deemed that of a second-year.

law.[7]  The matter was factually and logistically challenging to say the least.  It involved a

substantial amount of discovery, particularly because DOE had no centralized system for

documenting its implementation of IHO orders.  (*See* Defs.' Br. 20.)  It required plaintiffs'

lawyers to collect, organize, and analyze a very large number of documents to assess how well

DOE had implemented IHO orders.  And it occasioned the use of statistical analysis, because

during discovery defendants proposed using statistical sampling to retrieve certain representative

documents without having to produce them all.  In short, viewed on the spectrum of civil rights

cases, this case was much more complex than the ordinary single-plaintiff lawsuit.

As the particular challenges of this litigation underscore, there are at least two

overlapping markets here—one for the provision of complex class action legal services, the other

for the provision of civil rights legal services.  In measuring the reasonableness of plaintiffs'

hourly rates, it would be a mistake to seek guidance from one of these markets to the exclusion

of the other.  Accordingly, the Court finds it appropriate to look to rates courts in this district

have awarded in similarly complex civil rights cases, remembering that lawyers with the skills

and resources necessary to litigate this case generally command higher rates.  *Cf. Arbor Hill*, 522

F.3d at 184 (in determining reasonable hourly rates, district court may consider, among other

things, "the complexity and difficulty of the case, the available expertise and capacity of the

client's other counsel (if any), [and] the resources required to prosecute the case effectively").

With these observations in mind, the Court turns to the alleged deficiencies in Milbank's and

AFC's requested rates.

---

[7] The action was brought pursuant to the due process clause of the Fourteenth Amendment; IDEA; 42 U.S.C. § 1983; Section 504 of the Rehabilitation Act of 1972, 29 U.S.C. § 794; and New York State Education Law §§ 4401, *et seq.*

A.      **Milbank Lawyers**

Defendants contend that Milbank's fees should be reduced because none of its attorneys working on this case has professed to have any experience in civil rights or education law. (Defs.' Br. 6.)  Even if that is true, however, experience in the substantive field of law is only one way to assess lawyers' skill and expertise.  A class action like this one requires a large number of skills, many of them unrelated to intimate knowledge of the relevant law.  *See Simmonds v. New York City Dept. of Corrections*, No. 06-5298, 2008 WL 4303474, at *4 (S.D.N.Y. Sept. 16, 2008) (although putative civil rights plaintiffs might be unwilling to pay a large law firm its usual rates, they might well pay a reduced rate to take advance of the firm's "expertise in federal litigation and trial practice").  On this point *Robinson v. City of New York*, No. 05-9545, 2009 WL 3109846 (S.D.N.Y. Sept. 29, 2009), is instructive.  There, Judge Lynch found that employment discrimination lawyers' experience was "wholly transferable and relevant" to a civil rights case.  *Id* at *5.  The case involved no "difficult or novel issues in employment law, but rather was proved through an assiduous review of numerous records"; the skills required were "investigative and trial-oriented, not conceptual or based in expertise in substantive law."  *Id.*  So too here, where the case's particular complexity stemmed more from "logistical and factual" concerns*, id.*, than from difficult legal issues.  *See Wise v. Kelly*, 620 F. Supp. 2d 435, 446 (S.D.N.Y. 2008) (stating that the large law firm Skadden, Arps, Slate, Meagher and Flom LLP, litigating a civil rights case pro bono, was entitled to higher rates than a small civil rights firm by virtue of its "skills and experience").

The defendants also object to Milbank's use of the rates other large Manhattan firms charge their paying clients in calculating its own rates for this case.[8]  Milbank argues that these

---

[8] Defendants separately argue that Milbank's fees should be reduced to account for the fact it represented plaintiffs pro bono.  (Defs.' Br. 12–14.)  But although *Arbor Hill* said that "whether [an] attorney was initially acting pro

rates are of some relevance to show what a paying client would pay for large-firm services of the

sort they provided in this litigation—that is, representation of clients in a complex class action.

(Pltfs.' Reply 12 n.59.)  This is one guidepost for the Court in assessing rates in a class action

like this one, but it should not be untethered entirely from the civil rights litigation market.  *See*

*Arbor Hill*, 522 F.3d at 184 n.2 (quoting *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d

496, 506 (2d Cir. 1980) ("The fees that would be charged for similar work by attorneys of like

skill in the area [is] the starting point for determination of a reasonable fee award.")); *Morris v.*

*Eversley*, 343 F. Supp. 2d 234, 247 (S.D.N.Y. 2004) (Chin, J.) ("Although one could debate

whether substantially higher rates are warranted for a corporate lawyer with the same number of

years experience as a civil rights lawyer, the fact is the markets and billing considerations are

different.").  Though the services Milbank provided in this action are in many ways comparable

to the services plaintiffs' lawyers provide in litigating securities class actions, the Court must

also take into account the particularities of the civil rights litigation market.  *See Heng Chan v.*

*Sung Yue Tung Corp.*, No. 03-6048, 2007 WL 1373118, at *3 (S.D.N.Y. May 8, 2007) ("[A]

discount in fees is appropriate insofar as the market rate for civil rights litigation services is

lower than the market rate for services provided to high-profile corporate clients.").  Milbank

---

bono" is a factor courts should take into account in determining what a paying client would pay, *Arbor Hill*, 522 F.3d at 184, it also emphasized that attorneys representing clients pro bono are "not excluded from the usual approach to determining attorneys' fees" and that a reasonable fee "does not depend on whether the attorney works at a private law firm or a public interest organization."  *Id.* at 184 n.2.  Put differently, law firms working on a case pro bono are likely to be doing so in a market for legal services with lower rates, and courts should take that fact into account in deciding what the market is.  *See Simmons*, 2008 WL 4303474, at *3 ("*Arbor Hill* merely directs the district courts to examine all of the case-specific factors relevant to evaluating the market rate for comparable legal services.").  *Reiter v. MTA New York City Transit Authority*, 457 F.3d 224, 233 (2d Cir. 2006) ("courts 'must avoid . . . decreasing reasonable fees because the attorneys conducted the litigation more as an act of pro bono publico than as an effort at securing a large monetary return'") (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)).  But, as the court in *Heng Chan* said, in a passage the defendants quote, "the fact that an attorney is willing to take a case pro bono is not itself a basis for reducing fees."  (Defs.' Br. 13 (quoting *Heng Chan v. Sung Yue Tung Corp.*, No. 03-6048, 2007 WL 1373118, at *3 (S.D.N.Y. May 8, 2007)).)  In the same vein, that one of Milbank's lawyers garnered an award for his pro bono service (*see* Defs.' Br. 14) is not in itself a basis for reducing fees.  The fact that the market for pro bono litigation services is different from that for private litigation services is important, but Milbank has already accounted for it by discounting its rates.  (*See* Pltfs.' Br. 18.)

candidly recognizes this distinction and has itself proposed a rate structure that is markedly below that charged to its normal fee-paying clients.

