UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LV, RC, AD, NA, ADJ, YG, LO, AP, RLB, RD, and JYW, individually; and VSG, HR, CW, SS, MG, MS, ST, RZ, MC and JP, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  -against-<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION; NEW YORK CITY BOARD OF EDUCATION; JOEL KLEIN, in his individual and official capacity as Chancellor of the New York City School District,<br><br>       Defendants. | ECF CASE<br><br><br><br><br>No. 03 Civ. 9917 (RJH)<br><br><br>**REDACTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF SPECIAL MASTER AND COMPENSATORY RELIEF**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS ............................................................................................................ 3

ARGUMENT ....................................................................................................................... 15

I.     RELIEF REQUESTED ............................................................................................ 16

        A.    Appointment of a Special Master ................................................................ 16

        B.    Implementation as Defined in the Stipulation ............................................. 19

        C.    Compensatory Relief to Parents Whose Orders Are Unimplemented ......... 19

II.    DEFENDANTS HAVE FAILED TO COMPLY WITH THE STIPULATION ....... 20

III.   PLAINTIFFS ARE ENTITLED TO APPOINTMENT OF A SPECIAL MASTER ....... 22

        A.    Appointment of a Master is Appropriate When a Defendant Persistently Fails to Comply with an Order, Especially When the Defendant Exhibits Resistance to Compliance ............................................................................................... 23

        B.    Appointment of a Special Master is Appropriate to Ensure Compliance with a Large-Scale, Complex Remedial Program ................................................. 26

IV.   IMPLEMENTATION IN THE STIPULATION MEANS ACTUAL IMPLEMENTATION, NOT A SUBSTITUTE ......................................................... 27

        1.    RSAs ............................................................................................................ 27

        2.    Payment Orders ........................................................................................... 29

        3.    Late Documentation of Implementation ..................................................... 29

V.    COMPENSATORY RELIEF IS NECESSARY TO MAKE PARENTS AND STUDENTS WHOLE FOR CONTINUING FAILURES TO IMPLEMENT ORDERS ... 30

CONCLUSION ..................................................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blackman v. District of Columbia,*
454 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................................ 23

*Brewer v. Muscle Shoals Bd. of Educ.,*
790 F.2d 1515 (11th Cir. 1986) ............................................................................................... 31

*City of Hartford v. Chase,*
942 F.2d 130 (2d Cir. 1991) .................................................................................................... 29

*Cruz v. Globe Realty Mgmt. Co.,*
No. 03 C 9298, 2005 WL 3455846 (N.D. Ill. Dec. 13, 2005) ................................................. 31

*EEOC v. Local 638,*
753 F.2d 1172 (2d Cir. 1985) .................................................................................................. 31

*Hurley v. Coughlin,*
158 F.R.D. 22 (S.D.N.Y. 1993) .............................................................................................. 31

*Jamie S. v. Milwaukee Pub. Schs,*
No. 01-C-928, 2009 U.S. Dist. LEXIS 51238 (E.D. Wis. June 9, 2009) .......................... 23, 25

*Lemus v. Manhattan Car Wash, Inc.,*
No. 06 Civ. 15486, 2010 U.S. Dist. LEXIS 33263 (S.D.N.Y. Mar. 26, 2010) ....................... 29

*NLRB v. Remington Rand, Inc.,*
130 F.2d 919 (2d Cir. 1942) .................................................................................................... 31

*Petties v. District of Columbia,*
No. 95-0148 (D.D.C. July 8, 1997) .................................................................................. 23, 26

*Powell v. City of Pittsfield,*
221 F. Supp. 2d 119 (D. Mass. 2002) ................................................................................ 31, 32

*Sabatini v. Corning-Painted Post Area Sch. Dist.,*
78 F. Supp. 2d 138 (W.D.N.Y. 1999) ..................................................................................... 31

*Stephens v. City of Vista,*
994 F.2d 650 (9th Cir. 1993) ................................................................................................... 31

