UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LV, RC, AD, NA, ADJ, YG, LO, AP, RLB, RD, and JYW, individually; and VSG, HR, CW, SS, MG, MS, ST, RZ, MC and JP, on behalf of themselves and all others similarly situated,<br><br>                        Plaintiffs,<br><br>            -against-<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION; NEW YORK CITY BOARD OF EDUCATION; CATHLEEN BLACK, in her individual and official capacity as Chancellor of the New York City School District,<br><br>                        Defendants. | ECF CASE<br><br>No. 03 Civ. 9917 (RJH)<br><br>**REDACTED** |

**REPLY DECLARATION OF REBECCA SHORE IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND COMPENSATORY RELIEF**

REBECCA SHORE, an attorney duly admitted to practice before this Court, hereby declares, under penalty of perjury, as follows:

1. I am a member of the bar of this Court and the Director of Litigation at Advocates for Children of New York ("AFC"). AFC and Milbank, Tweed, Hadley & McCloy LLP ("Milbank") represent Plaintiffs and the Class in the above-captioned action.

2. I respectfully submit this declaration in further support of Plaintiffs' Motion for Appointment of Special Master and Compensatory Relief.

3. This declaration is based on my personal knowledge, my consultation with colleagues at AFC, and the review of documents relating to this action and the impartial hearing

order described below. Capitalized terms not defined herein have the meanings set forth in the Stipulation and Agreement of Settlement, dated December 11, 2007.

**The Lack of a Centralized and Coordinated System for Implementing Orders Harms Parents and Students**

4. AFC represents approximately 100 parents a year in connection with impartial hearings against the DOE. Many of those hearings result in impartial hearing Orders awarding parents the relief they requested.

5. The difficulties that C.M.'s parents experienced in implementing their Order, as described below, and that D.S.'s parent experienced in implementing her Order, as described in the Declaration of Allison Guttu, filed concurrently herewith, demonstrate the difficulties that our clients face in implementing Orders.

6. During the summer of 2010, Miranda Johnson, a staff attorney at AFC, Caroline Miller, a summer legal intern at AFC (then a rising third year law student at Syracuse University College of Law), and Romi Paek, a legal assistant at AFC, worked under my supervision in connection with C.M.'s impartial hearing.

7. AFC was counsel to C.M. in Case$^{\text{REDACTED}}$. C.M. is a student with autism who, despite possessing high average intelligence, was reading at the first grade level at the age of 13. Among other relief sought in C.M.'s April 2010 Impartial Hearing Request, C.M.'s parents sought 1:1 remedial reading tutoring at Lindamood-Bell Learning Processes and transportation to and from Lindamood-Bell. The DOE agreed to pay for C.M.'s compensatory tutoring services at Lindamood-Bell, but refused to provide the requested transportation to and from the tutoring without being so ordered by an impartial hearing officer.

8. At the hearing, C.M.'s parents requested that the DOE provide door-to-door busing when the DOE's Office of Pupil Transportation ("OPT") operated buses (*i.e.*, when DOE schools are open, including during the summer session) and prospective payment for car service to and from Lindamood-Bell when OPT did not operate buses. Because of C.M.'s needs, C.M. was unable to take the subway, and C.M.'s parents believed that busing was the most appropriate method of transportation. Because of C.M.'s parents' very limited income, they could not afford to pay for his transportation. Thus, C.M. had to await a decision before he could attend the remedial reading tutoring—tutoring that was necessary for his success during the 2010-2011 school year.

9. An Order was issued on July 23, 2010 that the DOE "provide door to door transportation from [C.M.'s] home to the Lindamood-Bell Center and return trip to his home, from July through August 18, 2010." The decision further ordered that the DOE "front" the funds for a car service to and from the student's home and Lindamood-Bell and provide MetroCards during NYC public school breaks when special education busing is not available. A true and correct copy of the Order, redacted to protect C.M.'s confidentiality, is attached as Exhibit A.

10. Upon receiving the Order, on Friday July 23, 2010, Caroline Miller left a phone message for Ms. Berelson, a Field Support Officer at OPT, in order to arrange the door-to-door transportation for C.M. so that C.M. could begin tutoring as soon as possible (C.M. had already lost tutoring for the month of July because the DOE insisted on litigating whether he could receive the transportation). Ms. Berelson did not return Ms. Miller's message that Friday.

11. On Monday, July 26, 2010, Ms. Miller left a telephone message for Mr. Carney, Ms. Berelson's supervisor at OPT. Ms. Miller also tried to reach Pete Gillum (whom AFC believed to be in charge of Special Education Routing at OPT), but could not locate him.

12. On Tuesday, July 27, 2010, Mr. Carney returned Ms. Miller's call. He requested that Ms. Miller e-mail him the Order, which Ms. Miller did. A true and correct copy of the e-mail to Mr. Carney is attached as Exhibit B. Mr. Carney indicated in an e-mail response that OPT had "no role in item 3 of the order regarding 'fronting' the funds for private car service ... OPT would not be the source of such funds." A true and correct copy of Mr. Carney's response is attached as Exhibit C.

