# Milbank

**JASPER J. I. PERKINS**

*Associate*

55 Hudson Yards  |  New York, NY 10001-2163

T: 212.530.5406

jperkins@milbank.com  |  milbank.com

April 15, 2024

<u>**VIA ECF**</u>

Hon. Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>*L.V., et al. v. New York City Dept. of Educ., et al.*</u>, No. 03 Civ. 9917

Dear Judge Preska:

    We represent lead plaintiffs and the Class ("Plaintiffs") in the above-referenced action. We write regarding (i) findings in the Special Master's March 19, 2024 Program Monitoring Report #2 covering activities through that date (Dkt. No. 342, the "Second Report") and (ii) recent developments in the Department of Education's ("DOE") system for implementing impartial hearing orders ("IHOs") that require payment ("Payment IHOs").

    The Special Master's findings raise further concerns—on top of those Plaintiffs expressed in their December 21, 2023 letter (Dkt. No. 334, "Pls.' Dec. Ltr.") in response to the Special Master's first monitoring report (Dkt. No. 333, the "First Report")—with the DOE's progress in fulfilling the obligations ("Obligations") in the Court's July 19, 2023 Order Implementing the Special Master's Recommendations (Dkt. No. 328, the "Order"). In particular, (i) the percentage of Obligations that the DOE fulfilled in the most recent monitoring period fell compared to the period covered by the First Report; (ii) the Special Master cited new causes for non-fulfillment in addition to those he previously cited; and (iii) the non-fulfillment of certain complex Obligations that were due in the second monitoring period is likely to impact DOE's ability to fulfill other Obligations coming due soon. In addition, the DOE recently instituted new practices and conditions precedent in its system for implementing Payment IHOs which have significantly increased burdens on parents, especially those who cannot afford legal counsel to assist in securing

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

Hon. Loretta A. Preska
Page 2

implementation of hearing orders, and/or violate the Individuals with Disabilities Education Act ("IDEA").

In light of the foregoing concerns, Plaintiffs respectfully request an in-person conference to discuss these issues and the steps that the DOE will take to remedy them in order to finally ensure that students receive their ordered and necessary services on time.

*Background*

On July 19, 2023, the Court ordered the DOE to fulfill approximately forty Obligations for improving the DOE's system for fulfilling IHOs. *See* Order at 1-12. The Order contained Obligations with fixed deadlines of approximately 45 days to more than a year that were negotiated by the parties with the aid of the Court and the Special Master. *See* Pls.' Dec Ltr. at 1. Pursuant to the Order, the Special Master is required to file with the Court every 120 days a report setting forth, among other things, "the Special Master's analysis as to whether each Obligation has been fulfilled," and, for each Obligation not fulfilled by the ordered deadline, "the impediments to fulfilling such Obligation, the measures necessary to overcome such impediments, and the timeframe for fulfilling the Obligation." Order at 9 (¶ 39).

On December 1, 2023, the Special Master filed the First Report, covering work to implement the Order through that date. *See* Dkt. No. 333. The Special Master concluded that five of the sixteen Obligations due by November 19, 2023, the last due date in the covered period, were "not yet fulfilled": Obligations 7, 12, 17, 26, and 40. *See* First Report at 23-27. In other words, eleven Obligations, or 69%, were "fulfilled or "tentatively fulfilled." *Id.* at 7. The "biggest issue" impeding fulfillment of the Obligations, the Special Master found, was that the DOE lacked the necessary funding to pay or support new personnel and technologies required to improve timely implementation of impartial hearing orders. *See* First Report at 9. The Special Master predicted that at least half Obligations coming due in January 2024 would not be fulfilled on time due to lack of funding—on top of those that already were past due as of the filing of the First Report. *See id.*

In Plaintiffs' December Letter, Plaintiffs expressed concern that unless the DOE secured additional funding, "any hope that the Order would finally cure the DOE's Impartial Hearing Order system will prove illusory." Pls.' Dec. Ltr. at 3. In their January 31, 2024 response, the DOE acknowledged delays in fulfilling Obligations, but noted that the City's January 16, 2024 allocation of additional funds to support fulfillment of the Obligations—$25 million for fiscal year 2024 and additional funds for later years—was a "significant step." Defs.' Jan. 31, 2024 Ltr. (Dkt. No. 341) at 1. The DOE further stated that it was "committed to overcoming . . . obstacles" to fulfilling the Obligations, and "will actively engage with the OMB to navigate these challenges. These

Hon. Loretta A. Preska
Page 3

commitments are held at the highest levels of leadership within DOE, with several cabinet members personally acting to carry out necessary steps." *Id*. at 2.

