

**THE CITY OF NEW YORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**STEVEN BANKS**
*Corporation Counsel*

**JEFFREY S. DANTOWITZ**
Room 2-178
Tel. (212) 356-0876
jdnatowi@law.nyc.gov
(not for service)

August 4, 2026

**VIA ECF**
Hon. Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York

Re:  LV v. NYC Dep't of Education, et al., 03 Civ. 9917 (LAP)

Dear Judge Preska:

As discussed at the conference held on May 19, 2026, the parties jointly submit this letter to present the various disputes requiring the Court's attention.[1]

### I.      Stipulation and Agreement of Settlement

### A.      IESP cases

1.      Defendants' Position:

**Issue:** Defendants argue that orders issued in connection with Individualized Education Service Plans ("IESPs") are not subject to the Stipulation.

Unlike Individualized Education Plans ("IEPs"), IESPs are developed for students with disabilities in grades K-12 who have been voluntarily placed in a private school.  Defendants assert that such decisions concerning disputes regarding IESPs are not subject to the Stipulation.

Plaintiffs brought this case in 2003 alleging violations of the due process clause of the 14th Amendment of the U.S. Constitution, the IDEA, 42 U.S.C § 1983, Section 504 of the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Stipulation.

1

Rehabilitation Act and NY Education Law §§ 4401, *et seq*. based on Defendants' failure to timely implement decisions issued by Impartial Hearing Officers ("IHOs").[2] At the time this action was commenced, students who had received IESPs were not a part of this action. Nor could they have been. At that time N.Y Education Law § 3602-c explicitly stated that disputes regarding IESPs were to be resolved by the Commissioner of the New York State Education Department, not by IHOs. Of note, none of the individually-named student-Plaintiffs had received an IESP.

The parties engaged in extensive discovery, particularly with respect to impartial hearing orders issued by IHOs for students attending public school in Region 9. None of the discovery (including deposition testimony) concerned students attending private schools or who had received IESPs.

By Memorandum Opinion and Order issued September 15, 2005 (ECF No. 80), the Court certified a class, as proposed by Plaintiffs, consisting of:

> all persons (1) who have obtained, or will in the future obtain, for the benefit of a child with disability, a favorable order by an IHO against, or stipulation of settlement placed on the record at an impartial due process hearing with, the New York City Department of Education, or who are children with disabilities who are the beneficiaries of such order or stipulation of settlement, and (2) who fail to obtain, or are at risk of failing to obtain, full and timely implementation of such order or settlement.

ECF No. 80 at 15. Notably, the parties' papers in connection with that motion and the Court's Opinion extensively discuss orders related to rights to a "free appropriate public education" ("FAPE"). Specifically, in the first paragraph of the Court's Opinion, the Court makes clear that the class that Plaintiffs moved to certify was intended to be comprised of a subset of persons with orders "relating to a child's statutory entitlement to free appropriate public education as provided by the Individuals with Disabilities in Education Act ('IDEA'), 20 U.S.C. 1400 *et seq*." *Id*. at 1. The statutory entitlement to a FAPE, however, is not relevant to cases regarding the implementation of IESPs.[3] Thus, there is no mention of IESPs or parentally-placed students in any of the papers related to class certification. This is unsurprising as decisions related to IESPs were not being issued by IHOs and were never contemplated as being part of this case. Similarly, the parties never discussed IESP cases during their extensive settlement discussions that resulted in the Stipulation.

---

[2] The initial Complaint did not include Section 504 or NY Education Law; they were added in the Second Amended Complaint on or around April 15, 2004.

[3] The obligation to make available a FAPE is "distinct from" a district's obligations regarding services for students who are parentally-placed. *E.T. v. Board of Educ. of Pine Bush Cent. School Dist.*, 2012 WL 5936537 * 11 (S.D.N.Y. Nov. 26, 2012). In essence, when parents parentally place their child they are voluntarily choosing to forgo a FAPE.

Effective June 1, 2005, N.Y Education Law § 3602-c was amended so as to eliminate language making appeals to the SED Commissioner the exclusive vehicle to raise disputes concerning IESPs. The language was subsequently further amended in June 2007 to make clear that some disputes concerning IESPs were to be resolved pursuant to the administrative process set forth in N.Y. Education Law § 4404, which includes the submission of disputes to an IHO for resolution. Although this section sets forth the mechanism for resolving disputes concerning IEPs under the IDEA, due process hearings concerning IESPs for parentally-placed students arise under State law, not the IDEA. *See* 34 C.F.R. § 300.137(a) (under federal law, "[n]o parentally-placed private school child...has an individual right to receive...special education and related services...") and 34 C.F.R. § 300.140 (stating that, with one limited exception, the IDEA's due process procedures do not apply to complaints about equitable services).

This Court has consistently held that because these claims arise only out of State law, it does not have subject matter jurisdiction over disputes relating to IESPs or the administrative hearing decisions arising from those disputes. *Chera v. N.Y.C. Dep't of Educ.,* 2026 U.S. Dist. LEXIS 8073, *8-11 (S.D.N.Y. Apr. 8, 2026); *Manos v. New York City Dep't of Educ.*, 2026 U.S. Dist. LEXIS 43104, * 13-16 (S.D.N.Y. Mar. 3, 2026); *The Law Office of Philippe J. Gerschel v. New York City Dep't of Educ.*, 2025 U.S. Dist. LEXIS 193977, *6-12 (S.D.N.Y. Sept. 30, 2025) (holding that the Court lacked subject matter jurisdiction because claims concerning entitlement of parentally-placed private school students to the services included on their IESPs are brought under state law and not the IDEA); *see also Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730 (2d Cir. 2007) ("Even assuming that IDEA incorporates the relevant New York Education Law, this does not provide an independent federal question that would sustain the court's jurisdiction."). If this Court does not have jurisdiction over the underlying claims and decisions, it follows that this Court does not have jurisdiction over the implementation of those decisions.

As orders concerning IESPs were not part of this case at the time it was commenced and are not subject to this Court's jurisdiction, they cannot be subject to the Stipulation.

To the extent that the lack of subject matter jurisdiction over the underlying claims is not dispositive, the Court need only look to the clear and unambiguous language of the Stipulation to confirm parties' understanding that IESP cases fall outside the scope of this action and were never intended to be subject to the Stipulation:

  a. The first "Whereas" clause acknowledges that this action was bought under New York State Education Law §§ 4401, *et seq.* which, as noted above, does not govern IESPs, which are governed by NY Education Law § 3602-c, and did not apply to disputes concerning IESPs.

  b. "Impartial Hearing Officers" is defined as "individuals who conduct hearings pursuant to 20 U.S.C. § 1415(f)(1)(A), Section 504 of the Rehabilitation Act, and any successor statutes." (§ I.1.p). As discussed above, however, hearings related to IESPs are conducted pursuant to the NY Education Law, not the IDEA or Rehabilitation Act. Accordingly, decisions relating to IESPs are not

"Orders" that are subject to the Stipulation because they are not issued by "Impartial Hearing Officers" as that term is defined.

c.  Paragraph 2 of the Stipulation provides that "The obligations incurred pursuant to this Stipulation shall be in full and final disposition of the Action and any and all Settled Claims as against all Released Parties and any and all Settled Defendants' Claims against any of the Lead Plaintiffs, Class Members, or Plaintiffs' Counsel."  "Settled Claims," is defined to consist of claims that (i) Plaintiffs or Class Members asserted in this case, or (ii) could have asserted in this action "based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint." (§ I.1.ee).  As discussed above, however, Plaintiffs and Class Members did not assert claims concerning IESPs in this action, and disputes concerning IESPs are not based on "the allegations, transactions,… involved, set forth, or referred to in the Complaint."

Settlement agreements are construed as contracts and governed by general contract law principles. *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 205 (2d Cir. 2016).  "When interpreting a contract, the intention of the parties should control, and the best evidence of intent is the contract itself." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). Thus, if the terms of the agreement are unambiguous, the court must interpret the agreement "within [their] four corners, and not by reference to what might satisfy the purposes of one of the parties to [them]." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)(quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)).  Thus, courts must give effect to the plain and unambiguous words chosen by the parties, even if doing so yields an undesirable impact or fails to satisfy the subjective purposes or expectations of one of the parties.[4]

Here, the Stipulation clearly and unambiguously defines Impartial Hearing Officers in a manner that excludes individuals that issue orders in disputes concerning IESPs, as those orders are not issued pursuant to "20 U.S.C. § 1415(f)(1)(A), Section 504 of the Rehabilitation Act, [or] any successor statutes." (§ I.1.p).  This exclusion is wholly consistent with the claims raised in this action, the class definition, the parties' conduct in discovery and settlement discussions.  Thus, even if the Court were to find that it has subject matter jurisdiction over these disputes, it should not enlarge the reach of the Stipulation beyond what the parties provided.