Defendants, however, contend that Milbank's rates are still too high, and that rates charged in other civil rights cases are the only useful points of comparison regardless of their level of complexity or the kinds of skills and resources required to litigate them.[9]  As defendants have recognized, this was a "complex class action"[10] (Henkin Decl. Ex. 2 at 2), and Milbank was able to supply "superior resources," "larger staff," and "experience with class actions" (Defs.' Br. 6).  The need for such resources and experience reflects the difficulty of this case relative to many other civil rights cases defendants cite in their brief.  *Compare Yea Kim v. 167 Nail Plaza, Inc.*, No. 05-8560, 2009 WL 77876 (S.D.N.Y. Jan. 12, 2009) ("procedurally simple" case), *and Reiter v. Metro. Transportation Authority*, No. 01-2762, 2007 WL 2775144 (S.D.N.Y. Sept. 25, 2007) (case brought by single plaintiff, only one of whose claims survived summary judgment) (Gorenstein, M.J.), *with Adorno v. Port Authority of New York and New Jersey*, --- F. Supp. 2d ----, 2010 WL 582045, at *4 (S.D.N.Y. Feb. 19, 2010) (Chin, J.) (awarding lead partner $550 per hour where the "case was a complex and difficult one, involving alleged discrimination and retaliation in the Port Authority Police Department, and a high level of skill was required"), *and Wise*, 620 F. Supp. 2d at 445 (awarding partner $425 per hour in a putative class action because the "case has been considerably more difficult and complex than the average civil rights case. . . . [It] has always been a putative class—with a *Morell* claim—challenging city-wide enforcement practices").  Complex cases may require more resources and different skills than civil rights

---

[9] Defendants rely, for example, on *Yea Kim v. 167 Nail Plaza, Inc.*, No. 05-8560, 2009 WL 77876 (S.D.N.Y. Jan. 12, 2009), which the court described as "procedurally simple in comparison with many wage or employment cases." *Id.* at *1.

[10] Now defendants attempt to frame the case as presenting a "rather straightforward" issue.  But they admit that a considerable amount of discovery was involved in the case.  (Defs.' Br. 20.)  Contrary to defendants' contention, the amount of time to prosecute a case, and in particular the sheer resources required to do so, may be taken into account in setting hourly rates.  *See Arbor Hill*, 522 F.3d at 190 ("In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors . . . .").

lawyers working in solo practice, small firms, or non-profit organizations can feasibly supply. (*See* Johnson Decl. ¶ 15 ("It is unlikely that a small firm or sole practitioner could have provided AFC with the support it needed to litigate this case on behalf of Plaintiffs and the Class.").) These kinds of services must be factored into the rate. *See Heng Chan*, 2007 WL 1373118, at *3 ("it is appropriate to award a relatively high hourly rate that reflects the institutional resources that made it possible for the attorneys to take on the case"); *cf. Kahlil*, 657 F. Supp. 2d at 476 ("[T]he fact that the wage and hour issues in this case were not particularly complex or unusual supports application of the unexceptional rate of $400 per hour for a senior lawyer with 25 years' experience.").[11]  Similarly, courts may look to rates charged by firms that are "similarly situated, including the rates of firms that are comparably sized," *Simmonds*, 2008 WL 4303474, at *2 (internal quotation marks and citation omitted), although large firms' higher overhead should not be a basis for automatically increasing the rate, *McDonald*, 450 F.3d at 97 n.6.[12]

Here, considering all the factors, the Court concludes that Milbank's proposed rates should be subject to a further discount.  The firm deserves credit for discounting those rates to reflect that civil rights lawyers charge less and that it has litigated this case pro bono; still, some of its discounted rates are notably higher than other rates courts have set for complex civil rights actions in this district.  Plaintiffs cite *Vilkhu v. City of New York*, No. 06-2095, 2009 WL 1851019 (E.D.N.Y. June 26, 2009) for the proposition that in "non-class action cases, courts in [the Southern] [D]istrict have awarded fees of up to $600 per hour for partner time, $350 for senior associates, and $250-300 for junior and mid-level associates."  (*See* Pltfs.' Br. 19.)  But the rates they request for Milbank are substantially higher, between $640 and $650 an hour for

---

[11] In *Heng Chan*, a Fair Labor Standards Act ("FLSA") action brought by eleven restaurant workers against their employer, the court found that the action's "size and complexity" justified a fee that was "quite high" compared to the market of Manhattan civil rights litigators.  2007 WL 1373118, at *3.

[12] Defendants concede that "it is clear that the size of the firm is a valid consideration in setting the hourly rate," and that "courts typically award lower fees to smaller firms than those awarded to larger firms."  (Defs.' Br. 10.)

partners, and up to $425 an hour for associates.  Although some disparity may be justified

because this is a class action and other cases cited were not, several of the "non-class action

cases" to which Milbank refers were quite complicated in their own right.  In *Heng Chan*, for

example, the court awarded $450 an hour to lead counsel in an FLSA non-class action that was

"unusually difficult and complex, the resources required to prosecute it immense."  2007 WL

1373118, at *2.  The case "involve[ed] a host of witnesses and parties, numerous boxes of

documents, and depositions and investigations conducted in four languages."  *Id.* at *3.

A consideration of the totality of the circumstances leads the Court to reduce certain of

Milbank's rates, but to a lesser degree than defendants propose in their brief (Defs.' Br. 21–23).

Milbank requests that its two partners who worked on the case, Joseph Genova and Douglas

Henkin, be billed at $640 and $650 per hour, respectively.  (Henkin Decl. ¶ 27.)  Henkin has

more than sixteen years of experience as a litigator and is experienced in trying securities and

complex commercial disputes.  (*Id.* ¶ 31.)  He served as supervising partner during the discovery,

pre-trial, and settlement stages of this case.  (*Id.*)  Genova has been a lawyer for 33 years and a

Milbank litigation partner since 1986.  (*Id.* ¶ 32.)  Along with Henkin, he served as supervising

partner during the "initial stages" of this case.  (*Id.*)  Both partners request rates higher than the

highest rate quoted in plaintiffs' papers, $600 per hour.  *See Rozell v. Ross-Holst*, 576 F. Supp.