*United States v. Vulcan Soc'y, Inc.,*
No. 07-cv-2067, 2010 U.S. Dist. LEXIS 52092 (E.D.N.Y. May 26, 2010) ................. 23, 24, 26

### STATUTES

20 U.S.C. § 1415(b)(6) ........................................1

N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5 ........................................1

N.Y. Educ. Law § 4404(1) ........................................1

### RULES

Fed. R. Civ. P. 23(b)(2) ........................................3

Fed. R. Civ. P. 53 ........................................22, 23

## PRELIMINARY STATEMENT[1]

One of the procedural safeguards provided to parents under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415, is the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."[2]  New York state law authorizes an aggrieved parent to obtain an impartial hearing against the DOE.[3]  Orders resulting from such hearings are known as impartial hearing orders.

Seven years ago Plaintiffs brought this lawsuit because of a systematic failure by the DOE to implement impartial hearing orders.  The class action complaint alleged that Orders[4] were neither enforced nor implemented in a timely, effective, and comprehensive manner and that Defendants had not developed or maintained a system to ensure that all Orders were enforced or to track and monitor Orders for the purposes of ensuring timely enforcement.[5]  Discovery confirmed Plaintiffs' allegations: Defendants had *no* system for ensuring that the DOE timely implemented Orders.[6]

---

[1]  Capitalized terms not defined herein are defined in the Stipulation and Agreement of Settlement entered into and filed by the parties on December 11, 2007 (the "Stipulation").

[2]  20 U.S.C. § 1415(b)(6).

[3]  *See* N.Y. Educ. Law § 4404(1); N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5.

[4]  Orders are defined in the Stipulation as "a decision, determination, order or statement of agreement and order (in its entirety, including all Action Items contained therein) issued by an impartial hearing officer in New York City" under the relevant laws.  Declaration of Rachel Penski, dated Nov. 5, 2010 (hereinafter, "Penski Decl.") Ex. A ¶ 1(t).

[5]  Dkt. No. 1.

[6]  Penski Decl. Ex. B.

As a result, parents who had sought impartial hearings because the DOE was not providing appropriate services for their children were unable to receive those services or payment for those services even after an impartial hearing officer ordered the DOE to provide them. The DOE had two chances to provide the requisite services to students—as a matter of course as a recipient of IDEA funding and as ordered by an impartial hearing officer. The DOE failed both times to do as the law required.

In December 2007, the parties reached a settlement in this case. On April 10, 2008, the Court approved the Stipulation, which provides compensatory relief for the Compensatory Relief Subclass and injunctive relief for the Injunctive Relief Subclass.[7] The injunctive relief provisions are the subject of this Motion and require Defendants to meet certain benchmarks, measured by the Independent Auditor.[8] The first of the benchmarks was set low: the DOE was required to implement either 75% of Orders and 70% of Action Items[9] or 70% of Orders and 75% of Action Items issued during the first six-month benchmark period.[10] The DOE did not meet the First Benchmark for either Service or Payment Orders and Action Items.[11] In many quarters, the DOE was unable to Timely Implement even 50% of Payment Orders.[12]

Thus, despite years of litigation, settlement negotiations, and operating under the Stipulation for over two years now, the DOE *still* does not have a functioning

---

[7] Dkt. No. 120.

[8] Penski Decl. Ex. A ¶¶ 4-23.

[9] As defined in the Stipulation, an "Action Item" is a specific, identifiable action in an Order that, as determined by the Independent Auditor, requires implementation by the DOE. *Id.* ¶ 1(b).

[10] *Id.* ¶ 4(a).

[11] *Id.* Ex. J at 6.

[12] *Id.* Ex. H at 8; Ex. I at 7; Ex. K.

system for ensuring that it is timely implementing Orders. And children *still* are not getting necessary services and relief even after an impartial hearing officer orders the DOE to provide them. This has to change, and it is now clear that it will require direct supervision by the Court to ensure that change occurs.