13. While AFC was trying to arrange the door-to-door busing for C.M., on July 27, 2010, Romi Paek received an e-mail from Linda Chow, a payment implementation liaison within the DOE. The e-mail requested that AFC submit a reimbursement form for the car service and proof of attendance at Lindamood-Bell. A true and correct copy of that e-mail is attached as Exhibit D. Ms. Paek clarified with Ms. Chow later that day that the Order required the DOE to pay prospectively for car service, and not reimburse the parents after payment. Ms. Chow stated that she was unsure how to implement that part of the Order. Further, she stated that the DOE did not have the ability to arrange for car service in C.M.'s case. A true and correct copy of that e-mail is attached as Exhibit E. Over the next two days, Ms. Paek was in constant communication with Ms. Chow and members from the CSE regarding the provision of car service for C.M., which was specifically required in the Order.

14. On July 28, 2010, Ms. Berelson returned Ms. Miller's calls stating that AFC would need to speak with her supervisor, Mr. Carney, and transferred Ms. Miller to him. I

4

also was on the call with Ms. Miller and Ms. Carney. Mr. Carney informed us that OPT would not provide C.M. bus transportation despite the clear requirements of the Order. Mr. Carney claimed that transportation to Lindamood-Bell was a related service and that it was against DOE's policies to provide busing. He again stated that he would have no idea how to implement the part of the Order requiring the DOE to pay prospectively for car service. Thus, OPT, the entity Defendants claim is responsible for implementing Orders relating to student transportation (*see* Declaration of Judy Nathan in Opposition to Plaintiffs' Motion for Appointment of a Special Master and Other Relief, dated Jan. 24, 2011, Dkt. No. 157 ("Nathan Declaration") ¶ 19), denied such responsibility when faced with an actual Order.

15.     On July 28, 2010, AFC's Director of Legal Services and I left phone messages for and e-mailed several senior counsel within the Special Education Unit of the DOE's Office of General Counsel (the "SEU") seeking assistance with implementation of C.M.'s Order. Finally, after informing the DOE that AFC would seek a preliminary injunction to enforce the Order for busing, AFC received confirmation by phone late on July 30, 2010, from Ms. Susan Fingerle, Senior Counsel for Special Projects in the SEU, that OPT would provide C.M. with busing to and from Lindamood-Bell.

16.     On August 2, 2010, I received an e-mail from Ms. Fingerle that while OPT would provide busing, it was not yet in place. A true and correct copy of this e-mail is attached as Exhibit F.

17.     On August 4, 2010, Ms. Miller spoke with C.M.'s parents and confirmed that he began to receive busing to and from Lindamood-Bell that day.

18. As a result of the DOE's delay in providing C.M. door-to-door transportation pursuant to the Order, C.M. lost two weeks of critical remedial reading tutoring that was necessary to prepare him for the upcoming school year.

19. In the examples of C.M. and D.S., discussed in the Guttu Declaration, implementation was initially refused because no one within the DOE accepted responsibility for implementation of the Orders. Both Orders on their face would have been very simple to implement had there been any semblance of a centralized system: In C.M.'s case to provide busing to a compensatory services program and in D.S.'s case to offer a new school placement. In both cases, the office Defendants claim was responsible for implementation refused to implement the Order. Because implementation is not centralized and there is not one person overseeing and ensuring implementation of all types of Orders, the designated DOE offices were unable to enforce the Order and instead denied responsibility. It was only when AFC contacted senior people within the DOE—people that are not identified in the Nathan Declaration and not known or accessible to most parents—that AFC was able to get results. Even then, these students' educations were delayed. If these parents were not represented by attorneys who had relationships with senior members of the DOE and were able to navigate the complicated structure and apply legal pressure to get results, the parents would have been stuck in a quagmire with the persons assigned to implement these precise orders (OPT and Children's First Networks ("CFN"), respectively) refusing implementation.

20. As these examples demonstrate, the process for obtaining implementation of Orders is not transparent, and there is no roadmap for parents to learn who is responsible for implementation of the Order. Nor is there one person overseeing all Action Items within an

Order who the parent can contact with concerns regarding implementation. A parent is likely to call the DOE staff with whom they were working before the impartial hearing or the DOE hearing representative, but those staff members often have no responsibility for implementation.

21. Similarly, the Nathan Declaration describes CFNs as assisting in implementing some types of Orders. CFNs are not geographically based. The only way to determine which CFN is assigned to a particular school is to look for the "DSSI Network Leader" listed on the bottom of the school's website.

### Non-Implementation Notices Are Not Adequate Remedies for The Substantial (and Growing) Number of Parents Whose Impartial Hearings Have Not Been Implemented

22. The Non-Implementation Notices provided by the Stipulation have turned out to be insufficient because of how long it takes to send them to Class members and how many Orders go Unimplemented despite the years the Stipulation has been in effect.

23. Non-Implementation Notices are generally sent between six and 12 months after an Order is issued.

24. For example, the Fifth Quarter Report, issued in November 2009, included Orders and Action Items due to be implemented between June 2009 and August 2009, based primarily on Orders issued during the period from April 2009 to July 2009. Non-Implementation Notices for the Fifth Quarter were issued in March 23, 2010, almost a year after these Orders were originally issued.

25. Similarly, the PCA Second Quarter Report, issued in August 2010, included Orders and Action Items to be implemented between December 2009 and February 2010, based on hearing decisions made during the period from October 2009 to January 2010. The DOE sent the Non-Implementation Notices for the PCA Second Quarter in September 2010.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2011
in New York, New York

*Rebecca Shore*
Rebecca C. Shore