Thirteen additional Obligations were due during the period covered by the Second Report: Obligations 5, 8, 10, 13, 14a, 14b, 16, 20, 22a, 24b, 23, 29, and 30, all due by January 19, 2024. *See* Second Report at 6.

*The Special Master's Findings in the Second Report*

In the Second Report, the Special Master concluded that, as of March 18, 2024, ten of the thirteen Obligations due by January 19, 2024 were "not yet fulfilled": Obligations 5, 8, 10, 13, 14a, 16, 20, 22a, 24b, and 30. *See* Second Report at 20-30. Two Obligations, 23 and 29, were "tentatively fulfilled," *id*. at 7, 18-19; one, Obligation 14b, was "fulfilled," *id*. at 7, 15. The Special Master further found that the City's allocation of $25 million to implement the Order had removed lack of funding from the causes of non-fulfillment, but "a combination" of other "high-level factors" contributed to non-fulfillment in the monitoring period. In particular, the Special Master highlighted the DOE's lack of staffing capacity. *See* Second Report at 9 (Implementation Unit staff are "overburdened"); 24 ("A recruiting/hiring/HR resource is needed" for Obligation 22a); 27 ("Capacity to [fulfill Obligation 30] has been a challenge."); 33 ("DOE OGC staff are overburdened with other competing priorities.").

For several Obligations, the Special Master noted that effectively no progress was made during the monitoring period. For example, with respect to Obligation 8, the Special Master noted that the "DOE has, in comments to [the Second Report], pointed me to some specific [business requirements documents] that relate to this process [*i.e.*, the process described in Obligation 8].[1] However, I have not received any communications outside of these comments shared on 3/15." *See* Second Report at 29. The Special Master noted the same finding with respect to Obligation 16.[2] *See id.* at 30. For other Obligations, although the DOE represented that it was "working" on them, the DOE had not shared with the Special Master any meaningful steps toward fulfillment. For example, Obligation 30 required the DOE to create an Operating Procedures Manual by

---

[1] Obligation 8: "Within six months of the date of this Order, the DOE will design a process by which the DOE can collect relevant implementation documentation from parents and guardians, parent representatives, and providers before the hearing; the DOE will conduct user research with parents to design a web-based and offline data collection process to facilitate this. The DOE will modify any necessary policies or technologies to allow parents to submit payment documentation as multiple files or different formats."

[2] Obligation 16: "Within six months of the date of this Order, the DOE will design an automated service to generate emails to parents, attorneys and advocates, and providers at key milestones in the administrative workflow of the implementation of an order, such as when an Implementation Manager unpacks the hearing order, when a service provider has been identified, when a payment action item has been authorized, and when the payment has been sent to the parent or provider."

Hon. Loretta A. Preska
Page 4

January 19, 2024.  As of March 18, 2024, however, the DOE had not shared a draft with the Special Master.  *See id.* at 27.

*The DOE's Non-Compliance with the Order Raises Concerns for Future Obligations*

The Special Master's findings reflect that the DOE's fulfillment rate for Obligations that were due in the most recent monitoring period fell significantly compared to the period covered by the First Report—from approximately 69% in the first period (11 of 16 Obligations "fulfilled or "tentatively fulfilled") to 23% in the second period (3 of 13 Obligations "fulfilled or "tentatively fulfilled").  Consistent with the Special Master's prediction that "at least half" of the Obligations due in this reporting period would not be fulfilled, just one such Obligation was, Obligation 14(b), which required the DOE to "within six months of the date of [the Order], design a plan for additional staffing within the Implementation Unit."  *See* Second Report at 15.  Overall, according to the Second Report, 10 of 27 Obligations that have come due in the two monitoring periods since the Court entered the Order have not been fulfilled.  *Id.* at 7.

In addition, certain larger, more complex Obligations that are vital to the fulfillment of other Obligations, and key to the overall scheme proposed by the Special Master, have not been fulfilled or, apparently, progressed at all.  For example, Obligation 8 required the DOE to develop a web-based system to collect IHO-related documentation and was a key feature of the Special Master's recommendation that the impartial hearing system adopt web-based tools to remove bottlenecks in the implementation process.  Yet in the Second Report, the Special Master found that the DOE's only mention of steps taken to fulfill Obligation 8 was in its comments to the Special Master's draft Second Report on or about March 15, 2024—four days before the Special Master filed the Second Report.  *See* Second Report at 29.  Similarly, the DOE only mentioned any steps to fulfill Obligation 16—designing an "automated service" to email stakeholders at various key points in the IHO implementation process—in comments to the Special Master's draft Second Report on or about March 15, and, with respect to Obligation 24b—implementing improvements to DAITS, the DOE's principal technology system for tracking and implementing IHOs—had only drafted a statement of work by the January 19, 2024 deadline and apparently made no other progress.  *See* Second Report at 30, 33.  These major Obligations are key aspects of the overall scheme to fix the IHO implementation process and are connected to numerous other Obligations within that scheme.  Absent intervention, DOE's failure to fulfill them is likely to have cascading effects on the timely fulfillment of other Court-ordered Obligations.