Plaintiffs' desire to expand the Stipulation beyond what was contemplated and agreed upon is severely prejudicial to Defendants.  Since the time the Stipulation was executed in December 2011, the number of decisions concerning IESP cases has increased dramatically.  For DPCs filed in the 2010-2011 school year, there were fewer than 850 cases that resulted in a final decision by a hearing officer, including decisions about *all* issues, including both FAPE and IESP. By the 2024-2025 school year, there were more than 7,000 final decisions issued by hearing

---

[4]  Of note, paragraph 49 of the Stipulation provides "This Stipulation and its exhibits constitute the entire agreement among the Parties concerning the Settlement of the Action . . . ."

officers *on just cases dealing with IESP issues*, with decisions about cases dealing with IESP issues comprising well over 50% of the final decisions issued by hearing officers.  The inclusion of these cases in the calculation of DOE's compliance imposes additional demands on DOE in demonstrating timely implementation and artificially extends the Court's jurisdiction over Defendants.  In contrast, Plaintiffs are not prejudiced by adhering to the original intent of the parties, as Defendants are still required to implement decisions concerning IESP cases. To be clear, Defendants are committed to implementing IHO decisions concerning cases involving IESPs; however, given that these decisions are outside the scope of this lawsuit, they would be removed from any future data or considerations in this case. Therefore, Defendants' compliance with decisions concerning § 3602-c would not be assessed by the Independent Auditor and should not be included in the obligations imposed by the Independent Auditor, Special Master and Stipulation, and are outside the purview of the Court.

2.   <u>Plaintiffs' Position</u>

Defendants' request to exclude impartial hearing orders ("Orders") and action items ("Action Items") relating to IESPs from the audit is meritless for two reasons: (i) the plain and unambiguous language of the Stipulation includes Orders and Action Items involving IESPs as part of the settlement, and (ii) the two-decade course of dealing between the parties confirms that it was the parties' original intent to include Orders and Action Items involving IESPs within the scope of the Stipulation.

***First***, Defendants correctly state that courts must give effect to "the plain and unambiguous words chosen by the parties" when interpreting a settlement agreement.  Applying this very standard, the Stipulation plainly and unambiguously provides that these Orders and Action Items are within its scope, like all other Orders and Action Items.

Defendants' reliance upon the Class definition is misleading.  Judge Holwell's decision certifying the Class was issued in September 2005, after the June 2005 amendments to New York Education Law referenced by Defendants.  Contrary to Defendants' description of the certified Class as a stagnant definition of recipients of impartial hearing orders, the Class definition by Judge Holwell made clear that the Class includes "all persons (1) who have obtained, *or will in the future obtain*, for the *benefit of a child with disability*, a *favorable order by an IHO against*, or stipulation of settlement placed on the record at an impartial due process hearing with, the New York City Department of Education, or who are children with disabilities who are the beneficiaries of such order or stipulation of settlement."  Mem. Op. & Order, Dkt. No. 80, at 15 (emphasis added).  The Class definition was not limited by the claims asserted in the impartial hearing request, so long as the IHO issued the Order for the benefit of a child with a disability against the DOE.

As Defendants acknowledge, New York Education Law was amended in June 2007 "to make clear that some disputes concerning IESPs were to be resolved pursuant to the administrative process set forth in N.Y. Education Law § 4404, which includes the submission of disputes to an IHO for resolution."  Notably, the Stipulation was negotiated and entered into in December 2007, six months after IESP cases were unambiguously made subject to the impartial hearing process. Defendants were aware of these changes to the law in 2005 and 2007, during the negotiations of

5

the Stipulation, yet Defendants neither limited the language in the Stipulation nor moved to amend the Class definition to exclude IESP cases prior to the Stipulation being signed.

The Stipulation itself makes explicitly clear that impartial hearing orders included within the Stipulation are those "issued by an Impartial Hearing Officer in New York City, under the IDEA, Section 504 of the Rehabilitation Act of 1972, 29 U.S.C. § 794, New York Education Law §§ 4401 *et seq.*, any equivalent federal or state statute or *law enacted subsequent to the Effective Date and which becomes the basis for adjudication* by Impartial Hearing Officers, and all regulations promulgated thereunder." (Stip. ¶ I.1(t) (emphasis added)). Based on this language, there can be no doubt that – even if the law had changed subsequent to the Class certification order – impartial hearing orders relating to IESPs would be covered by the Stipulation. In any event, the parties negotiated and settled the litigation against the backdrop of the law in December 2007, which even then included Orders involving IESPs, recognizing that the jurisdiction of Impartial Hearing Officers might change to include other types of Orders if the jurisdiction of IHOs expanded. Additional text of the Stipulation further confirms this:

a. The first "Whereas" clause acknowledges that this action was brought under New York State Education Law §§ 4401, *et seq.* Contrary to Defendants' characterization, that statute encompasses New York State Education Law § 4404, pursuant to which IESP disputes are submitted to IHOs for resolution.
b. New York Education Law § 3602-c provides that IESP disputes are to be resolved by "impartial hearing officers" as defined by "subsection (f) of section fourteen hundred fifteen of title twenty of the United States code," which is consistent with the applicable definition in the Stipulation. (*See* Stip. ¶ I.1.p).
c. The definition of "Settled Claims" under the Stipulation consists of claims that Plaintiffs or Class Members asserted in this case, or "could have asserted based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint." (Stip. ¶ I.1.ee). Because the Complaint alleged claims pursuant to New York State Education Law §§ 4401, et seq., which included the amended § 4404 as of the time of settlement pursuant to which IESP disputes are submitted to impartial hearings for resolution, the systemic failure to implement Orders relating to IESPs squarely falls within the Stipulation's definition of "Settled Claims."

Therefore, the plain and unambiguous language of the Stipulation provides that IESP disputes are included within the settlement Class.

Relatedly, Defendants argue that this Court "does not have subject matter jurisdiction over disputes relating to IESPs or the administrative hearing decisions arising from those disputes." This argument confuses jurisdiction over standalone IESP disputes with the Court's jurisdiction to enforce the terms of its own settlement. Having established above that cases involving IESPs are within the scope of the Stipulation, the Stipulation itself expressly and unambiguously provides that the Court retains jurisdiction to "enforce the terms of the Stipulation." (Stip. ¶ VIII.47). The Court's enforcement jurisdiction over the Stipulation is not limited only to disputes that could independently sustain federal subject matter jurisdiction. Rather, the Court retains authority to enforce the settlement it approved. *See, e.g.*, *Lemus v. Manhattan Car Wash, Inc.*, No. 1:06-CV-

15486, 2010 WL 1372705, at *12 (S.D.N.Y. Mar. 26, 2010) ("This form of order, which in substance invokes the authority of the court to require the parties to comply with the settlement terms, suffices to vest jurisdiction in this court . . . to enforce the agreement."); *178 E. 80th St. Owners, Inc. v. Jenkins*, No. 1:01-CV-01814, 1:00-CV-06262, 1:00-CV-05959, 2003 WL 22004900, at *1 (S.D.N.Y. Aug. 22, 2003) ("A district court may exercise jurisdiction to enforce settlement agreements even though the underlying subject matter may not be within the subject matter jurisdiction of the court.").