2d 527, 546 (S.D.N.Y. 2008) (Francis, M.J.).  The award in *Rozell* cuts in both directions: on one

hand, that case was "relatively straightforward" and "did not involve multiple parties, class

allegations, unique claims, or other characteristics that would tend to require counsel to charge

premium rates in order to take the case on," whereas this action did.  *Id.*  On the other, the court

in *Rozell* awarded $600 to two attorneys each of whom had several decades of civil rights law

experience; Genova and Henkin, while seasoned litigators, have less experience in this area of

the law and overall.  But defendants' requests—$400 per hour for Genova, and $350 per hour for

Henkin (Defs.' Br. 21)—are low in light of the difficulty of this matter and low when compared

to rates awarded to senior lawyers in recent complex civil rights cases in this district.  *See Vilkhu*,

2009 WL 1851019, at *6, *9 (awarding $525 to a 1990 law school graduate with considerable

civil rights experience); *Robinson*, 2009 WL 3109846, at *4-*5 (awarding rates as high as $500

and $450); *Adorno*, 2010 WL 582045, at *4 (awarding $550 to an "experienced civil rights

lawyer[]" and $500 to a seasoned litigator without civil rights experience who had not appeared

before the court in the case); *Wise*, 620 F. Supp. 2d at 447 (awarding $425 for lead counsel in an

action "considerably more difficult and complex than the average civil rights case"); *Rahman v.

The Smith & Wollensky Restaurant Group, Inc.*, No. 06-6198, 2009 US. Dist. LEXIS 3510, at *4

(S.D.N.Y. Jan. 7, 2009) (Francis, M.J.) (in employment class action, awarding $535 per hour to

lawyer with thirty years of employment law experience); *Heng Chan*, 2007 WL 1373118, at *2-

*3 (awarding $450 to lead counsel in "unusually difficult and complex" case); *cf. Imbeault*, 2009

WL 2482134, at *4 (awarding $400 to litigator with 13 years' experience for work in a

straightforward, less complex wage-and-hour case).  Given these two senior lawyers'

considerable experience, the value of their firm's resources, and the complexity of this lawsuit,[13]

the Court finds that $600 is a reasonable rate for both.

Milbank requests that Jeffrey Nagel, a former associate and 1994 law school graduate, be

awarded a rate of $425.  (Henkin Decl. ¶¶ 27, 35.)  Nagel's work on this case included

coordinating discovery and drafting submissions to opposing counsel and the Court.  (*Id.* ¶ 35.)

Although plaintiffs do not specify which years he worked on the case, he was certainly a senior

associate at the time (according to defendants, a "ninth and tenth year associate").  The Court

---

[13] Plaintiffs proposed that, in light of his greater experience litigating class actions, Henkin receive $650 per hour compared to $640 for Genova.  (Pltfs.' Reply 13.)  In the Court's view, this cuts too fine.

finds that, given Nagel's seniority and substantive contributions, he is entitled to the rate of $375, which is consistent with rates recently awarded to comparably experienced lawyers in this district. *See Vilkhu*, 2009 WL 1851019, at *4, *6, *9 (describing associate rates as ranging from $200 to $350 in the Southern District, and awarding a 2001 law school graduate $400 per hour and 1997 law school graduates $450 per hour); *Rozell*, 576 F. Supp. 2d at 546 (awarding $350 to senior associates); *Heng Chan*, 2007 WL 1373118, at *4 (awarding $300 to current sixth-year associate for work performed during the previous few years); *Torres v. City of New York*, No. 07-3473, 2008 WL 419306, at *1 (S.D.N.Y. Feb. 14, 2008) ("The rate of $350 is not unreasonable for a lawyer of ten years' experience."); *Simmonds*, 2008 WL 4303474, at *5 (awarding $325 to 1998 law school graduate); *Rahman*, 2008 WL 1899938, at *4 ($350 for attorney with ten years' experience); *cf. Imbeault*, 2009 WL 2482134, at *4 ($325 to eighth-year associate in straightforward wage-and-hour case).

Milbank requests a rate of $350 for several other associates: Nicole Capuano Ball, Maanit Zemel, and Matthew Gagnon, who graduated from law school in 2003; Grace Gilligan and Patricia Quilizapa, who graduated in 2004; and Paul Torres, Joshua Del Castillo, and Rachel Penski, who graduated in 2005. Plaintiffs do not contest that Ball, Gilligan, Penski, and Quilizapa performed all their work on the case as, first-, second- or third-year associates. (*See* Defs.' Br. 22–23.) As a junior associate who worked on all stages of the pre-trial proceedings, and who took a deposition and assisted in taking six others, Penski is entitled to the reasonable rate of $275. *See Vilkhu*, 2009 WL 1851019, at *6, *9 (awarding $275 to junior associate at a well-regarded civil rights firm); *Rozell*, 576 F. Supp. 2d at 546 (awarding $250 to junior associates in mid-size firm specializing in civil rights employment law); *Simmonds*, 2008 WL 4303474, at *5 (awarding $250 to 2003 and 2004 law school graduates). As for Ball, Gilligan,

and Quilizapa, plaintiffs provide no information about their work on the case beyond their class year.  Though the Court is confident these lawyers worked ably on the case, they were less involved than Penski was (she billed close to 600 hours on the matter) and took on less responsibility (she took a deposition herself, among other things).  Accordingly, Ball, Gilligan, and Quilizapa are entitled to the reasonable rate of $ 250.  Torres, Del Castillo, and Zemel worked on the case only as first-years (Defs.' Br. 22–23) and in recognition of their inexperience are awarded the lower rate of $225.  *See Adorno*, 2010 WL 582045, at *5 (awarding $200 to 2008 law school graduate who was a "first-year lawyer during the bulk of this case"); *Torres*, 2008 WL 419306, at *2 (stating that "courts have awarded amounts ranging from $125 to $200 per hour for attorneys with less than three years' experience"); *Heng Chan*, 2007 WL 1373118, at *4 ($200 for work a junior associate performed after admission to the bar).  Gagnon played a much more extensive role in the case, working on it from his first through fifth years as an associate.  (Defs.' Br. 22.)  He took two depositions, assisting in taking many others, and drafted a number of submissions to the Court and to opposing counsel.  (Henkin Decl. ¶ 34.)  Gagnon's work entitles him to a rate of $300, which is in line with what junior and mid-level associates have received for their work in complex civil rights cases in this district.  *Vilkhu*, 2009 WL 1851019, at *6, *9 (awarding $400 to 2001 law school graduate); *Adorno*, 2010 WL 582045, at *5 ($200 to junior associate).