Under paragraph 10(b) of the Stipulation, if the DOE fails to meet a benchmark, Plaintiffs may ask this Court to impose a remedy on Defendants.[13] Plaintiffs now seek such relief and respectfully request that the Court appoint a special master to ensure Timely Implementation of Orders and Action Items and award relief to those parents whose impartial hearing orders are not implemented within a specified timeframe.

## RELEVANT FACTS

### Background

Plaintiffs filed this action in 2003. By Memorandum and Order dated September 15, 2005, the Court certified a class under Federal Rule of Civil Procedure 23(b)(2).[14] On December 27, 2007, the Court amended the definition of the Class to include the Injunctive Relief Subclass and the Compensatory Relief Subclass.[15]

Through the discovery process, it became evident that the DOE not only lacked a system for timely implementing Orders, but even for tracking whether it *was* implementing Orders.[16] Within a month of this Court setting a date for a trial,[17] Defendants agreed to settle this case. In December 2007, the parties entered into the

---

[13]  *Id.* Ex. A ¶ 10(b).

[14]  Dkt. No. 80.

[15]  Dkt. No. 113.

[16]  Penski Decl. Ex. B at 1-7.

[17]  *Id.* Ex. C at 8-10.

Stipulation. On April 10, 2008, the Court approved the Stipulation between the Class and the Defendants.[18]

### The Independent Auditor

Following execution of the Stipulation, the parties attempted to reach an agreement regarding who would serve as Independent Auditor. Plaintiffs proposed an Independent Auditor;[19] Defendants rejected Plaintiffs' proposal and requested that Daylight Forensic & Advisory LLC ("Daylight") be appointed Independent Auditor, arguing that, in addition to the lower fees that the DOE claimed Daylight would charge, Daylight's "experience in compliance monitoring, conducting forensic investigations and performing the type of auditing functions contemplated by the Settlement" made it better qualified to serve as the Independent Auditor.[20] The Court reviewed both proposals and interviewed representatives of each entity.[21] On March 26, 2008, the Court appointed Daylight as the Independent Auditor.[22]

Beginning on the Effective Date (June 1, 2008), Daylight measured whether the DOE's implementation of Orders and Action Items fulfilled the Stipulation's requirements on a quarterly basis. For each such quarter, pursuant to paragraph 16(f) of the Stipulation, Daylight issued a draft report with its findings. Following the issuance of

---

[18] Dkt. No. 120.

[19] *Id.* Exs. D, E.

[20] *Id.* Exs. F, G.

[21] Dkt. No. 114.

[22] *Id.* Pursuant to this Court's Order on June 24, 2010, Daylight was replaced by its successor corporation Navigant Consulting, Inc. ("Navigant"). (Dkt. No. 140.) For ease of reference, we will use Daylight to refer to both Daylight and Navigant herein.

these reports, the Stipulation allowed each party to "comment on those drafts."[23] When Daylight's reports showed the DOE's lack of compliance, rather than work on fixing its systems, the DOE expended considerable time and effort commenting on or disputing the reports, repeatedly asking Daylight to change its analysis on the same issues so that the DOE's rates of compliance would seem higher than they were.[24] Notably, the way in which Daylight interpreted certain portions of the Stipulation benefitted Defendants by causing Defendants' compliance rates to appear higher than they actually were.[25]

**Results From First Benchmark Period**

The Stipulation lays out a series of benchmarks that Defendants must meet in order to show their progress in improving implementation of Orders and Action Items. Orders and Action Items are deemed "Uncounted" in four specific circumstances: (i) it is factually impossible or would violate a law to do what the Order or Action Item requires, *provided that* the DOE either appeals or offers the parent an appropriate written alternative; (ii) the parent has not complied with certain obligations necessary to implement the Order or Action Item *and* the DOE has made "substantial showing of attempts" to reach the parent about its obligations; (iii) the Order or Action Item required the provision of a shortage area service and the DOE made a substantial showing that it offered the parent an appropriate substitute service within 35 days of the issuance of the

---

[23] Penski Decl. Ex. A ¶ 16(f).