Notably, the DOE repeatedly cited obstacles of which it was well aware prior to the entry of the Order as reasons that certain Obligations were not fulfilled or did not progress at all in the monitoring period.  For example, the DOE waited until after it received funding in the January 19, 2024 budget—well after entry of the Order—to even draft job descriptions for certain Obligations, likely contributing to further delay in hiring staff, even after the City allocated funding to the Obligations.  *Id*. at 15; *see also id.* at 21 (DOE claiming that a litigation that has been pending

Hon. Loretta A. Preska
Page 5

since 2017, and of which the DOE was well aware at the time the Order was entered, was the reason for the non-fulfillment of Obligation 20 by January 19, 2024).

The purpose of the Order and the appointment of the Special Master was to break the long-running trend of the DOE failing to meet Court-ordered deadlines and completion standards for the timely implementation of IHOs[3]—yet the declines in the fulfillment rate in the second monitoring period and the overall proportion of Obligations "fulfilled" reflect that this trend continues.[4]

*DOE's New Conditions on Implementation of Payment Hearing Orders Violate the IDEA*

As the Special Master noted in his March 19, 2024 cover letter to the Second Report, the DOE recently imposed new conditions on the implementation of Payment IHOs. *See* Dkt. No. 342-1 (noting "concern" that "DOE now requires parents and/or advocates to be included in payment submissions to verify services."). Until recently, the DOE received invoices and communications from private schools, service providers, and other payment recipients directly. When the DOE did not pay the invoices, the service providers and schools would notify the DOE's Implementation Unit, and the Implementation Unit would communicate directly with the schools and service providers regarding implementation. In the past two months, the DOE has begun notifying schools, providers, and parents that the DOE will no longer communicate with schools or providers, and any communications regarding implementation of IHOs must come from the parent or parent's attorney. This is burdensome on all parents: parents of students with disabilities cannot afford the additional time or money to repeatedly follow up with the DOE to secure ordered payments, especially when implementation often already is delayed by months and/or already requires repeated outreach to the DOE. This burden is even greater on parents not represented by legal counsel. Even when a parent is represented by legal counsel at an impartial hearing, that representation does not always include representation after the IHO is issued and, in some cases, parents cannot afford to pay for follow-up representation in connection with IHO implementation. The DOE's refusal to implement hearing orders when implementation-related communications (including invoices) come from the school or provider is an undue and unnecessary burden and hinders students' ability to receive ordered services.

The DOE also has recently imposed other conditions precedent on implementation of Payment IHOs, which this Court has already ruled violates the IDEA. Specifically, in at least two recent instances, the DOE has conditioned reimbursement to parents on additional documentary proof of payment beyond what an impartial hearing officer had already determined was sufficient. When an impartial hearing officer orders that the DOE pay a set amount based on evidence

---

[3] *See generally* Mem. of Law ISO Pls.' Mot. for Appointment of a Special Master (Dkt. No. 206); Reply Mem. of Law ISO Pls.' Mot. for Appointment of a Special Master (Dkt. No. 220).

[4] In its most recent monitoring report, covering orders due to be implemented between November 15, 2022 and February 15, 2023, the Independent Auditor found that the DOE timely implemented 1.9% of payment orders and 5.8% of service orders due in that period. *See* App'x 2.

Hon. Loretta A. Preska
Page 6

presented at the hearing, the DOE must pay that amount.  As Your Honor ruled in Your Honor's
February 18, 2021 Memorandum and Order granting Plaintiffs' Motion for a Declaratory
Judgment:

> If no appeal is taken, the IHO's order is binding on the parties, "and no further
> review appears to be contemplated under the [IDEA]."  *Antkowiak ex rel.
> Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988).  Indeed, the efficacy of
> the administrative review process "depends on the binding IHO decision being
> adhered to by the parties." *SJB ex rel. Berkhout v. N.Y.C. Dep't of Educ.*, No. 03
> Civ. 6653 (NRB), 2004 WL 1586500, at *4 (S.D.N.Y. July 14, 2004).  The upshot?
> Orders that are not appealed, such as those at issue here, are "final," and DOE's
> only lawful course of action is to implement them.