*Second*, the nearly two-decade history of the parties' performance under the Stipulation demonstrates that Defendants never considered IESP cases to be outside the scope of the Stipulation and that it was the parties' "original intent" to include them. Defendants had every opportunity to negotiate the definition of the settlement Class in 2007 and did not seek to exclude IESP cases. From 2007 to this day, Defendants have had countless opportunities to seek clarification of the definition, including through the numerous submissions to this Court, and again did not do so. For nearly two decades, Orders and Action Items involving IESPs have been included in the Independent Auditor's quarterly audits and subject to the Stipulation's compliance framework. Despite their inclusion, in 2011, in response to Plaintiffs' first Motion for a Special Master, Defendants raised a number of the complaints that they raise now regarding the Independent Auditor's interpretation of the Stipulation, but did not raise any objection to the inclusion of hearing orders relating to IESPs. *See, e.g.*, Defs.' Opp'n Special Master Mot., Dkt. No. 160; Decl. Judy Nathan Opp'n Special Master Mot., Dkt. No. 162. Nor did Defendants raise any objection to the inclusion of hearing orders relating to IESPs in their opposition to Plaintiffs' second Motion for a Special Master filed in 2019, or the supplemental papers Defendants filed in 2020. *See, e.g.*, Defs.' Mem. Opp'n Pls.' Special Master Mot., Dkt. No. 216; Decl. Judy Nathan Opp'n Pls.' Special Master Mot., Dkt. No. 215; Decl. Sapna Kapoor Opp'n Pls.' Special Master Mot., Dkt. No. 214; Defs. ' Suppl. Mem. Opp'n Pls.' Special Master Mot., Dkt. No. 248.

The law was clear at the time the Stipulation was signed and ordered that Orders and Action Items involving IESPs were covered, as was the language of the Stipulation, and the parties' course of dealing confirms that Defendants themselves understood that the audit of Orders and Action Items including IESP cases along with all other Orders and Action Items was "contemplated and agreed upon" by the parties from the entry of the Stipulation forward.

Parents of students with IESPs are paying on their own for nonpublic school tuition or home-schooling their children due to religious or personal reasons or reasons related to their child's disability or family circumstances, and are seeking only provision of related services that the DOE is obligated to provide.[5] When the DOE does not provide those related services, those parents seek an impartial hearing order requiring payment for the services the DOE was obligated to provide but did not. Under the current law and regulations – which existed before the Stipulation was signed or ordered – parents have the ability to seek orders related to IESPs from IHOs. *See* N.Y. Education Law § 3602-c. Defendants assert that they "are committed to implementing IHO

---

[5] As this Court expressly acknowledged in 2021, the "IDEA requires DOE to provide a FAPE to all New York City students with disabilities," 20 U.S.C. § 1412(a)(1)(A), and "parents may, unilaterally and at their own financial peril, enroll their child in a private school and then seek reimbursement for the private-school tuition." Mem. & Order, Dkt. No. 258 at 3–5.

decisions concerning cases involving IESPs." If that assertion is genuine, the DOE should have no objection to having its implementation of IESP orders assessed by the Independent Auditor in the context of this action, as the Stipulation has required for nearly two decades.

### 3. Defendants' Reply

Although Plaintiffs agree that the Stipulation should be read according to its terms, they wholly ignore the definition of "Impartial Hearing Officer" which excludes hearings conducted pursuant to Education Law and thus unambiguously excludes orders concerning IESP disputes. Thus, Plaintiffs' attempts to manufacture an ambiguity should not be considered.

A.      Plaintiffs' reliance on Judge Holwell's decision certifying the class is misplaced, as (i) none of the class representative-Plaintiffs had IESPs and, despite Plaintiffs amending their Complaint twice (on January 14, 2004 and May 13, 2004), Plaintiffs never included parents who had received a decision resolving an IESP dispute, (ii) at the time the Complaint was filed and twice amended, Education Law § 3602-c vested authority to adjudicate IESP disputes with the State Education Department, not by impartial hearing officers, (iii) the parties never discussed IESP cases, (iv) at the time the class certification motion was initially presented to the Court (fully briefed by December 13, 2004), IESP cases could not be decided by impartial hearing officers, (v) although replete with references to IEPs, none of the papers submitted in connection with the class certification motion (either in the initial filings or in papers filed in connection with the renewed motion (filed on October 25, 2005) mentioned IESP cases, (vi) Plaintiffs never amended their motion for class certification to include parents who had received a decision resolving an IESP dispute, (vii) Plaintiffs did not advise Judge Holwell of the amendment to Education Law § 3602-c, and (viii) the decision granting class certification describes this action as being brought on behalf of those "who have obtained favorable orders or stipulated settlements . . . relating to a child's statutory entitlement to free appropriate public education as provided by the [IDEA]." ECF No. 80 at 1. Judge Howell reiterated in his Rule 23(b) analysis that "plaintiffs are challenging...alleged...failure to enforce IHO orders in a timely fashion in providing free appropriate public education to class members." *Id.* at 13. Judge Howell referenced FAPE more than ten additional times in his order. As Defendants explained above, however, IESP cases and orders do not relate to a child's entitlement a free appropriate public education under the IDEA.[6]

Thus, the inclusion of IESP cases was not presented to Judge Holwell, and his decision cannot be fairly considered to have encompassed cases that were not addressed by the parties at the time the motion was presented. Plaintiffs' attempt to interpret Judge Holwell's decision in light of the amendment to § 3602-c and then apply knowledge and consideration of that amendment retrospectively, should be rejected.

---

[6] Plaintiffs' footnote 5 may tend to cause confusion as its text discusses only unilaterally-placed students who sue under the IDEA for tuition while alleging that they sought and DOE failed to offer a FAPE.while its placement in the body of their opposition suggests that it is somehow relevant to parentally-placed students, who opted to forgo a FAPE and are seeking equitable services under NY Educ Law 3602-c.

B.       Plaintiffs' text-based arguments also are unavailing.

i.    Although the first "Whereas" clause acknowledges that this case was brought under Education Law §§ 4401, *et seq.* (which includes the procedural mechanisms of impartial hearings under § 4404), it omits any mention of § 3602-c, which governs IESPs.  That Education Law § 3602-c refers to and adopts the hearing procedures set forth in § 4404 is immaterial, and cannot be construed to mean that IESP cases were "brought under" Education Law §§ 4401, *et seq*. as Plaintiffs contend.  Were that the case, parents with favorable IESP orders would be able to claim an entitlement to due process, in contradiction to Court holdings. Accordingly, to accept Plaintiffs' argument would be to improperly graft the substantive provisions and protections of Education Law §§ 4401, *et seq.*, onto what are clearly the limited procedural mechanisms described in § 3602-c.

ii.    Plaintiffs' reliance on the United States Code's definition of "impartial hearing officer" is irrelevant, as the Stipulation defines this phrase differently and in such a way so as to exclude cases adjudicated under the Education Law.  *See Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 485 (2d Cir. 1999)(rejecting party's "*post hoc* attempt to redefine the terms of the Settlement Agreement and thereby to create ambiguity where none exists."); *2138747 Ontario, Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 377 (Ct. of Appeals 2018)("It is a deeply rooted principle of New York contract law that parties may contract as they wish")(cleaned up) *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (Ct. of Appeals 1993)("there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed").

iii.  Plaintiffs' argument that the definition of "Settled Claims" includes IESP orders is incorrect.  The parties agree that this definition of "Settled Claims" consists of claims that Plaintiffs "could have asserted based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint." (Stip. ¶ I.1.ee).  As noted above, however, IESP disputes could *not* have been asserted at the time the Complaint was filed, or at either of the two times it was amended.[7]  Moreover, as none of the "allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint" concerned orders issued in connection with IESP cases, such claims are not within the definition of "Settled Claims."

C.       Plaintiffs' response to Defendants' jurisdictional argument also fails.   While Plaintiffs are correct that a court has jurisdiction to enforce its own settlements, they ignore the principle that parties to a settlement agreement cannot agree to confer subject matter jurisdiction on a federal court. As the Second Circuit has stated, "[g]raven in stone is the maxim that parties cannot confer jurisdiction on a federal court by consent or stipulation." *Reale Int'l v. Fed. Republic*

---

[7] Plaintiffs' description of § 4401 as having been amended is incorrect.  Rather, it was § 3602-c that was amended, to allow parents to bring some disputes concerning IESPs according to the procedures set forth in § 4404.

*of Nig.*, 647 F.2d 330, 331 (1981) (citing, *inter alia*, *California v. LaRue*, 409 U.S. 109, 112 n.3 (1972)).