Finally, Milbank requests that Andrew Hood and Jonathan Petts be awarded the rate of $250.  (Henkin Decl. ¶ 27.)  The lower rate reflects Hood's and Petts's inexperience; Hood graduated from law school in 2006, Petts in 2007.  Neither performed any work on the case after admission to the bar, according to the defendants, and plaintiffs do not argue to the contrary.  (Defs.' Br. 22.)  Accordingly, these two lawyers will be awarded the rate of $100 per hour for

their work.  *See Heng Chan*, 2007 WL 1373118, at *4 (awarding $100 hour for work performed

pre-admission to the bar); *Torres*, 2008 WL 419306, at *2 (same).[14]

**B.**     **AFC Lawyers**

While defendants acknowledge that AFC "as an institution" was experienced in

education law and in particular the IDEA (Defs.' Br. 6), they want the Court to reduce AFC's

rates because plaintiffs have not explained how much experience each AFC attorney had in these

practice areas.  (*Id.* 9.)  They observe that some AFC attorneys "worked in large, corporate law

firms or practiced in other areas prior to joining AFC."  (*Id.*)  But as the Court has said, extensive

knowledge of the relevant law is only one branch of experience; there are many others.  *See*

discussion *supra* Part I.A; *cf. Torres*, 2008 WL 419306, at *1 (finding that a lawyer's experience

in criminal law was "certainly transferable" to civil litigation for the purpose of determining her

reasonable hourly rate).  AFC attorneys' prior experience in commercial litigation is easily

transferable to civil rights litigation.  Moreover, having examined the biographies of these

attorneys, the Court notes that the AFC lawyers who worked at large firms before coming to

AFC were practicing civil rights litigation on a pro bono basis while at those firms.  (*See* Johnson

Decl. ¶¶ 31, 32.)  Finally, plaintiffs have now submitted additional information about the

significant experience of certain AFC attorneys, including Hyman, Morehead, Waldman, and

Hechtman, in education and civil rights law.  (*See* Reply Johnson Decl. ¶¶ 6–10.)  Defendants'

arguments on this point are therefore unpersuasive.

---

[14] Defendants argue briefly that some of the work performed by Milbank attorneys—in particular, Del Castillo, Gagnon, Hood, Penski, Petts, Quilizapa, and Torres—was so simple it should be billed at paralegal rates.  They cite tasks like "reviewing and coding orders, quality assurance of data entry and training regarding data entry."  (Defs.' Br. 19.)  But defendants provide no authority for billing such work at paralegal rates, and the Court's experience is that these tasks require legal judgment that lawyers are particularly equipped to provide.  That these tasks are less complex than other types of legal work is what makes them well-suited for junior associates, whose billable rates reflect their comparative inexperience.

Defendants also contend that AFC's requested rates are higher than is justified for an organization of its size.  (Defs.' Br. 10–11.)  Plaintiffs respond that AFC set its rates by "look[ing] to the rates of other nonprofit organizations as well as small private legal practices." (Pltfs.' Reply 19; Shore Decl. ¶ 5.)[15]  But it is plaintiffs' burden to offer evidence to the Court "in addition to the attorney's own affidavits" why its requested fee is appropriate.  *Chambless*, 885 F.2d at 1059; *see Imbeault*, 2009 WL 2482134, at *3 (plaintiffs' counsel submitted affidavit from partner of well-regarded civil rights firm that supported their requested rates).  Here, plaintiffs have supplied only an affidavit to the effect that AFC checked with other organizations to be sure its rates were consistent with theirs.  (Shore Decl. ¶ 5.)  That affidavit does not cite any concrete rates charged by another organization.  The Court, then, will rely on the decisional law and its own experience in assessing the reasonableness of AFC's requested rates.  *See Farbotko v. Clinton County of New York*, 433 F.3d 204, 209 (2d Cir. 2005) (courts may take "judicial notice of the rates awarded in prior cases and [rely on their] own familiarity with the rates prevailing in the district").

Many of the rates AFC requests are reasonable.  It requests a rate of $375 for Elisa Hyman, a former executive director at AFC who graduated from law school in 1991 and has substantial experience as lead counsel in federal class action lawsuits.  (Johnson Decl. ¶ 29; Reply Johnson Decl. ¶ 7.)  Hyman made significant contributions to this case; she filed the complaint, drafted and argued several substantive motions, took three depositions and second-chaired others, and oversaw strategy.  (Johnson Decl. ¶ 33.)  Given her extensive experience and the value she added to this litigation, Hyman's requested rate is entirely in line with recently

---

[15] Quoting *Arbor Hill*, plaintiffs claim that AFC would have been justified in requesting the same rates Milbank did. (Pltfs.' Reply 19 n.73 (quoting *Arbor Hill*, 522 F.3d at 184 n.2 (stating that the decision does not exclude "attorneys from non-profit organizations or attorneys from private law firms engaged in pro bono work . . . from the usual approach to determining attorneys' fees").)  But that does not explain why AFC should be treated as a large law firm rather than a firm more comparable to it in size.

awarded rates in this district.  *See Vilkhu*, 2009 WL 1851019, at *6, *9 (awarding $400 to 2001

law school graduate and $450 to 1997 law school graduates); *Rozell*, 576 F. Supp. 2d at 546

($350 for senior associates); *Heng Chan*, 2007 WL 1373118, at *4 ($400 was reasonable rate for

lawyer with fifteen years' legal experience and significant experience in complex civil rights

litigation).  The requested rate of $350 is reasonable for Matthew Lenaghan, a 1999 law school

graduate and long-time member of AFC who drafted supporting documents relating to plaintiffs'

submissions and assisted with depositions.  The same is true for Sarah Hechtman, a 1993 law

school graduate with several years of experience in federal class action civil rights lawsuits.