[24] *See* Penski Decl. Exs. Y and Z (DOE making individual comments on hundreds of Action Items); Penski Decl. Exs. V at 4-5; W at 3-7; X at 1-6 (DOE repeatedly asking Daylight to change its analysis on prospective payment Orders).

[25] *See infra* at 8-15.

Order or Action Item;[26] or (iv) the DOE appealed.[27] The parties agreed to deem Orders and Action Items Uncounted in these very specific circumstances because the parties agreed that in *those* circumstances it would be unfair to count those Orders or Action Items for or against the DOE's compliance statistics; they therefore were removed from the count entirely. The Stipulation also contemplates that Payment and Service Orders will be calculated separately and that the DOE must meet the benchmarks for both Payment and Service Orders.[28]

The First Benchmark Period ran from June 1, 2008 through November 30, 2008.[29] On June 11, 2009, Daylight issued its final report for the First Benchmark Period.[30] The report indicated that the DOE Timely Implemented just 66.1% of Service Orders and only 33.1% of Payment Orders (one of the easiest types of Orders to implement because it requires simply making a payment), missing the First Benchmark by a wide margin.[31] Because the DOE did not meet the First Benchmark, the Stipulation required it to "formulate and implement a Corrective Action Plan ["CAP"] to correct the problems that caused the DOE to miss the benchmark at issue."[32]

---

[26] Shortage areas are specified as "occupational therapy, physical therapy, or bilingual counseling, or services to be provided by hearing teachers, vision teachers, bilingual special education teachers, bilingual speech teachers, or monolingual speech teachers." Penski Decl. Ex. A ¶ 1(ll)(iii).

[27] *Id.* ¶ 1(ll).

[28] *Id.* ¶ 15(a).

[29] *Id.* Ex. J at 3 n.3.

[30] *Id.* at 1.

[31] *Id.* at 6.

[32] *See id.* Ex. A ¶ 10(a).

Pursuant to the Stipulation, Defendants were given nearly three months—from June 11, 2009 through September 7, 2009—to develop a CAP that would improve their implementation and allow them to meet the Stipulation's benchmarks. To Plaintiffs' knowledge, Defendants never created a written CAP. Plaintiffs' Counsel requested that Defendants provide a copy of the CAP to Plaintiffs' Counsel, but were told that there was no such documented plan.[33] During meetings and other interactions with the DOE, Plaintiffs' Counsel also made specific suggestions for improving Timely Implementation, most of which Defendants ignored or rejected.[34] Defendants instead dedicated themselves to commenting on and disputing Daylight's draft reports and seeking changes in Daylight's analysis of Orders and Action Items as a means to meet the benchmarks.[35]

---

[33] Declaration of Rebecca Shore, dated Nov. 5, 2010 (hereinafter, "Shore Decl.") ¶ 8.

[34] Shore Decl. ¶ 6. With respect to the DOE's general practices, Plaintiffs suggested that the DOE appoint one person to oversee the implementation of impartial hearing orders, add to the DOE's computer system flags or "ticklers" to indicate when the deadline to timely implement an Order or Action Item is approaching or has passed, and save exhibits introduced at the impartial hearing onto the DOE's computer system so that the DOE does not need to ask parents to re-submit the same documents already submitted at hearing. *Id.* Plaintiffs also made a variety of suggested changes to the DOE's practices relating to implementation of Payment Orders. *Id.*

[35] *E.g.*, Penski Decl. Ex. W at 3-9 (DOE asking Daylight to change its analysis on prospective payment Orders and expressing its disagreement with Daylight's analysis of dozens of individual Orders and Action Items); Ex. X (DOE again asking Daylight to change its analysis on prospective payment Orders and expressing its disagreement with Daylight's analysis of dozens of individual Orders and Action Items); *see also id.* Exs. Y, Z (DOE making specific comments on nearly 200 individual Action Items on which they disagreed with Daylight's analysis).