Dkt. No. 258 at 13.  The DOE's requirement of additional documentation denies students services
that have already been ordered and thus violates the IDEA.

*       *       *

Plaintiffs agree that the City's budget allocation to facilitate DOE's compliance with the
Order is a "significant step."  However, the continuation of trends that the Court's Order was
specifically designed to remedy, and the creation of new impediments on the implementation of
payment IHOs, are cause for alarm.  Plaintiffs would welcome the input of the Special Master, the
DOE, and the Court on the foregoing topics.  Accordingly, Plaintiffs respectfully request an in-
person conference to discuss the foregoing topics and the steps that the DOE will take to bring its
implementation of the Order in line with the deadlines and other requirements therein, and thus
secure students' ordered services.

Respectfully submitted,

 /s/ Jasper J. I. Perkins
Jasper J. I. Perkins
Milbank LLP

Rebecca C. Shore
Advocates for Children

cc:      All counsel of record (via ECF)

Hon. Loretta A. Preska
Page 7

## Appendix 1 – Summary of Fulfillment of Obligations in Second Monitoring Period

**Obligations Due in the Second Monitoring Period and
Fulfilled or Tentatively Fulfilled as of the Filing of the Second Report**

- **Obligation 14(b)** Within six months of the date of this Order, [the DOE will] design a plan for additional staffing within the Implementation Unit.

- **Obligation 23:** The DOE will designate a dedicated resource to plan, develop, and deliver training materials for Implementation Unit and OGC staff and within six months of the date of this Order, create a training plan, develop materials, and deliver training pertinent to the implementation of orders. The DOE will update training materials to reflect changing policies and processes.

- **Obligation 29**: Within six months of the date of this Order, the DOE will add the role of Implementation Systems Analyst to the Due Process Systems and Analytics Office to maintain documentation of workflows and continue the process of streamlining implementation processes.

**Obligations Due in the Second Monitoring Period and
Not Fulfilled as of the Filing of the Second Report**

- **Obligation 5**: With endorsement from Plaintiffs, DOE, OATH and NYSED leadership, within six months of the date of this Order, the DOE will research and design a web-based interface for Impartial Hearing Officers to issue decisions and build the user-friendly web form for capturing orders â€¦ allowing both common and uncommon relief to be ordered. The web-based interface must include the ability to capture the decision and order, both via structured input fields (e.g., a dropdown menu) and/or in writing (e.g., a free-form text field), with the full independence and discretion of the Hearing Officer.

- **Obligation 8**: Within six months of the date of this Order, the DOE will design a process by which the DOE can collect relevant implementation documentation from parents and guardians, parent representatives, and providers before the hearing; the DOE will conduct user research with parents to design a web-based and offline data collection process to facilitate this. The DOE will modify any necessary policies or technologies to allow parents to submit payment documentation as multiple files or different formats.

- **Obligation 10**: The DOE will assess and implement a solution to support the submission and immediate approval of timesheets within six months of the date of this Order.

- **Obligation 13**: Within six months of the date of this Order, the DOE will define data and system requirements for monitoring incoming and tracking the ongoing implementation

Hon. Loretta A. Preska
Page 8

of orders comprised of service action items.  Structured input by the hearing officer
issuing the order should include deadline or due date types of input fields.

- **Obligation 14a**: Within six months of the date of this Order, the DOE and the Office of
  School Health will modify any applicable procedures with nursing agencies to specify
  that postings and assignments for a nurse will remain open until an individual nurse has
  been formally assigned to a student rather than when the nursing agency has claimed the
  posting.

- **Obligation 16**: Within six months of the date of this Order, the DOE will design an
  automated service to generate emails to parents, attorneys and advocates, and providers at
  key milestones in the administrative workflow of the implementation of an order, such as
  when an Implementation Manager unpacks the hearing order, when a service provider
  has been identified, when a payment action item has been authorized, and when the
  payment has been sent to the parent or provider.

- **Obligation 20**: Within six months of the date of this Order, the DOE and the Office of
  School Health will modify any applicable procedures with nursing agencies to specify
  that postings and assignments for a nurse will remain open until an individual nurse has
  been formally assigned to a student rather than when the nursing agency has claimed the
  posting.