Plaintiffs' citation to *178 E. 80th St. Owners, Inc. v. Jenkins*, No. 1:01-CV-01814, 1:00-CV-06262, 1:00-CV-05959, 2003 WL 22004900 (S.D.N.Y. Aug. 22, 2003) is misplaced. That case involved a dispute over which the federal court had original jurisdiction. The parties entered into a settlement agreement and the terms were incorporated into the order of dismissal. When defendants moved to enforce the terms of the settlement, the district court referred the dispute to a magistrate. Plaintiffs moved to vacate the reference, arguing that the dispute raised a matter of state law and, therefore, the court lacked subject matter jurisdiction. The court denied the motion, holding that because the order included the terms of the settlement, the court had ancillary jurisdiction to decide the disputed matter, as breach of the settlement agreement also would constitute beach of the court's order. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)

A similar posture existed in *Lemus v. Manhattan Car Wash, Inc.*, No. 1:06-CV-15486, 2010 WL 1372705 (S.D.N.Y. Mar. 26, 2010) – cited by Plaintiffs -- where the court had original jurisdiction over the underlying claim, which was bought under the Fair Labor Standards Act. *See id.,* 2010 WL 1372705, at \*1. The court rejected plaintiffs' argument that the court lacked jurisdiction over defendant's motion to enforce the settlement, explaining that the court "has subject-matter jurisdiction not to enforce the agreement itself, per se, but to enforce the court's order." *Id.,* 2010 WL 1372705, at \*4.

Here, in stark contrast to both these cases, this Court does not have subject matter jurisdiction over the underlying claims to resolve disputes concerning IESP cases, and Plaintiffs do not argue otherwise. To accept Plaintiffs' argument, then, would, violate the maxim "graven in stone" against the parties conferring subject matter jurisdiction on a federal court.

D.      Finally, Plaintiffs' "course of conduct" argument also fails. Where, as here a contract is clear and unambiguous, a party's course of conduct cannot change its meaning. *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (Ct. of App. 2013); *W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162,  (Ct. of App. 1990) (court should determine intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities). Here, the intent of the parties to include only cases relating to a free appropriate public education, and thus exclude IESP cases, is clear from the Stipulation, and supported by the pleadings, motion practice, discovery and settlement negotiations – which are replete with references to FAPE and to the IDEA but contain no mention of 3602-c or IESPs.

**B.**    **<u>Time frames governing implementation</u>**:

1. **<u>Date from which compliance is measured</u>**:

A.    <u>Defendants' Position</u>:

**Issue:** DOE seeks to revise the Stipulation so as to modify the date by which timely implementation of impartial hearing orders is measured,

Under the Stipulation, the date by which an Order or an obligation contained therein ("Action Item") is generally to be counted as "Timely Implemented" is measured from the issuance of the Order (I.1.ii). Defendants seek to change this so that the due date is calculated from the date the Order is received in the system of record (*e.g.*, DAITS, IHMS).

At the time the Stipulation was executed, impartial hearing officers were appointed by the DOE, which issued instructions to IHOs concerning the processing of their decisions once issued. Currently, however, impartial hearings are adjudicated under the auspices of the Office of Trials and Hearing ("OATH"), which appoints and supervises the impartial hearing officers and is responsible for processing decisions once issued.

Unfortunately, however, OATH does not always timely or accurately process orders into the Impartial Hearing System (IHS), which is the means by which orders that have been issued are transmitted to DOE.  In fact, DOE has identified a very substantial number of closing documents that are required for implementation (*e.g.*, decisions, transcripts, and other documentary evidence necessary to accurately understand the obligations in the Orders) and other instances where OATH has either uploaded the documents incorrectly or uploaded the incorrect documents.

In these situations, DOE's Implementation Unit may be unaware that an order has been issued, yet under the terms of the Stipulation, its time to implement has already begun running. While DOE has requested that OATH instruct its IHOs on this matter, OATH (which is not a party to this action) is an independent agency over which the DOE has no control.  Thus, this revision is necessary in fairness so that the DOE's obligation to timely implement begins only once it receives the order.

B.  <u>Plaintiffs' Position</u>

It is abundantly clear from the proposals contained in this Section I.B that Defendants' proposed amendments are not good-faith revisions intended to improve the rate at which students receive ordered services.  Rather, they are self-serving changes designed to facilitate Defendants' satisfaction of the Stipulation's benchmarks by expanding the time within which they can implement an Order or Action Item and still be found to have Timely Implemented such Order or Action Item.  These proposed amendments are fundamentally inconsistent with the Stipulation's stated purpose of ensuring that parents and students receive the services or payments specified in their impartial hearing Orders without unnecessary delay.  This class action was commenced, and the Stipulation was entered into by the parties and approved by this Court, to ensure the timely implementation of impartial hearing Orders.  Every proposed modification to the Stipulation must

be measured against that purpose. *See Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) ("A defendant who has obtained the benefits of a consent decree . . . cannot then be permitted to ignore such affirmative obligations as were imposed by the decree."); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) ("[A] party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree."). Accordingly, Plaintiffs oppose the DOE's proposal to calculate the due date from the date an Order is processed in the DOE's internal system of record rather than from the date the Order is issued.

Defendants argue that this revision is necessary because OATH does not always timely upload Orders and documents into the Impartial Hearing System (IHS), and that the DOE's Implementation Unit may be unaware that an Order has been issued even though the implementation clock has already begun to run. As an initial matter, shifting the start date to the DOE's internal processing date would transfer the consequences of those delays onto the parents and Class Members whom the Stipulation was designed to protect and benefit. Parents have no control over when OATH uploads an Order or when the DOE processes it, and they should not bear the burden of inefficiencies within any governmental entity.

More importantly, Defendants' stated challenge is one of their own making. OATH is responsible for administration of impartial hearings in New York City solely due to a Memorandum of Agreement entered into by the DOE and OATH on December 1, 2021.[8] To the extent that the DOE is claiming a breach of responsibilities by OATH, this is a problem that the DOE should resolve by seeking available remedies against OATH in connection with their agreement, and not by transferring the resulting harm to the Class Members.

Moreover, the DOE hearing representatives, who are paid DOE employees and consultants under the DOE's direct supervision, receive the Orders directly from the IHOs on the same day as the parents. Nothing prevents the DOE from establishing a process under which the DOE hearing representatives either upload the Orders directly to the Implementation Unit or promptly notify the Implementation Unit of the issuance of the Orders. Instead, the DOE has chosen not to rely on the Orders received by its own hearing representatives and has elected to wait until OATH separately uploads the Orders into the IHS. Defendants now seek to rewrite the Stipulation to accommodate this inefficient internal administrative process. Their proposal would permit the implementation deadline to be extended even though the DOE is in possession of every single Order since its issuance, solely because the Implementation Unit declines to act until it receives the Order through OATH's upload process. The consequence of the DOE's proposal is that parents who have received an Order would be left waiting without knowing when the implementation clock for their Order will actually begin to run, even though the Stipulation plainly provides that timely implementation requires implementation within 35 days of the Order. (*See* Stip. ¶ I.1.ii).

Defendants also erroneously claim that this change in the Stipulation should be granted because implementation requires "a very substantial number of closing documents . . . (*e.g.*, decisions, transcripts, and other documentary evidence necessary to accurately understand the obligations in the Orders)." That assertion is contrary to both the Stipulation and this Court's prior

---

[8] *See* Mem. of Agreement (Dec. 1, 2021), https://www.nysed.gov/sites/default/files/office-of-administrative-trials-and-hearings-memorandum-of-agreement.pdf.

order.  The DOE is required to implement the Order or Action Item solely based upon the Order itself.  *See* Mem. & Order, Dkt. No. 258 at 13 ("Orders that are not appealed . . . are 'final,' and DOE's only lawful course of action is to implement them); *id.* at 14 (school districts have no "authority to reassess unilaterally the facts underlying final, binding Orders").  Moreover, to the extent that the DOE now claims that it requires additional "documentary evidence," the DOE's hearing representatives already possess all of the documents admitted into evidence during the impartial hearing.  Yet, the DOE's current practice is ***not*** to rely on the evidence already admitted at the hearing, but instead to require parents to resubmit the very same evidence to the DOE's Implementation Unit before implementing the Action Item.