(Johnson Decl. ¶ 36.)  She will be awarded her requested rate of $350.  Miranda Johnson, a 2006

law school graduate, has worked on two other federal class action lawsuits while at AFC and

worked throughout the settlement portion of this matter.  (*Id.* ¶ 37.)  She is entitled to her

requested rate of $275.  *See Vilkhu*, 2009 WL 1851019, at *6, *9 (awarding $275 to junior

associate at a well-regarded civil rights firm); *Rozell*, 576 F. Supp. 2d at 546 ($250 to junior

associates in mid-size firm specializing in civil rights).  The plaintiffs request the rate of $225 for

Maggie Moroff (law school class of 1990); defendants propose that she be awarded a rate of $50

because all she did was "return[] telephone calls." (Defs.' Br. 23.)  As plaintiffs describe it,

Moroff's work entailed responding to class member inquiries regarding settlement and

compensatory relief—work that likely required a lawyer's skills.  (Johnson Decl. ¶ 17.)  In

recognition of the lesser complexity of this task, they ask for a reduced rate despite the fact that

Moroff has been an admitted lawyer for 19 years.  The court believes Moroff's usual rates have

already been sufficiently discounted, and will award her a rate of $225.  Plaintiffs also request

$175 for Alice Rosenthal and Marcia Del Rios, both 2007 law school graduates.  (*Id.* ¶ 29.)  Both

attorneys' work on the case occurred just after they were admitted to the bar and entailed

"responding to class member inquiries." (Johnson Decl. ¶¶ 46, 47.) Although defendants argue that the work consisted mainly of telephone calls and thus should be discounted, these telephone calls "advise[d] claimants on more complex issues" that paralegals were less equipped to discuss. (Reply Johnson Decl. ¶ 13.) The Court believes that $175 is appropriate in light of recent decisions in this district. *See Adorno*, 2010 WL 582045, at *5; *Torres*, 2008 WL 419306, at *2 (stating that "courts have awarded amounts ranging from $125 to $200 per hour for attorneys with less than three years' experience"); *Heng Chan*, 2007 WL 1373118, at *4 ($200 for work a first-year associate performed after admission to the bar).

The plaintiffs are also reasonable in proposing a rate of $225 for Robyn Grodner (law school class of 1999), Chris Tan (2000), Jennifer Pringle (2000), Gisela Alvarez (2001), Jana Kosberg (2001), and Erika Palmer (2004). Defendants contend that all the work billed by Grodner, Tan, Pringle, Alvarez, Kosberg, and Palmer, along with some of the work billed by Randee Waldman, should be at paralegal rates because it involved the "review and 'coding' of impartial hearing orders." (Defs.' Br. 17–18.) While this work is undoubtedly less complex than other work that lawyers often perform, it entails the use of legal judgment and, in the Court's experience, is often suited for associates, who can perform the work faster and with less supervision than paralegals. Here, moreover, the plaintiffs have requested lower rates for Grodner, Tan, Pringle, Alvarez, Kosberg, and Palmer, in recognition of the lesser complexity of their work. Thus the Court finds that paralegal rates are not warranted and $225 is appropriate.

The other rates plaintiffs request for AFC attorneys, however, require some reduction. Plaintiffs seek a rate of $375 for Rebecca Shore, who graduated from law school in 1999, and since joining AFC in late 2008 has "overseen Plaintiffs' monitoring and enforcement" of the injunctive relief defendants stipulated to. (Johnson Decl. ¶ 31.) Shore has the same level of

experience as a senior associate at a large firm—indeed, that was her position before joining AFC just over a year ago—and so her rate will be adjusted to $350, in keeping with rates similarly experienced lawyers have received. *Rozell*, 576 F. Supp. 2d at 546 (awarding $350 to senior associates); *Heng Chan*, 2007 WL 1373118, at *4 (300 for sixth-year associate); *Torres*, 2008 WL 419306, at *1 ("The rate of $350 is not unreasonable for a lawyer of ten years' experience."); *Simmonds*, 2008 WL 4303474, at *5 ($325 to 1998 law school graduate); *Rahman*, 2008 WL 1899938, at *4 ($350 to attorney with eleven years' experience). Shawn Morehead, whose requested rate is $375, has excellent experience in federal class action civil rights litigation but has only been a practicing lawyer since 2000. (Johnson Decl. ¶¶ 29, 32.) She worked on this case mainly in 2005, 2006, and 2007, as a mid-level associate. (Defs.' Br. 23.) Accordingly, her rate will be reduced to $325. *Heng Chan*, 2007 WL 1373118, at *4 ($300 to sixth-year associate). Randee Waldman will be awarded the same rate; although she graduated from law school earlier than Morehead, in 1997, she worked on this case mainly in 2004, as a mid-level associate. (Johnson Decl. ¶ 29; Defs.' Br. 23.)

## C.   Paralegals and Support Staff

Plaintiffs request a rate of $150 per hour for Milbank's paralegal and managing attorneys' office staff, and $240 an hour for the head of its managing attorneys' office. (Pltfs.' Reply 15–16.) Plaintiffs also request $125 for AFC paralegals' work, and $50 for AFCL paralegals' work that was secretarial in nature. (*Id.* at 16.) Defendants seek to have these rates reduced. First, they argue that work performed by Milbank's managing attorneys' office should be rejected entirely. (Defs.' Br. 14.) That office performed tasks like serving, filing, and docketing papers (*id.*), which are "normally subsumed into an attorney's overhead expenses" and "not generally considered recoverable." *Bridges v. Eastman Kodak Co.*, No. 91-7985, 1996 WL

47304, at *7 (S.D.N.Y. Feb. 6, 1996); *see Marisol A.*, 111 F. Supp. 2d at 390–91 ("time spent

serving and filing papers . . . is not usually considered recoverable").  Accordingly, plaintiffs'

hours will be reduced by the time spent on these tasks, which yields a reduction of $11,569.50.[16]

Second, defendants contend that the rates requested for Milbank and AFC paralegals are

excessive.  But $150 is within the range of rates recently awarded for such work.  *See Adorno*,

2010 WL 582045, at *4-*5 (awarding rate of $150); *Vilkhu*, 2009 WL 1851019, at *9 (awarding

$125); *Heng Chan*, 2007 WL 1373118, at *5 (awarding fees from $50 to $150 per hour for

paralegal services).  If plaintiffs had provided no information about the paralegals' levels of

experience, an award at the lower end of the range might be appropriate.  *See Robinson*, 2009

WL 3109846, at *5 (a rate at the low end of the range, $100, is justified if plaintiffs failed to

provide information about paralegals' experience); *Torres*, 2008 WL 419306, at *2 (with "no

evidence regarding the skills, qualifications, or experience of the paralegal," "compensation must

be made near the lower end of the market range").  Here, however, plaintiffs have provided

biographical information about each of AFC's paralegals and have stated that each Milbank

paralegal has a four-year college degree.  (Johnson Decl. ¶¶ 52–59; Henkin Decl. ¶ 38; Genova

Decl. ¶ 3.)  This information, together with the prevailing rates of paralegals in the community,

suffices to establish the reasonableness of the rates requested.