### Results From the Post-CAP First Benchmark Period

On September 8, 2009, Daylight began measuring Defendants' implementation rates after the time to develop the CAP passed (the "Post-CAP Period"). On August 13, 2010, Daylight issued the Post-CAP First Benchmark Report, which measured implementation from September 8, 2009 through January 31, 2010.[36] Again, Defendants failed to meet the required First Benchmark, this time Timely Implementing 62.3% of Payment Orders and 62.8% of Payment Action Items and 68.7% of Service Orders and 81.5% of Service Action Items.[37] And, Defendants' largest shortfall was with the easier-to-implement Payment Orders and Payment Action Items. Nearly three years after the parties' settlement, Defendants still were unable to reach the First Benchmark.

**REDACTED**

The chart attached as Appendix A summarizes Daylight's findings for each of the quarters since the Effective Date.

### Daylight's Analysis Overstates the DOE's Rate of Timely Implementation

Throughout the injunctive relief period, Daylight inflated Defendants' reported rates of compliance by (i) counting Orders and Action Items as Timely

---

[36] *Id.* Ex. Q at 1, 4 n. 4.

[37] *Id.* at 8.

[38] *Id.* Ex. R.

Implemented when they were not or (ii) treating as "Uncounted" Orders and Action Items that should have been counted as Unimplemented (which thus lowered the total number of Orders counted and increased the percentage of Orders considered Timely Implemented). Specifically, Daylight: (i) counted the issuance of vouchers, rather than the provision of a service itself, as sufficient to satisfy "implementation" of certain Service Orders and Action Items; (ii) counted as paid Payment Orders and Action Items regardless of whether a check has been sent to a parent or provider; and (iii) accepted documentation submitted after the analysis period as evidence that the DOE achieved Timely Implementation.

### *Counting Vouchers as Implementation of Service Orders*

Daylight has counted certain Service Orders and Action Items as Timely Implemented where a student did not actually receive the particular service at issue. The Stipulation provides that Orders and Action Items will be considered "Timely Implemented" where "implemented within the length of time specified by the Order or, if no such time is specified in the Order, within 35 days of issuance of the Order."[39] The Stipulation allows a Service Order or Action Item to be considered "Uncounted" if "[t]he Order or Action Item cannot be Timely Implemented because it required the provision of [a shortage area service]" *and* the DOE offers an appropriate substitute service.[40]

After the issuance of the First Quarter report, Plaintiffs commented that Daylight was finding certain Service Action Items were Timely Implemented by the

---

[39] *Id.* Ex. A ¶ 1(*ii*). By a subsequent agreement of the parties, "[i]f an action item requires implementation 'immediately' or 'forthwith,' DOE will be required to implement such action item within 7 business days of issuance of the order, or else demonstrate to Daylight why that specific action item could not be implemented within that time frame." *Id.* Ex. CC.

[40] *Id.* ¶ 1(ll)(iii).

DOE's issuance of a voucher, such as a Related Service Authorization ("RSA") or "P-3" letter, to parents, regardless of whether they required the provision of a shortage area service. RSAs and P-3s[41] are letters from the DOE representing that the DOE will pay for the provision of a particular service *if* the student's parents can locate a provider of that service *at the rate set by the DOE*; it does not guarantee that the service will actually be provided, in part because the parent may not be able to find a provider ready, willing, and able to accept the RSA.[42] Indeed, in Plaintiffs' Counsel Advocates for Children's almost 40 years of experience advocating on behalf of students with special needs in New York City, many service providers do not accept the vouchers because the rate is typically lower than market rate and the providers do not want to deal with delays in the DOE's processing of payments.[43] As a result, many students who receive RSAs cannot use them and thus never receive necessary services.[44]

Daylight responded to Plaintiffs' comments by explaining that it was counting Service Action Items as Timely Implemented based on the wording of the Order in which that Service Action Item was found, essentially relying upon the voice and tense

---

[41] Because the vast majority of vouchers issued as a result of an impartial hearing order are through RSAs, in this memorandum, we refer to both types of vouchers as "RSAs."