- **Obligation 22a**: Within six months, the DOE will develop a recruitment and hiring
  strategy for new staff to meet the volume of backlogged orders that have not been
  implemented and orders as they are issued currently and in the future.

- **Obligation 24b**: Within six months of the date of this order, the DOE will develop, test,
  and release the DAITS enhancements.

- **Obligation 30**: Within six months of the date of this Order, the DOE will expand the LV
  Payment and Service Guidelines for Implementation Unit staff into an Operating
  Procedures Manual, and design and implement a professional development series on
  order implementation for DOE staff.

# APPENDIX 2



**L.V. v. D.O.E.**

**03 Civ. 9917 (RJH)**

**Stipulation and Agreement of Settlement**

**Independent Auditor's Post Corrective Action**

**Fifty-Fourth Quarterly Report**

**April 8, 2024**



**Table of Contents**

I.  Introduction ....................................................................................................................... 1

II.  Executive Summary and Statistical Overview .................................................................. 3

III.  Implementation of Service Action Items by Category ...................................................... 5

IV.  Implementation of Payment Action Items by Category..................................................... 6

V.  Comparison of Timely Implemented Orders and Action Items ......................................... 8

VI.  Limitations ........................................................................................................................ 9

VII.  Conclusion ........................................................................................................................ 9



**Appendices**

A.  List of Post Corrective Action Fifty-Fourth Quarter Unimplemented Orders
B.  List of Post Corrective Action Fifty-Fourth Quarter Timely Implemented Orders
C.  List of Post Corrective Action Fifty-Fourth Quarter Uncounted Orders
D.  Post Corrective Action Fifty-Fourth Quarter Orders Grouped with Related Action Items
E.  List of Post Corrective Action Fifty-Fourth Quarter Unimplemented Action Items
F.  List of Post Corrective Action Fifty-Fourth Quarter Timely Implemented Action Items
G.  List of Post Corrective Action Fifty-Fourth Quarter Uncounted Action Items



### I.  Introduction

On December 12, 2003, Advocates for Children of New York ("AFC") and Milbank, Tweed, Hadley & McCloy LLP ("Milbank") filed a class action, L.V. v. D.O.E.  03 Civ. 9917 (RJH).  The class was comprised of parents of special needs children who alleged that while they had obtained a favorable order from an Impartial Hearing Officer against the New York City Department of Education ("DOE") or stipulation of settlement placed on the record at an impartial hearing with the DOE, the DOE failed to obtain full and timely implementation of such order or settlement.

On December 11, 2007, the Corporation Counsel of the City of New York on behalf of the DOE and AFC and Milbank on behalf of Lead Plaintiffs and Class[1] ("Plaintiffs"), referred to collectively herein as ("the Parties"), signed a Stipulation and Agreement of Settlement ("Stipulation") in connection with L.V. v. D.O.E. 03 Civ. 9917 (RJH). Pursuant to the terms of the Stipulation, Daylight Forensic & Advisory LLC ("Daylight") was appointed as Independent Auditor on March 27, 2008.  On May 9, 2008, the DOE formally engaged Daylight to commence the independent audit.

The Stipulation requires the Independent Auditor to generate reports concerning the DOE's implementation of Orders and Action Items for all Quarterly Measurement Periods (each a "Quarterly Report") and Benchmark Measurement Periods (each a "Benchmark Report").

---

[1] Pursuant to Section I.1.f. of the Stipulation, "Class" is defined as the Compensatory Relief Subclass and the Injunctive Relief Subclass.



Guidehouse[2] issued the following reports in conjunction with the Injunctive Relief Subclass: (1) Gap Period Report (dated August 6, 2008); (2) Fourth Quarterly Report (dated January 9, 2009); (3) Eighth Quarterly Report and Fourth Benchmark Report (dated June 11, 2009); and (4) Post Corrective Action[3] Fourth Quarterly Report (dated April 9, 2010).[4]

Guidehouse issued reports in conjunction with the Injunctive Relief Subclass, including the Post Corrective Action ("PCA") Fourth Benchmark Report dated August 13, 2010, as well as reports for the PCA Fourth Quarter through the PCA Fifty-Third Quarter. Guidehouse issued the final PCA quarterly reports during the time period of August 13, 2010 through October 13, 2023.

The current report focuses on Guidehouse's review of Injunctive Relief Subclass Orders and summarizes our analysis of the Total Orders and Total Action Items that were part of the post corrective action Fifty-Fourth Quarterly Measurement Period ("PCA Fifty-Fourth Quarter") and includes Orders issued between October 11, 2022 through January 9, 2023 with Action Item final due dates between November 15, 2022 through February 13, 2023.