Simply put, the DOE has not provided any legitimate reason for this change that justifies departing from the Stipulation's negotiated terms.  If OATH's delays are as significant as the DOE represents, the appropriate remedy is for the DOE to create a process by which its hearing representatives upload hearing Orders upon receipt, or to work with OATH to improve its internal upload processes, not to rewrite the Stipulation so that the implementation clock does not start running until the DOE has received and processed the Order uploaded from OATH, thereby leading to further delays for parents and students to obtain their ordered services.

     C.  <u>Defendants' Reply</u>

As an initial matter, Plaintiffs' opposition to this proposal is surprising given DOE's understanding that Plaintiffs had agreed to this revision at the court conference held on January 27, 2026. Furthermore, Plaintiffs minimize the complex nature of the situation. Since the Stipulation was executed in 2007, there have been drastic changes in the development of science, medicine, and technology that impact clinical standards and the DOE's delivery of special education.  For example, there have been changes to the clinical standards for evaluations, standards of care, and what may be appropriate for students, all of which may impact timelines for implementation of hearing orders.

Contrary to Plaintiffs' assertion, the changes that DOE proposes in this letter are not for DOE's benefit but rather to be transparent and set realistic expectations for implementation of impartial hearing orders. The Implementation Unit exists in the larger structure of the DOE as well as the even larger context of City government. To be able to implement orders accurately and efficiently, the Implementation Unit relies on many dependencies and operates within the context of policies, legislative agendas and guidelines aimed at protecting the rights of children and families. It is only fair and reasonable to take into account the realities of these structures when determining how the timelines of implementation should operate.

With regard to OATH and its operations, the timely administration of special education impartial hearings is the subject of a separate lawsuit filed in the Eastern District of New York, *J.S.M. v. New York City Dep't of Education*, 20-CV-705 (EK). In that case, the Court approved the parties' settlement agreement by Order dated April 22, 2025. Pursuant to that settlement, the *J.S.M.* court "retains continuing and exclusive jurisdiction to adjudicate issues" relating to that settlement, including "[a]ny motion arising under or to enforce any part of this Stipulation." *Id.*, ECF No. 203-1, § XII.A.2. Accordingly, Plaintiffs' attempt to inject into *this* litigation any issues

pertaining to timely adjudications by OATH is improper, and should be left for Judge Komitee, if anyone, in *J.S.M.*

At the time the Stipulation here was executed, impartial hearings were directly administered by DOE. That has since changed. DOE raises these issues solely to explain the changed circumstances, and why its timeliness obligations are dependent, in part, on the operations of an independent agency. While DOE continues to collaboratively support OATH in improving efficiencies, DOE should not be prejudiced by events that were unforeseen and unforeseeable at the time the Stipulation was executed. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).

DAITS is a system designed to receive impartial hearing orders directly from IHS (the Impartial Hearing System) for the implementation of impartial hearing orders. Thus, DAITS is the system of record that provides a singular point for DOE to receive impartial hearing orders and the most accurate and efficient way for impartial hearing orders to be transferred to the Implementation Unit to begin the implementation process. Plaintiffs' suggestion that DOE representatives at impartial hearings upload orders or even forward them to the Implementation Unit is impractical given the tens of thousands of impartial hearing orders that are issued each school year. (Of note, this represents a substantial increase in the number of orders issued since the execution of the Stipulation in 2007.) Furthermore, transmitting orders to the Implementation Unit in such a decentralized manner would be chaotic and disorganized and would likely lead to confusion and further delays in implementing orders. Therefore, the best and fairest course of action, as the DOE set forth in its initial position, is to reflect the reality of the current situation by measuring DOE's time for implementation when the Implementation Unit receives an impartial hearing order in DAITS.

2. **Deadline for implementation**:

   A. Defendants' Position:

   **Issue**: Defendants seek to differentiate between payment orders/action items and service orders/action items with respect to the deadline for implementation. Under the Stipulation, the time within an Order or Action Item is to be implemented is 35 days from issuance. (I.1.ii).

   Defendants propose that this be modified as follows:

   a. For Service Action Items, the Item will be deemed "Timely Implemented" if the conditions set forth in § I.1.ii apply, or if it is implemented the later of (i) 35 business days from DOE's receipt of the Order in the System of Record, unless the Order specifies otherwise or (ii) 35 business days from the date DOE receives the required information to implement the Item (*i.e.*, parent's consent for evaluation, parent's response to scheduling request).

   b. For Payment Action Items requiring the DOE to reimburse a parent, the Item will be deemed "Timely Implemented" if it is implemented within 35 business days from the date DOE receives the parent's vendor's information. For prospective Payment Action

14

Items, (*i.e.*, where a payment is to be made directly to a provider in the future), the Item will be deemed "Timely Implemented" if it is implemented the later of (i) 35 business days from DOE's receipt of the Order in the System of Record, or (ii) 35 business days from the date DOE receives the parent's vendor's information.

The new standard should allow for:

- fairness, as DOE should not be held responsible for implementing Action Items when it has not yet received the necessary information.
- adherence to the Second Circuit's recent decision in *Mendez v. Banks*, 65 F.4th 56, 63 (2d Cir. 2023) which recognized "the practical realities of bureaucratic administration" and that the IDEA "does not require circumvention of ordinary payment procedures." *See id.* ("Any agency will need some amount of time to process and pay submitted invoices.")
- compliance with NYSED regulations regarding the provision of services, such as consent and mutually-agreed upon scheduling, such as for IEP meetings or evaluations (*see, e.g.*, 8 NYCRR §200.4 (b)).
- union and civil service contractual time off, which includes many days when school personnel are off, though the Implementation Unit is working (*e.g.*, winter and spring recess, various religious holidays).
- adequate time to process and obtain approval for W-9 and/or DRSS Forms for new vendors and parents who have not previously received reimbursements from the DOE, which may be delayed due to holidays and contractual days off.

B. <u>Plaintiffs' Position</u>:

Defendants' proposal would convert the original 35-calendar-day deadline agreed upon in the Stipulation to 35 business days, from the date on which the DOE processes OATH's upload of the Order in its system of record, which translates to approximately ***49 calendar days***, exclusive of any additional time to process the Order pursuant to Defendants' other requested amendment to the Stipulation discussed above. When combined with the DOE's proposed 30-calendar-day outreach window discussed below, the total implementation timeline for Payment Action Items could extend to approximately ***79 calendar days (or more than 2.5 months)*** – more than double the current period required under the Stipulation. This extension would significantly delay parents' access to the services and payments to which they are entitled for their children and is fundamentally inconsistent with the purpose of the Stipulation.

Defendants invoke the Second Circuit's recognition of "the practical realities of bureaucratic administration," but those realities have not changed since 2007, when the parties entered into the Stipulation. The DOE's obligation to comply with NYSED regulations regarding the provision of services existed in 2007. Holidays and contractual days off likewise existed in 2007. None of these constitute new or changed circumstances warranting modification of the parties' negotiated settlement. *See Rufo*, 502 U.S. at 383 (the "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"). "Any agency will need some amount of time to process and pay submitted invoice[s]," and in this instance, the DOE negotiated, agreed to, and bound itself to a 35-calendar-

15

day timeline under the Stipulation, which is an adequate amount of time.  Indeed, given the DOE's significant technological advancements over the past two decades, there is no reasonable explanation for the DOE's request for **more than double the time** to perform the same work it believed to be achievable in 2007, which would result in a delay of nearly a quarter of a year for students to get their ordered services.

Finally, counsel for Plaintiffs notes that they have heard from attorneys representing Class Members who are deeply concerned about this proposed change.  This proposal does not provide any benefit to students or parents; it serves only to extend the DOE's implementation timeline at the expense of the Class Members.  To the extent the DOE moves for, and the Court considers, any related amendments to the Stipulation, such a change would have a material adverse effect on the rights of the Class Members and would therefore require notice to the Class before approval.[9]

> C.   Defendants' Reply:

Plaintiffs misunderstand Defendants' proposal. The DOE requests that the Court amend the requirement for implementation of service action items to 35 calendar days from the Implementation Unit's receipt of impartial hearing orders in DAITS or 35 calendar days from the date of receipt of necessary information for implementation from parents for payment action items. These timelines would not be combined with any other timelines mentioned in order to calculate due dates for implementation.