## D.      Billing Work at Paralegal Rates

Recognizing that some of the work Milbank partner Genova performed in this litigation

was essentially paralegal work, plaintiffs have proposed that much of his time be billed at

paralegal rates.  (Henkin Decl. 11 n.10.)  Claiming that many of Genova's entries for work billed

at paralegal rates are indistinguishable from entries for work billed at normal rates (*see* Danowitz

---

[16] This includes work performed by Marion Turner (10.25 hours), Icsom Jones (8.8 hours), and Thomas Bivona
(36.30 hours).  (Danowitz Decl. Ex. A.)

Decl. Exs. B and C), defendants want even more of Genova's time to be billed at those reduced rates. (Defs.' Br. 17.) This argument is overblown, but defendants are right that some tasks for which plaintiffs request Genova's higher rate include "QC'ing" (i.e., performing quality control on) IHO orders and "work[ing] on database issues"—tasks that are elsewhere charged at paralegal rates. After reviewing the disputed entries, the Court finds that 25 percent of Genova's hours for which normal rates are requested should billed at paralegal rates.[17]

## II.     Hours

The second prong of the presumptively reasonable fee is the number of hours reasonably expended on the action. *Arbor Hill*, 522 F.3d at 189–90. This is defined as the hours actually expended less "excessive, redundant, or otherwise unnecessary time." *Hensley*, 461 U.S. at 434. To this end, plaintiffs' counsel should submit contemporaneous time records that "specify, for each [timekeeper], the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). It is not necessary to report "the exact number of minutes spent on each activity." *McDow*, 657 F. Supp. 2d at 467. Here, plaintiffs kept such records and have submitted their daynotes to the Court.[18] With the qualifications given below, these records generally contain enough specificity to enable the Court to determine their reasonableness. Defendants raise three objections to the hours submitted: (1) they are excessive because of overstaffing and duplicative work; (2) block billing and vague time entries preclude them, and the Court, from properly assessing entries' reasonableness; and (3) travel time should be discounted by 50 percent, as is customary in this district.

---

[17] Twenty-five percent of Genova's hours for which normal rates are sought comes to 63.06 hours.
[18] Certain secretarial work is not contained in the daynotes. Although secretaries do keep contemporaneous records of their work, they do not submit daynotes as attorneys and paralegals do. (Henkin Decl. ¶ 48.)

**A.      Overstaffing and Duplicative Work**

District courts have "ample discretion" in "assessing the extent of staffing and background research appropriate for a given case."  *New York State Ass'n for Retarded Children, Inc.*, 711 F.2d at 1146 (quoting *Seigal v. Merrick*, 619 F.2d 160, 164 (2d Cir. 1980)).  While "[t]he use of multiple attorneys . . . is not unreasonable *per se*," *Simmonds*, 2008 WL 4303474, at *6 (quoting *Williamsburg Fair Housing Comm. v. Ross-Rodney Hous.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984)), courts should reduce the hours actually expended to account for "duplicative or repetitive work."  *Simmonds*, 2008 WL 4303474, at *6.  Here, given AFC and Milbank's arrangement as co-counsel both intimately involved in the case, duplication of effort was inevitable, if unintentional.  Defendants observe that during this litigation, plaintiffs used 29 attorneys, including two Milbank partners, and 19 non-legal staff.  (Defs.' Br. 26.)  The staffing was certainly large, though not unjustified for a class action that involved a large number of documents and lasted several years.  But the staffing led to certain inefficiencies, as, for example, that three or more plaintiffs' attorneys often attended depositions. (Defs.' Br. 27.)   The duplication is also in evidence in the time plaintiffs' attorneys spent in team meetings and conferences together conferring about strategy.  (*See id.*)  Milbank has already factored potential inefficiencies into its hours, cutting 359.05 hours of time for which Milbank lawyers actually billed, and writing off 209 hours of work performed by Milbank attorneys and paralegals who billed less than 20 hours on the case through June 30, 2008.  (Pltfs.' Br. 12; Henkin Decl. ¶ 24.)  Milbank has also chosen to bill 132.75 hours of Genova's time at paralegal rates despite the fact he is a seasoned Milbank litigator, because his work was similar to that later performed by paralegals in the case.  (Pltfs.' Br. 12.)  Plaintiffs' use of billing judgment recommends against another large deduction here; the Court will simply reduce plaintiffs' hours across the board by

an additional five percent.  *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) ("In reducing the number of hours claimed, a court may, in its discretion, apply an across-the-board percentage reduction 'as a practical means of trimming fat from a fee application.'") (quoting *New York Ass'n. for Retarded Children*, 711 F.2d at 1146); *Kahlil*, 657 F. Supp. 2d at 476 ("It is well established that across-the-board reductions are appropriate when 'billings records are voluminous' and numerous billings entries are in dispute.").

The defendants also object to unspecified "excessive billing" in Gagnon's time entries and contend that the number of hours Milbank billed for deposition-related tasks (496, or 27.56 hours per deposition) was excessive.  (Defs.' Br. 27.)  "Without specific references to disputed entries to guide it, this Court declines to review the voluminous record to determine which non-attorney time entries are vague, excessive, or unrelated to the litigation."  *Vilkhu*, 2009 WL 1851019, at *15.[19]  In addition, the amount of time spent preparing for depositions is unremarkable in a case where depositions routinely lasted a day and careful preparation was required.

## B.    Block Billing and Time Entries

Block-billing, the practice "of aggregating multiple tasks into one billing entry," is "not prohibited."  *Wise*, 620 F. Supp. 2d at 450 (quoting *Molefi v. Oppenheimer Trust*, No. 03-5631, 2007 WL 538547, at *7 (E.D.N.Y. 2007)).  Still, block-billing can make it "exceedingly difficult for courts to assess the reasonableness of the hours billed."  *Id.*  In such circumstances courts have found it appropriate to cut hours across the board by some percentage.  *See Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F. Supp. 2d 323, 325–26 (S.D.N.Y. 2003); *Kirsch v.*

---

[19] Defendants cite *Rozell*, 576 F. Supp. 2d 527, as an example of a case where the court reduced excessive hours billed for team conferences, but there the defendants identified the amount of time they felt was excessive.  *Id.* at 541.  Here, defendants do not; they merely attach as an exhibit almost all of Gagnon's daynotes, without any indication of which ones they find problematic.  (*See* Danowitz Decl. Ex. E.)

*Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (a court may reduce a fee award because of "vagueness, inconsistencies, and other deficiencies in the billing records."). Here, defendants ask for a reduction in hours because of what they see as pervasive block-billing and vague entries in plaintiffs' daynotes. (Defs.' Br. 28–30.) Although they do not itemize these problematic entries, based on the Court's independent perusal of the daynotes, defendants' contentions are partly justified. Many of AFC's entries are stated in the sparest of terms—"meeting w/co-counsel," "conference w/ c-counsel," and so on. (*See* Johnson Decl. Ex. C.) These kinds of entries omit information about the subject matter of the work and have justified reductions in hours in the past. *See Kirsch*, 148 F.3d at 172 (upholding reduction for entries such as "letter to court," "staff conference," and "work on motion"); *Spalluto v. Trump Int'l Hotel & Tower*, No. 04-7497, 2008 WL 4525372, at *8 (S.D.N.Y. Oct. 2, 2008) (reducing hours for vague entries like "phone call(s) with client," "prepare correspondence to co-counsel," "prepare correspondence to client," "conference with client," and "prepare letter to court"); *Soler v. G & U, Inc.*, 658 F. Supp. 1093, 1098–99 (S.D.N.Y. 1987) (reducing hours for time entries like "outline," "writing," "research," "travel & research," and "fee application"). These deficiencies justify an across-the-board cut of 12 percent in AFC's[20] hours. *See Kirsch*, 148 F.3d at 172–73 (upholding 20 percent reduction in billed time for vague entries, among other things); *Spalluto*, 2008 WL 4525372, at *9 (reducing hours by 15 percent for block billing and vague entries). As for the plaintiffs' block-billing, the Court for the most part does not find it unreasonable, with one exception: plaintiffs' block-billing of travel time. That issue is addressed below.

---

[20] The Court does not reduce Milbank's hours on this basis because its daynotes entries were generally specific as to the subject matter of the task performed.

## C.    Travel Time

Courts in this Circuit regularly reduce attorneys' fees by 50 percent for travel time.  *See Wilder v. Bernstein*, 975 F. Supp. 276, 283–84 (S.D.N.Y. 1997); *Lilly v. County of Orange*, 910 F. Supp. 945, 951 (S.D.N.Y. 1996).  Here, defendants challenge certain of plaintiffs' entries that seek to bill travel time at full rates.  The Court agrees that these amounts should be reduced by 50 percent.  This includes travel time that is included in block-billed entries.  *See Robinson*, 2009 WL 3109846, at *6 ("it is not appropriate to lump travel time together with fully compensable time").  For block-billed entries, the Court will allocate one hour to travel time.  One hour is reasonable in light of the circumstances.  (*See* Pltfs.' Reply 6 ("The time to travel from AFC's office to the courthouse, Milbank's offices, and Defendants' offices is approximately 30 minutes each way."); Reply Johnson Decl. ¶ 15.)  Calculating AFC attorneys' time in this way, according to the attorneys' awarded rates, yields a reduction of $1,812.50.[21]  Calculating Milbank attorneys' time in the same way yields a reduction of $9,213.75.[22]

## III.    Fees Incurred in Connection with This Application

Plaintiffs request fees in connection with the preparation of their fee application.  The law is clear that prevailing plaintiffs—which, here, defendants acknowledge that plaintiffs are (Defs.' Br. 33)—are entitled to such fees.  *See Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 525 (S.D.N.Y. 2002); *Colbert v. Furumoto Realty, Inc.*, 144 F. Supp. 2d 251, 262 (S.D.N.Y. 2001) ("A prevailing party is entitled to reimbursement for the time expended in the preparation of the fee application."); *Natural Res. Def. Council, Inc. v. Fox*, 129 F. Supp. 2d 666, 675 (S.D.N.Y. 2001) ("[T]he fee application is a necessary part of the award of attorney's fees."

---

[21] This includes 4.7 hours of travel time for Morehead; 4.9 for Hyman; 21 for Waldman; 10 for Hechtman; and 11.7 for Johnson.  (*See* Reply Johnson Decl. Ex. A.)

[22] Ball, Henkin, and Penski block-billed travel time with other tasks.  The Court finds it appropriate to allocate one of Ball's hours to travel, two of Henkin's, and 4.5 of Penski's.  (*See* Dantowitz Decl. Ex. F.)

(internal quotation marks and citation omitted)).  Nevertheless, defendants assert that if the Court reduces plaintiffs' total requested fee, it should also deny plaintiffs' fees relating to the application.  Defendants' rationale is that plaintiffs proposed unreasonable rates during negotiations and, unless they have to pay for this fee application, future plaintiffs will have no incentive to negotiate in good faith prior to applying to a court for fees.  That is not the law, and, even if it were, defendants' argument suffers from a logical flaw.  The assumption that plaintiffs' fee requests were unreasonable, but that defendants' were not, does not follow from the Court's award of a reduced fee—particularly here, where many of defendants' own requests have been denied.  Because plaintiffs prevailed, they are entitled to fees on their application.  *See Mugavero v. Arms Acres, Inc.*, No. 03-5724, 2010 WL 451045, at *11 & n.12 (S.D.N.Y. Feb. 9, 2010) (awarding application fees to plaintiff even though the total fee award was less than plaintiff had requested).