[42] Shore Decl. ¶ 9. The DOE's Standard Operating Procedures Manual for the Referral, Evaluation and Placement of School-Age Students with Disabilities ("SOPM") states that "[i]f a DOE provider is not available, the [DOE] will issue a request for services to an agency under contract with the DOE. If the DOE is unable to locate a related service provider within an additional 13 days, the [DOE] will issue a Related Service Authorization letter ("RSA") to the parent. The parent will be provided with information on available providers and instructions regarding how to invoke the RSA." Shore Decl. Ex. A at 128. The SOPM also provides a sample RSA that sets forth the rates the DOE will pay for the service. *Id.* at 267-75.

[43] Shore Decl. ¶ 10; *see also* Penski Decl. Ex. T at 1-2.

[44] *Id.*

of the verb used by the impartial hearing officer.[45] Under Daylight's approach, if (but only if) the Order directs the DOE "to provide" a service, the DOE is required to show proof that the student actually received the service. But if the language of an Order differs slightly – requiring that a student "receive" a service or that a child is "entitled to" a service – then Daylight's interpretation allows the DOE to not actually provide the service and only offer an RSA to constitute Timely Implementation.[46] That is, Daylight read into the Stipulation that "implementation" of a Service Action Item under paragraph 1(*ii*) can mean *either* providing the actual service *or* a voucher for that service, the distinction turning solely on the particular verb that an impartial hearing officer used in finding that a student is legally entitled to receive a service. As a result, if an Action Item requires that the student "receive" a service, the Action Item can be found to have been Timely Implemented even if the student does not actually receive the service.

Daylight's interpretation of the Stipulation artificially inflates the DOE's percentage of Timely Implemented Service Orders and Action Items. The table below shows the results for Timely Implementation in the Post-CAP First Benchmark as

---

[45]   Daylight has explained its position as follows:

> Where the DOE is affirmatively ordered "to provide" a service, they must take active steps to ensure that the child is provided with the service. Daylight requires documentary evidence that the child is receiving the service to analyze such Action Item as Timely Implemented. . . . On the other hand, where the language states that the child is "to receive" or is "entitled to" the service, the same obligation is not imposed on the DOE. In these cases, the RSA authorizes the child to receive the service from a non-DOE provider and is considered sufficient evidence of Timely Implementation.

Penski Decl. Ex. AA at 2.

[46]   *Id.*

compared to the results for Timely Implementation had Daylight accepted the interpretation of the Stipulation Plaintiffs advocated.

|  | Post-CAP 1Q Service Orders | Post-CAP 1Q Service Action Items | Post-CAP 2Q Service Orders | Post-CAP 2Q Service Action Items | Post-CAP First Benchmark Service Orders | Post-CAP First Benchmark Service Action Items |
|---|---|---|---|---|---|---|
| Daylight's Interpretation[47] | 74.1% | 85.4% | 62.8% | 76.5% | 68.7% | 81.5% |
| Plaintiffs' Interpretation[48] | 63.4% | 78.6% | 60.7% | 75.1% | 62.0% | 77.0% |
| Difference in percentage | 10.7% | 6.8% | 2.1% | 1.4% | 6.7% | 4.5% |

The table above makes clear that Daylight's conclusion that an RSA is sufficient to show implementation under the Stipulation has a significant, concrete impact on the DOE's apparent rate of compliance. The DOE's attempt to use RSAs to comply with non-shortage area Service Orders and Action Items—not what the Stipulation provides—is indicative of the DOE's desire to take what they seem to think is the administratively simpler action instead of actually fixing the underlying problem.

***Treatment of Payment Orders***

With regard to Payment Orders and Action Items, Daylight overstates the DOE's compliance rate by counting Payment Orders as Timely Implemented upon the DOE's instructing the Office of the Comptroller to make a payment.[49]

The Stipulation defines Timely Implementation as "an Order or Action Item that was *implemented* within the length of time specified in the Order."[50] For

---

[47] *Id.* Ex. O at 8; Ex. P at 9; Ex. Q at 9.
[48] *Id.* ¶¶ 30-32.
[49] *Id.* Ex. H at 20-21.

12