The terms defined in Section I. Definitions of the Stipulation apply to the present report.

---

[2] On October 11, 2019, Guidehouse LLP completed its acquisition of Navigant. We refer to Navigant and Daylight as 'Guidehouse' for consistency purposes under the terms of this engagement. Guidehouse continues to perform according to the terms of the Engagement Letter, using the same analysis and methods and without changes to the schedule, price, or level of effort.

[3] Pursuant to Section III.10.a. of the Stipulation, "If the DOE fails to meet the Fourth Benchmark or Fifth Benchmark at the required date…the DOE must, within three months of issuance of the final Benchmark Report notifying the parties of the missed benchmark, formulate and implement a Corrective Action Plan designed to correct the problems that caused the DOE to miss the benchmark at issue."

[4] Pursuant to Sections I.1.r. and I.1.h of the Stipulation, "Injunctive Relief Subclass" is defined as the class of all persons who, on or subsequent to the Commencement Date of December 12, 2003, (1) obtain or obtained a favorable Order by an Impartial Hearing Officer against the DOE or stipulation of settlement placed on the record at an impartial hearing with the DOE and (2) fail or failed to obtain full and timely implementation of such Order or settlement.



## II.   Executive Summary and Statistical Overview

During the PCA Fifty-Fourth Quarter, Guidehouse determined that the DOE Timely Implemented [5] 5.8% of Service Orders; [6] 4.0% of Service Action Items; 1.9% of Payment Orders; [7] and 1.7% of Payment Action Items during this timeframe.

The following table summarizes the counted PCA Fifty-Fourth Quarter Orders and Action Items by type of relief:

|  | Service Orders | Payment Orders | Service Action Items | Payment Action Items |
|---|---|---|---|---|
| **Timely Implemented** | 184 (5.8%) | 96 (1.9%) | 284 (4.0%) | 136 (1.7%) |
| **Unimplemented**[8] | 2,967 (94.2%) | 5,030 (98.1%) | 6,854 (96.0%) | 7,896 (98.3%) |
| **Total** | 3,151 | 5,126 | 7,138 | 8,032 |

---

[5] "Timely Implemented" is defined as an Order or Action Item that was implemented within the length of time specified in the Order or, if no such time is specified in the Order, within 35 days of issuance (of the Order itself or of the Order containing the Action Item), except that particular Orders or Action Items will also be considered to have been timely implemented for measurement purposes pursuant to the additional requirements included in Section I.1.ii. of the Stipulation.

[6] Pursuant to Section I.1.dd. of the Stipulation, "Service Order" is defined as an Order, or all Action Items within an Order that requires the DOE to take any action other than make a payment directly to a parent, private service provider, or private school.

[7] Pursuant to Section I.1.v. of the Stipulation, "Payment Order" is defined as an Order, or all Action Items within an Order, requiring the DOE to make a direct payment to a parent, private service provider, or private school.

[8] Pursuant to Section I,1. mm of the Stipulation, "Unimplemented" or "Unimplemented Order" is defined as an Order or Action Item that is found by the Independent Auditor to have not been Timely Implemented. Guidehouse assessed Action Items as Unimplemented when 1) there was no indication that implementation occurred or 2) the analysis determined that implementation occurred after the due date. Orders were deemed Unimplemented when one or more of the Action Items associated with the Order was determined to be Unimplemented.



In addition, Guidehouse determined that 46 Orders and 87 Action Items issued during the PCA Fifty-Fourth Quarter were Uncounted.[9] There were 3,192 Orders issued during the PCA Fifty-Fourth Quarter that did not include Action Items, such as Orders of Dismissal and Orders where the parent's relief was denied.

Further, Guidehouse identified 712 Orders (comprising 1,160 Action Items) and 107 additional Action Items where the DOE was not required to implement the Action Items because they were beyond the scope of review.  These Action Items were beyond our scope of review for multiple reasons, including but not limited to:

- Situations where the parent refused an ordered service;
- Implementation performed pursuant to a prior Order; and
- Payment was made in conjunction with a previously analyzed Action Item.[10]

---

[9] Pursuant to Section I.1. ll. of the Stipulation, Orders or Action Items are deemed "Uncounted Orders" or "Uncounted Action Items," respectively, when an Order or Action item could not be Timely Implemented because:

  i. It required the DOE to take action that would either violate applicable law or is factually impossible;
  ii. The DOE had made a substantial showing of attempts to reach the parent and attempts to obtain compliance with the parent's obligations under the Order;
  iii. It required the provision of a DOE designated shortage area service which includes, inter alia, occupational, physical and speech therapy and where the DOE made a substantial showing that it offered the parent an appropriate substitute service within 35 calendar days of the issuance of the relevant Order or Action Item; and
  iv. The Order or Action item was timely appealed by the DOE.