Plaintiffs' insistence on adhering to provisions drafted in 2007 based on operational capabilities that existed at that time, ignores the realities that exist now in 2026.  From experience DOE knows for certain that the volume and complexity of special education needs and impartial hearing orders are vastly different now than in 2007.  Additionally, union contracts are negotiated every few years, and the terms of those contracts regarding holidays and paid days off are subject to change. Accordingly, Plaintiffs' statement that the holidays that were negotiated in 2007 are the same in present day is inaccurate (for example, Eid and Juneteenth did not exist as paid days off in 2007), and there may be additional changes in future years depending on future contract negotiations.

Notably, other than addressing paid days off, Plaintiffs do not address any of the other arguments Defendants presented in support of the proposed revisions.  The DOE believes that in the interests of creating realistic expectations with parents, they should be made aware of various factors that are outside the Implementation Unit's purview that have an impact on timelines for implementation.

---

[9] Courts have consistently held that where proposed modifications to a settlement are substantive and material, supplemental notice to class members is required.  *See, e.g.*, *Keepseagle v. Vilsack*, 102 F. Supp. 3d 306, 313 (D.D.C. 2015); *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2015 WL 13979694, at *3 (D. Vt. Sept. 1, 2015).

II.        **Methodology for Assessing Compliance**:

      1.  Defendants' Position

    **Issue:** Substantial attempts: The Stipulation describes the methodology by which the DOE's timely implementation of impartial hearing orders is to be calculated.  As there are instances when the DOE's compliance is dependent on actions to be taken by parents – such as the need for parents to submit necessary information including the name of the parent's selected service provider or evaluator, and their tax identification numbers - the methodology includes removing certain Orders/Actions Items from the calculation (defined as "Uncounted") where "DOE has made a substantial showing of attempts to reach the parent and attempts to obtain compliance with the parent's obligations under the Order." Stipulation, § I.1.ll.11.  This has been referred to by the parties as DOE's obligation to make "substantial attempts."  As this term is undefined, the Independent Auditor has imposed certain timeframes and actions on DOE for it to determine that DOE has met the conditions for the Order/Action Item to be considered "Uncounted" or else be deemed "Unimplemented." (Stipulation § I.1.mm).  Not only does the Independent Auditor lack the authority to impose such obligations, but some of its requirements are unreasonable.  For example, DOE seeks to modify:

      i.   the date from which its obligation to make substantial attempts is measured;
      ii.  the means by which its substantial attempts are to be made; and
      iii. the timeframe within which substantial attempts are to be made

    a.  For an Order to be deemed "Uncounted," Guidehouse requires the DOE to make three outreaches to parents on two different days by two different means (either letter, telephone or email) within 35 days of the date of the Order.   Defendants propose that an Order/Action Item should be deemed "Uncounted" if, within 30 calendar days of receiving an Order in the system of record (DAITS, IHMS), DOE makes two outreaches on two different days.  Such outreach may include letter, telephone or email, but also any outreach methods now available, or to become available, or such other means as advancements in technology permit.

    There is no reason why two outreaches on two different dates should not be sufficient.  This is particularly true given that an overwhelming number of cases are filed by attorneys or other sophisticated representatives, where email is the standard means of communication.  Also, Defendants propose that the means of communications allow for advances in technology and more modern approaches, especially those that are currently being developed in furtherance of the Special Master's recommendations incorporated in the July 2023 Order.  This includes emails/chats/calls by Nagarro and which are documented in the Nagarro Customer Service Platform.  Additionally, the SupportHub dashboard allows users to see the status of their cases in real-time on an ongoing basis, and also serves as an additional resource to inform parents and their representatives of actions that require their attention.

2.  <u>Plaintiffs' position</u>:

Plaintiffs oppose the DOE's proposal to reduce the outreach requirements.  The purpose of the outreach requirements is not merely procedural; it is to ensure that the parent is notified of what information the DOE believes it requires to implement the Order or Action Item, so that the student can obtain the ordered relief within the timeframe required by the Stipulation.  To that end, Plaintiffs continue to believe that the current outreach structure (*i.e.*, three outreaches made on two different days by at least two different means within 35 calendar days of the date of the Order[10]) is appropriate and should be maintained.  Importantly, this amendment to the Stipulation is relevant only when the DOE fails to timely implement the Order.  In other words, the DOE is requesting that the Court lower the standard for finding an Order timely implemented by permitting the DOE to make less effort to obtain the information necessary for implementation, rather than requiring it to actually make the ordered payment.

The Stipulation states that an Order or Action Item will be "Uncounted" in the audit if:

> The Order or Action Item cannot be Timely Implemented because the DOE has made a substantial showing of attempts to reach the parent and attempts to obtain compliance with the parent's obligations under the Order. Absent these steps, the Order or Action Item will be included in "Total Orders" or "Total Action Items," but not counted as Timely Implemented.

(Stip. ¶ I.1.ll.ii).

When the Independent Auditor began auditing the DOE's implementation of Orders and Action Items in 2008, the DOE asserted that Orders and Action Items should be deemed Timely Implemented if the DOE was waiting for documentation from a provider.  Plaintiffs objected to this interpretation.  Accordingly, with the consent of the DOE and Plaintiffs, the Independent Auditor proposed a series of briefings by which the parties would first attempt to negotiate an agreed-upon application, and if the parties could not agree, the parties would submit their respective positions to the Independent Auditor to decide the application of the Stipulation.[11]  Although the parties agreed on some issues, the parties were unable to resolve this issue, and the

---

[10] Plaintiffs' position regarding calculating time periods using the date of receiving an Order in the system of record is set forth in Section I.B above.

[11] This is consistent with the Stipulation, which provides that "the Independent Auditor shall have the sole discretion to determine whether to seek [] advice [on any issues that arise in the course of the Independent Auditor's work] and, if it does seek such advice, whether to follow any such advice it might receive."  (Stip. ¶ III.12(b)).  *See also* Stip. ¶ III.4 ("Whether a particular benchmark has been met will be determined solely by the Independent Auditor . . . ."); ¶ III.16(b) ("The Independent Auditor may reflect comments from counsel for the Parties in its final reports based on its judgment of the merits of any such comments.").

18

DOE notified the Independent Auditor.[12]   After reviewing the briefing from both parties, the Independent Auditor made the following determination:[13]

> [The Independent Auditor] is going to be looking for three outreach attempts made within 35 days of the date of the Order by at least two means to satisfy the obligation to make a substantial showing of attempts to reach the parent to obtain their compliance.  We will not be counting the letter sent with the Order as an outreach attempt to obtain payment related documentation.  Therefore, [the Independent Auditor]'s "Substantial Attempts" test [] can be met by any combination of three attempts consisting of the Second and/or Final Notification Letter, email(s) or phone call(s), i.e. 2 letters and 1 phone call, 1 letter and 2 e-mails, 2 e-mails and a phone call, etc.  Outreach attempts conducted via email to the parent or the parent's attorney must specifically address the Action Item under review.

Ex. 7, Dec. 23, 2008 Mem., attached to Reeves Aff., Dkt. No. 161-7 at 1–2.

The purpose of requiring three outreaches by two means is to ensure that parents know what information is needed so they can provide it to the DOE and avoid unnecessary delays in implementation.  Defendants' proposal suggests that if DOE sends two outreaches by the same means and receives no response, it should nevertheless be treated as having made a substantial showing of attempts to reach the parent.  Defendants' proposal fails to account for the possibility that the DOE may have used an ineffective means to contact the parent (for example, communications sent to an incorrect or outdated email address that the parent no longer uses, or an email that was automatically filed into junk or spam folders and therefore not read).  Thus, a third attempt using a different means of communication is necessary to ensure that the DOE has tried more than one means to reach the parent and would materially increase the likelihood that the parent will actually receive notice of what is needed for implementation.

Defendants propose that the means of outreach should "include letter, telephone or email, but also any outreach methods now available, or to become available, or such other means as advancements in technology permit."  Plaintiffs are certainly not opposed to using modernized means of communication, but are not aware of any technology beyond email, text, phone, and letter (all of which are already permissible means of outreach under the Independent Auditor's current analysis) that the DOE is proposing.  In practice, the DOE's proposal will amount to sending an email to only one member of the parent's team (either one parent or only one attorney)

---

[12] At the time the parties exchanged briefing, they also engaged in extensive correspondence memorializing their mutual agreement that, where the parties were unable to reach consensus regarding the application of the Stipulation, the Independent Auditor would determine how to assess implementation based on this circumstance involving payment Action Items after reviewing the briefing from the parties.  Plaintiffs can provide this correspondence to the Court at any hearing on these issues if the Court finds it helpful.