## IV.    Presumptively Reasonable Fee

Multiplying the reasonable hourly rates for plaintiffs' lawyers by the reasonable hours expended yields a presumptively reasonable fee of $1,238,403.09.  No adjustments are required, although a few words should be said about the degree of plaintiffs' success.  Defendants argue in passing that that success has been overstated (they do not go so far as to say it was in fact limited).  To the extent defendants mean to request a reduction in the fee award for plaintiffs' relative lack of success, the Court denies that request.  According to plaintiffs, as of May 2009, the independent auditor had approved 213 vouchers for educational services for class claimants. (Johnson Decl. ¶ 9; Pltfs.' Br. 4.)  The vouchers were variable in amount; the majority of claimants were given $8,000 vouchers, some were given $15,000 vouchers, and a few were given vouchers for amounts less than that.  (Johnson Decl. ¶ 9.)  The vouchers approved so far

total $2,106,000.  (*Id.*)  An additional $52,146.60 in reimbursements to parents has been

approved.  (*Id.*)  Defendants note, however, that the claims received so far comprise less than 2.5

percent of the entire class.  (Defs.' Br. 20.)  Presumably this results partly from the nature of the

case, which concerned educational issues relating to minors and stretching back to 2000.  Many

children may have grown up, changed school systems, or moved since then.  (*See* Pltfs.' Reply

8.)  In any event, the injunctive relief plaintiffs secured cannot be underestimated.  *See Morris v.*

*Eversley*, 343 F. Supp. 2d 234, 246–47 (S.D.N.Y. 2004) (Chin, J.) (stating that "the degree of

monetary success (or lack thereof) is only one factor to be considered. Courts must also consider

whether the plaintiff has achieved some other measure of success" and refusing to reduce

attorneys' fees based on "limited monetary value" of recovery, where a "significant victory" with

"non-monetary value" was obtained).  As plaintiffs observe, the relief here includes a

streamlined ability to enforce orders that have not been timely implemented.  In the 2008–2009

year alone, the independent auditor identified 585 unimplemented orders and directed DOE to

send non-implementation notices relating to those orders.  (Pltfs.' Reply 7–8.)  For these reasons,

the Court finds that no adjustment is warranted and the reasonable adjusted fee is $1,276,537.75.

## V.    Costs

A court will generally award "those reasonable out-of-pocket expenses incurred by

attorneys and ordinarily charged to their clients."  *LeBlanc-Sternberg*, 143 F.3d at 763.

Defendants object to the costs plaintiffs have submitted for reimbursement because the records

supporting them seem excessive and are too vague.  (Defs.' Br. 34.)  In general the Court does

not find these charges excessive.  The charges that defendants highlight—a photocopy charge on

April 30, 2004 of $2,775.80 and one on June 15, 2005 of $3,707.60, for example—are

reasonable in light of the sheer number of documents necessary to the case.  Because this lawsuit

concerned whether DOE was timely implementing IHO orders, defendants, who did not maintain

a central repository of documents relating to orders, produced during discovery "about 7,292

Orders, varying in length from a page or two to tens of pages, in no particular order."  (Genova

Decl. 3.)  Such a production generated the need for significant paper.  (*Id.* 5.)  As for the charge

of vagueness, plaintiffs' records specify the date of each expense, the lawyer responsible for

incurring it, a succinct description of the expense (such as "airfreight," photocopies," or

"printing"), the amount, and the category.  (*See* Henkin Decl. Ex. G.)  Plaintiffs' costs should

still be reduced slightly, however, because Milbank's records are unspecific about, for example,

"what[] documents were copied," *Lucky Brand Dungarees, Inc. v. Ally Apparel Resources, LLC*,

No. , 2009 WL 466136, at * 6 (S.D.N.Y. Feb. 25, 2009) (Dolinger, M.J.), why certain secretaries

worked overtime on some days, and what messengers delivered.  *See United States for Use and*

*Benefit of Evergreen Pipeline Const. Co. v. Merritt-Meridian Const. Corp.*, 95 F.3d 153, 173 (2d

Cir. 1996) (denying recovery for lack of documentation of what was copied and the numbers of

copies made).  The Court will reduce Milbank's costs by five percent on this basis.  Defendants

also rightly note that meals and hand deliveries are not compensable.  *See Lucky Brand*

*Dungarees, Inc. v. Ally Apparel Resources, LLC*, No. 05-6757, 2009 WL 466136, at * 6

(S.D.N.Y. Feb. 25, 2009) (Dolinger, M.J.) ("meals that are not required by out-of-town travel are

not compensable"); *Rozell*, 576 F. Supp. 2d at 547 (same); *V-Formation, Inc. v. Benetton Group*

*SpA*, No. 01-610, 2003 U.S. Dist. LEXIS 10223, at *6 (S.D.N.Y. June 15, 2003) (collecting

Southern District cases "show[ing] that courts have generally disallowed recovery of costs for

delivery expenses").  Meal expenses ($1,811.65) and messenger deliveries ($423.17) will be

reduced from plaintiffs' award.

The Court denies defendants' request that secretarial costs and computerized research costs be excluded from plaintiffs' award.  Plaintiffs have averred that they ordinarily charge such costs to clients (*see* Henkin Decl. ¶ 41) and there is authority in this Circuit that both kinds of costs are recoverable.  *Marisol A.*, 111 F. Supp. 2d at 390 ("the work performed in furtherance of organizing the countless number of documents in this case and maintaining a litigation-related database is fully compensable"); *Insinga v. Cooperatieve Centrale Raiffeisen Boerenleenbank B.A.*, 478 F. Supp. 508, 512–13 (S.D.N.Y. 2007) ("The Second Circuit has made clear . . . that 'charges for such online research may properly be included in a fee award.'") (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91, 98 (2d Cir. 2004), *superseded and amended on other grounds by* 522 F.3d 182 (2d. Cir. 2008)).

One remaining dispute must be addressed.  During discovery, the defendants proposed to use statistical sampling as an alternative to fully producing all the documents relating to their implementation of IHO orders in the regions within DOE.  (Henkin Decl. 6.)  In response, plaintiffs hired an expert on statistical sampling to review and respond to defendants' sampling proposal.  (*Id.* 7; Pltfs.' Reply 18.)  Defendants acknowledge that the Court rejected their proposal, but argue that plaintiffs should not be able to recover costs for this expert because the Court also rejected their counter-proposal.  (Defs.' Br. 35.)  A "court should not disallow fees for every motion that a prevailing party did not win," however, and lawyers may be compensated "for advancing plausible though ultimately unsuccessful arguments."  *Rozell*, 576 F. Supp. 2d at 538.  The Court finds that expert costs were justified in this circumstance and declines to reduce plaintiffs' award on that ground.

## CONCLUSION

For the reasons stated above, the Court grants plaintiff's motion for attorneys' fees **[126]**

in the amount of $1,238,403.09 ($847,184.38 for the work performed by Milbank and

$391,218.71 for the work performed by AFC) and costs in the amount of $123,964.45

($121,391.81 for expenses incurred by Milbank and $2,572.64 for expenses incurred by AFC).

SO ORDERED.

Dated: New York, New York
       March **31**, 2010

_____
Richard J. Holwell
United States District Judge