[10] A complete list of these Orders and Action Items will be provided to the Parties.

4



III.   **Implementation of Service Action Items by Category**

Guidehouse reviewed the 7,138 counted Service Action Items and noted that the top three most frequently identified categories were Speech and Language Therapy (2,451 Action Items or 34.3%), followed by Occupational Therapy (1,616 Action Items or 22.6%) and Counseling (955 Action Items or 13.4%).

The categories with the highest percentage of Unimplemented Action Items with respect to the total number of counted Service Action Items within the category were Assistive Technology Services (100.0%), followed by Paraprofessional (99.3%) and Reconvene Hearing or Meeting (99.0%).

The following table sets forth the top 10 Service Action Item categories based on the number of counted Action Items:

| | Action Item Category | Total Counted Service Action Items | % Total Counted Service Action Items | # Timely Implemented by Category | % Timely Implemented by Category | # Unimplemented by Category | % Unimplemented by Category |
|---|---|---|---|---|---|---|---|
| 1 | Speech and Language Therapy | 2,451 | 34.3% | 54 | 2.2% | 2,397 | 97.8% |
| 2 | Occupational Therapy | 1,616 | 22.6% | 24 | 1.5% | 1,592 | 98.5% |
| 3 | Counseling | 955 | 13.4% | 26 | 2.7% | 929 | 97.3% |
| 4 | Physical Therapy | 478 | 6.7% | 14 | 2.9% | 464 | 97.1% |
| 5 | Transportation | 436 | 6.1% | 141 | 32.3% | 295 | 67.7% |
| 6 | CSE Evaluation | 315 | 4.4% | 10 | 3.2% | 305 | 96.8% |
| 7 | Reconvene Hearing or Meeting | 314 | 4.4% | 3 | 1.0% | 311 | 99.0% |
| 8 | Paraprofessional | 135 | 1.9% | 1 | 0.7% | 134 | 99.3% |
| 9 | Assistive Technology Services | 89 | 1.3% | 0 | 0.0% | 89 | 100.0% |
| 10 | Offer Placement | 81 | 1.1% | 7 | 8.6% | 74 | 91.4% |
| | Remaining Categories with 80 or Less Action Items | 268 | 3.8% | 4 | 1.5% | 264 | 98.5% |
| | **TOTAL** | 7,138 | 100.0% | 284 | 4.0% | 6,854 | 96.0% |



**IV.   Implementation of Payment Action Items by Category**

Guidehouse reviewed the 8,032 counted Payment Action Items and noted 6,364 Action Items categorized as prospective payments and 1,668 Action Items categorized as reimbursements.  The top three most frequently identified categories of prospective Payment Action Items were Special Education Teacher Support Services (2,595 Action Items or 40.8%), followed by Tuition (1,334 Action Items or 20.9%), and SEIT Services (581 Action Items or 9.1%).

The categories with the highest percentage of Unimplemented Action Items with respect to the total number of counted prospective Payment Action Items within the category were Compensatory Services (100.0%), followed by Private Evaluations Ordered (99.6%) and Speech and Language Therapy (99.1%).

The following table sets forth the top eight prospective Payment Action Item categories based on the number of counted Action Items:

| | Action Item Category | Total Counted Payment Action Items | % Total Counted Payment Action Items | # Timely Implemented by Category | % Timely Implemented by Category | # Unimplemented by Category | % Unimplemented by Category |
|---|---|---|---|---|---|---|---|
| 1 | Special Education Teacher Support Services | 2,595 | 40.8% | 35 | 1.3% | 2,560 | 98.7% |
| 2 | Tuition | 1,334 | 20.9% | 37 | 2.8% | 1,297 | 97.2% |
| 3 | SEIT Services | 581 | 9.1% | 11 | 1.9% | 570 | 98.1% |
| 4 | Compensatory Services | 383 | 6.0% | 0 | 0.0% | 383 | 100.0% |
| 5 | Speech and Language Therapy | 348 | 5.5% | 3 | 0.9% | 345 | 99.1% |
| 6 | Private Evaluations Ordered | 279 | 4.4% | 1 | 0.4% | 278 | 99.6% |
| 7 | Occupational Therapy | 240 | 3.8% | 3 | 1.2% | 237 | 98.8% |
| 8 | ABA Therapy | 128 | 2.0% | 10 | 7.8% | 118 | 92.2% |
| | Remaining Categories with 68 or Less Action Items | 476 | 7.5% | 9 | 1.9% | 467 | 98.1% |
| | **TOTAL** | 6,364 | 100.0% | 109 | 1.7% | 6,255 | 98.3% |



The top three most frequently identified categories of reimbursement Action Items were Tuition (1,360 Action Items or 81.5%), followed by Transportation (81 Action Items or 4.9%) and Special Education Teacher Support Services (40 Action Items or 2.4%).