[13] Defendants raised their objection to this application before Judge Holwell in 2011 in connection with their opposition to Plaintiffs' first Motion for a Special Master, as one of the reasons that Defendants' rates of timely implementation were so low.  *See* Defs.' Opp'n Special Master Mot., Dkt. No. 160 at 8–11; *see also* Tr. of May 12, 2021 Hr'g at 130–31, 145 (filed under seal).  At that time, the DOE was found to have Timely Implemented 68.7% of Services Orders and 62.3% of Payment Orders between September 8, 2009 and January 31, 2010.  As reflected in the Guidehouse's January 2026 limited audit report, the DOE was found to have Timely Implemented *only 36.4% of Services Orders* and *12.8% of Payment Orders*.

that contains merely a link to SupportHub as the *sole* means of outreach. Email is not a particularly "modernized" means of communication in 2026, and it is well established that important communications can easily become lost among the volume of messages received in any given day. If the DOE wishes to employ automated outreach, SMS/text notifications could satisfy the "substantial attempts" requirements more effectively than email alone.

Defendants note that "an overwhelming number of cases are filed by attorneys or other sophisticated representatives, where email is the standard means of communication." While it is true that a majority of cases are initially filed by attorneys or representatives, the DOE's implementation system should not be designed on the assumption that parents will continue to have attorneys during the implementation phase. Even when parents are represented at the impartial hearing, they are not necessarily represented during the implementation phase due to multiple factors, including the additional cost, lack of attorney availability, and length of time some implementation takes. For those parents who do continue to be represented during implementation, Plaintiffs understand that email or another single method of communication may be sufficient and can agree to an exception to the "two different means" requirement where a parent's attorney has affirmatively indicated a preferred method of outreach. However, where the DOE has not received confirmation of preferred method of communication from the parent or their attorney, Plaintiffs maintain that outreach by two different means remains necessary. If email is the exclusive means of communication, three emails sent to the wrong address clearly do not constitute meaningful outreach as they are not advancing the goal of actually reaching the parent and obtaining the information needed for implementation.

Regardless of the method used, email or otherwise, the content of all outreach communications must satisfy the Independent Auditor's current criteria to ensure parent awareness of what is required for implementation. Specifically, the outreach must identify the Order and Action Item, and specify the information or documents that the DOE needs from the parent before the DOE can implement the Order or Action Item. The automated emails sent through SupportHub do not currently meet this standard; they merely provide a link without substantively informing the parent or attorney of what is required for implementation.[14]

There is an instructive parallel under the IDEA, which requires the local educational agency to provide the parent with a copy of the procedural safeguards notice annually. When the DOE sought clarification on whether posting the notice on its website and providing parents a link in correspondence satisfied this obligation, the U.S. Department of Education squarely rejected that approach. In a January 2019 letter, the U.S. Department of Education stated that posting the notice on a website "is clearly optional and for the convenience of the public and does not replace the distribution requirements in IDEA."[15] The same principle applies here – an automated email from the DOE containing a link to the SupportHub platform without identifying the specific documentation required for implementation does not constitute meaningful outreach, just as a

---

[14] Plaintiffs can provide examples of these SupportHub communications, including emails received by Class Members and their representatives, at any hearing the Court may hold on these issues.

[15] Laurie VanderPloeg, *OSEP Letter: Jan. 29, 2019 to Nathan*, U.S. DEP'T EDUC. (Jan. 29, 2019), https://sites.ed.gov/idea/idea-files/osep-letter-jan-29-2019-to-nathan/.

hyperlink to the procedural safeguards notice does not satisfy the IDEA's requirement to provide parents with substantive notice. The DOE cannot shift to parents and their attorneys the burden of navigating a portal to try to ascertain what the DOE requires.

3.  Defendants' Reply:

Contrary to Plaintiffs' assertions, Defendants' outreach efforts by email have been successful. The DOE conducts outreach using the email address on file at the time the due process complaint was filed and throughout the impartial hearing process. In general, in Defendants' experience, Parents' Representatives continue to represent parents throughout the life of the dispute, including the implementation process.

As of July 2026, 88% of parents or their representatives are utilizing the SupportHub Customer Service Platform to submit parent's chosen vendor information in response to the outreach emails generated by the system. The DOE's data shows that Parents' Representatives have inconsistent responses across action items, particularly for IESP cases, and certain Parents' Representatives are opening the links for some of their cases and taking action on them while failing to respond to others. Thus, Defendants know that these Parents' Representatives are actually using the system, demonstrating that DOE is, in fact, contacting the correct person and that email is an effective means of communication.

Plaintiffs' characterization that the SupportHub emails "merely provide a link without substantively informing the parent or attorney of what is required for implementation" is incorrect. Each outreach email generated by the SupportHub contains specific information about the particular action item including impartial hearing order case number, action item type, ticket number, student name, student identification number, and action items details. Further, the unique link contains pre-populated information for that specific action item and guides the parent or their representative to submit the documents needed for payment.

III.  **Independent Auditor review**:

A.  Defendants' Position:

**Issue:** Under paragraph 16 of the Stipulation, the Independent Auditor is required to generate reports for "all Quarterly Measurement Periods . . . beginning on the Effective Date [of the Stipulation] until the prospective relief provisions of this Stipulation have ceased to be in force." DOE seeks to have the Independent Auditor advance its review to assess Orders/Action Items which due dates fall within the most recent months and proceed from there. Furthermore, the DOE seeks to modernize the mechanism by which parties are notified of non-implementation of orders, and to have the Independent Auditor assess Defendants' performance based on a sample of Action Orders, rather than the thousands of Action Items that are issued each quarter.

On May 15, 2026, the Independent Auditor issued its Sixtieth Quarterly Report, covering Orders issued between April 9, 2024, through July 8, 2024, with Action Item final due dates between May 14, 2024, through August 12, 2024. It is thus apparent that the Independent Auditor is woefully behind and is only now reporting on Action Items with due dates as long as two years

21

ago.  Such out-of-date reporting simply is not meaningful and serves no useful purpose.  Indeed, it provides no insight into Defendants' current performance, nor can it provide the basis of any corrective action.

To make the reporting more meaningful – if not more cost-effective[16] -- the Independent Auditor should focus its attention and reporting on Orders/Actions Items that were due in recent months.  Although this would require the Independent Auditor to forego its review of certain Orders/Action Items, the benefits of more contemporaneous reporting outweigh any negative effects.

Defendants understand that Plaintiffs object to this proposal because it would deprive parents of the "skipped" Orders/Action Items of their receipt of "Non-Implementation Notices." These Non-Implementation Notices, however, have limited use.  First, they are required both where Defendants have completely failed to comply with an Order, and where DOE simply missed a deadline.  Given the significant lag in the Independent Auditor's reporting, DOE's alleged non-compliance has often been rectified by the time the Non-Implementation Notice is required to be issued.  Also, where lawsuits have been commenced, they are often resolved by then.  Second, although these Notices serve as prima facie evidence that an Order was not Timely Implemented, the DOE can defeat a parent's claim through the presentation of a broad range of evidence, including "the documents and information available to the Independent Auditor in connection with the preparation of" the Report giving rise to the Notice. Stipulation at § 20. Thus, the fact of actual non-implementation will rarely be in dispute by the time an action is commenced, making these Notices entirely meaningless and unnecessary.  For these reasons, perhaps, there are very few actions in which parents have alleged their receipt of a Non-Implementation Notices in support of their claims.

It is apparent that the significant lag in the Independent Auditor's reported has weakened, if not entirely defeated, the underlying purpose of these Notices.  Such purpose can be restored if the lag is eliminated.  Defendants' proposal serves this interest.

More importantly, it is apparent that these Notices have not had the results contemplated by the parties.  Rather than continuing this ineffectual practice, the DOE seeks to remove this requirement from the Stipulation. The DOE has two systems that provide parents, parents' representatives (attorneys/advocates), and vendors with current implementation information. This information is being distributed by email and is available on the dashboards in the systems. The SupportHub Customer Service Platform, which is directed to parents and/or their representatives, provides them with proactive information about unpacked orders and newly-created payment action items. The Polaris Invoicing System, which is directed to vendors, is an online billing system that allows vendors to submit and track invoices once the authorization is complete. Through these modern methods, parents and vendors have real-time information about the status of their cases, making the Non-Implementation Notices entirely superfluous.