The categories with the highest percentage of Unimplemented Action Items with respect to the total number of counted reimbursement Action Items within the category were Transportation (100.0%) and Special Education Teacher Support Services (100.0%).

The following table sets forth the top three reimbursement Action Item categories based on the number of counted Action Items:

| | Action Item Category | Total Counted Payment Action Items | % Total Counted Payment Action Items | # Timely Implemented by Category | % Timely Implemented by Category | # Unimplemented by Category | % Unimplemented by Category |
|---|---|---|---|---|---|---|---|
| 1 | Tuition | 1,360 | 81.5% | 27 | 2.0% | 1,333 | 98.0% |
| 2 | Transportation | 81 | 4.9% | 0 | 0.0% | 81 | 100.0% |
| 3 | Special Education Teacher Support Services | 40 | 2.4% | 0 | 0.0% | 40 | 100.0% |
| | Remaining Categories with 38 or Less Action Items | 187 | 11.2% | 0 | 0.0% | 187 | 100.0% |
| | TOTAL | 1,668 | 100.0% | 27 | 1.6% | 1,641 | 98.4% |



## V.   Comparison of Timely Implemented Orders and Action Items

Guidehouse identified a decrease in the percentage of Timely Implemented Orders and Timely Implemented Action Items in the PCA Fifty-Fourth Quarter. Guidehouse analyzed the statistics from the final PCA Forty-Sixth through the PCA Fifty-Third Quarterly Reports and determined that the DOE timely implemented, on average, 2.5% of Payment Orders, 3.7% of Payment Actions, 7.4% of Service Orders and 6.0% of Service Action Items. In the PCA Fifty-Fourth Quarter, Guidehouse determined that the DOE timely implemented 1.9% of Payment Orders, 1.7% of Payment Action Items, 5.8% of Service Orders, and 4.0% of Service Action Items.

It is worth noting that the percentage of Timely Implemented Payment Orders and Timely Implemented Payment Action Items fell below 2% and Timely Implemented Service Orders and Timely Implemented Service Action Items fell below 6% in the final PCA Fifty-Fourth Quarterly report.  The table below and the graph on the following page depict the Timely Implemented percentages in the final reports from Q46A through Q54A.

| Final Quarterly Reports | 46A 10/13/2020- 1/11/2021 | 47A 1/12/2021- 4/12/2021 | 48A 4/13/2021- 7/12/2021 | 49A 7/13/2021- 10/11/2021 | 50A 10/12/2021- 1/10/2022 | 51A 1/11/2022- 4/11/2022 | 52A 4/12/2022- 7/11/2022 | 53A 7/12/2022- 10/10/2022 | 54A 10/11/2022- 1/9/2023 |
|---|---|---|---|---|---|---|---|---|---|
| **Timely Implemented Payment Orders** | 0.7% | 1.2% | 4.3% | 2.5% | 1.9% | 2.3% | 4.0% | 3.0% | 1.9% |
| **Timely Implemented Payment Action Items** | 1.2% | 1.7% | 3.5% | 3.4% | 2.3% | 3.1% | 4.9% | 4.3% | 1.7% |
| **Timely Implemented Service Orders** | 8.5% | 8.7% | 10.9% | 6.5% | 7.8% | 5.8% | 2.5% | 8.6% | 5.8% |
| **Timely Implemented Service Action Items** | 10.5% | 9.9% | 10.2% | 4.4% | 5.9% | 5.2% | 2.6% | 6.0% | 4.0% |





**VI.**   **Limitations**

The conclusions, observations and assessments detailed in this report are based on Guidehouse's methodology and the procedures performed.   Had Guidehouse performed additional procedures or testing, it is possible that our conclusions, observations and assessments could be different.   Guidehouse also relied on information provided by the DOE and AFC during its work.

**VII.**   **Conclusion**

Guidehouse has continued with its analysis of the Injunctive Relief Subclass Orders and Action Items relating to subsequent reporting periods.