Additionally, the Sixtieth Quarterly Report reported on 4,513 Orders and 9,848 Action Items. Such review is obviously time-consuming and expensive.  To limit the scope of its work,

---

[16] In 2025, Defendants paid the Independent Auditor a total of $6.6 million for the year, and have paid over $2.8 million in 2026 to date.

22

improve more timely reporting and reduce costs, the Independent Auditor also should consider a sample of Orders/Action Items, rather than each one.

B. <u>Plaintiffs' Position</u>

This is not the first time Defendants have tried to justify their refusal to comply with the Stipulation's requirement to issue Non-Implementation Notices before this Court. In 2022, when Defendants advanced substantially the same arguments to contend that they should not be required to comply with this provision of the Stipulation, Your Honor ordered the DOE to issue the Non-Implementation Notices within a month of the Court's hearing on the issue. *See* Ltr. dated Sept. 29, 2022, Dkt. No. 295; Mem. Endorsement on Ltr. re Non-Implementation Notices, Dkt. No. 299. Despite that order, the DOE has continued to delay issuing the Non-Implementation Notices and now reasserts the same arguments.

Under the Stipulation, "[w]ithin 14 calendar days after each Quarterly Report is issued in final form by the Independent Auditor, the DOE shall send a Non-Implementation Notice to each parent and child with an Unimplemented Order during that quarter." (Stip. ¶ III.19). Such Non-Implementation Notices serve as "prima facie evidence that [the] Order at issue was not Timely Implemented" in any litigation to enforce an Unimplemented Order. (Stip. ¶ III.20). The issuance of Non-Implementation Notices is therefore critical to protecting Class Members' rights and their ability to enforce Unimplemented Orders in court.

Defendants contend that Non-Implementation Notices "have limited use" due to the "significant lag in the Independent Auditor's report[s]." The Stipulation provides timing for the issuance of the Independent Auditor's quarterly reports. Specifically, the Independent Auditor must provide a draft report no later than 45 days following the end of each quarter, followed by a 15-day period for the parties to submit comments and an additional 15 days to finalize the report. (*See* Stip. ¶¶ III.16(f)-(g)). Thus, under the timeline Defendants themselves negotiated and agreed to in the Stipulation, the Non-Implementation Notices were intended to be issued 90 days after the end of each quarter.

The DOE itself has contributed to delays in issuing Non-Implementation Notices, even where there is no lag in the Independent Auditor's reporting. Following the finalization of Guidehouse's March 2025 limited audit report – which was completed in a timely fashion after granting the DOE's request for an extension to submit comments and therefore not subject to any delay of the kind the DOE now complains of – the DOE did not issue Non-Implementation Notices for the March 2025 period until approximately two months after the report was finalized, far exceeding the 14-calendar-day deadline required under the Stipulation. Similarly, although the limited January 2026 report was finalized on June 12, 2026, the DOE has not issued the Non-Implementation Notices for the January 2026 period as of July 14, 2026. The DOE has repeated this pattern of delay for the issuance of Non-Implementation Notices following each quarterly report, despite multiple requests from Plaintiffs' counsel, and it has not even attempted to furnish an explanation for these violations of the Stipulation.

The purpose of the Non-Implementation Notices is to provide a form of relief to Class Members whose Orders were not Timely Implemented. Plaintiffs oppose the DOE's proposal to

skip any quarterly period or to adopt a sampling methodology, as either approach would result in Class Members with Unimplemented Orders during those periods being deprived of the Non-Implementation Notices to which they are entitled, thereby denying them the prima facie evidence that the Stipulation expressly provides to facilitate enforcement of their Orders. If the DOE is willing to consider alternative forms of relief for Class Members when their Orders or Action Items are not Timely Implemented – such as additional services or the payment of interest on amounts owed – Plaintiffs are willing to consider such proposals. Plaintiffs are likewise willing to consider alternative approaches to the review of specific quarterly periods that would not prejudice Class Members' receipt of Non-Implementation Notices (*e.g.*, issuing Non-Implementation Notices for all Action Items covered by any unaudited quarterly periods). However, Defendants' request to remove a negotiated obligation in the Stipulation that was intended to provide Class Members with relief, without providing any comparable alternative, would materially prejudice Class Members' rights under the Stipulation and should be rejected.

Lastly, Defendants suggest that the costs of the Independent Auditor justify reducing the scope of the audit. But the fees paid to the Independent Auditor are not the result of a lag in reporting; they are the most direct consequence of the DOE's failure to timely implement Orders and meet the Stipulation's benchmarks. The volume of the Independent Auditor's work is driven by the DOE's continuing non-compliance. Rather than focusing on improving its implementation rates, which would fundamentally reduce the number of future quarterly periods requiring audit, the DOE is asking this Court for shortcuts: amendments that would make the DOE's compliance with the Stipulation more permissive to its own benefit. This is not a new request. These are the same arguments the DOE has repeated since the failure of the DOE to meet its first benchmark report in 2010. At the end of the day, the appropriate response to the cost of the audit is not to eliminate the audit, but to eliminate the non-compliance that makes such audit necessary.

C.  Defendants' Reply

Contrary to Plaintiffs' argument, it is not any delay by DOE that has made the Non-Implementation Notices ineffectual; it is the Independent Auditor's failure to issue timely reports – a conclusion that Plaintiffs do not dispute. Until the lag in the Independent Auditor's reporting is eliminated, the Non-Implementation Notices do not serve the purpose for which they were intended (and do not seem to serve any purpose at all). Thus, skipping a reporting cycle or two has no actual consequences for class members, while doing so should eliminate the lag going forward (assuming the Independent Auditor can stay timely), and restore the benefit of these Notices.

Plaintiffs point to the limited reviews from March 2025 and January 2026 as examples of how Guidehouse's audit process may yield timely non-implementation notices to parents or their representatives. Although these limited reviews were more current than two-years ago, Guidehouse still required a significant amount of time to review one-month's worth of orders. The draft report for the March 2025 review was not provided to the DOE until three months later in June 2025; similarly the draft report of the January 2026 review (commenced in February 2026) was not provided to the DOE until two months later in April 2026. Once the January 2026 limited review was finalized on June 12, 2026, the DOE commenced the process of sending thousands of non-implementation notices. As of July 29, 2026, all non-implementation notices for the Sixtieth

Quarterly Report and the January 2026 Limited Review have been sent to parents and their representatives.

Additionally, Plaintiffs do not dispute that information readily available in the SupportHub Customer Service Platform and Polaris Invoicing System – neither of which were in existence when the Stipulation was signed in 2007 – provides parents and vendors real-time information about the status of their cases, and makes these Non-Implementation Notices entirely superfluous.

Plaintiffs cavalierly dismiss the significant costs to the public fisc involved in assessing every single order (money that can be better spent on providing special education services). Of note, these costs are not attributable to Defendants' non-compliance but rather with the unforeseen substantial increase in the number of impartial hearing orders that have been issued since the Stipulation was executed, and Plaintiffs' insistence that DOE's compliance be assessed with respect to each and every such order. Plaintiffs, however, fail to acknowledge that sampling is a common  and cost-effective means of monitoring a defendant's performance and should be considered.

Thank you for your consideration of the foregoing.

Respectfully submitted,


_/s/ Jeffrey S. Dantowitz_
Jeffrey S. Dantowitz
Assistant Corporation Counsel
Attorney for Defendants


_/s/ Donghao (Helen) Yan_
**MORRISON & FOERSTER LLP**
Michael B. Miller
Jessica Kaufman
Donghao (Helen) Yan
250 West 55th Street
New York, NY 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Email:  MBMiller@mofo.com
JKaufman@mofo.com
HYan@mofo.com

_Co-Counsel for Plaintiffs_

-and-

**ADVOCATES FOR CHILDREN OF NEW YORK**
Rebecca Shore
151 West 30th Street, 5th Floor
New York, NY 10001
Telephone:  (212) 822-9574
Email:  rshore@advocatesforchildren.org

*Co-Counsel for Plaintiffs*

cc:    All counsel of record
       Special Master Irwin
        (via ECF)